UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

-----------------------------------------------------

CHILDREN'S HEALTH DEFENSE,
TRIALSITE, INC., CREATIVE
DESTRUCTION MEDIA, LLC,
ERIN ELIZABETH FINN, JIM HOFT,
DR. BEN TAPPER, BEN SWANN,
DR. JOSEPH MERCOLA,  TY
BOLLINGER, CHARLENE
BOLLINGER & JEFF CROUERE,

              *Plaintiffs*,

        v.

WP COMPANY, LLC D/B/A THE
WASHINGTON POST, THE BRITISH
BROADCASTING CORP., THE
ASSOCIATED PRESS & REUTERS
NEWS & MEDIA, INC.,

              *Defendants*.

-----------------------------------------------------

CIVIL ACTION NO. _____




VERIFIED COMPLAINT



JURY TRIAL DEMANDED



LOCAL RULE 3.1 RELATED
CASE STATEMENT ATTACHED

G. SHELLY MATURIN, II
(La. Bar 26994)
Maturin Law
322 Heymann Blvd., Suite 1
Lafayette, LA 70503
Telephone: (337) 362-3514
E-mail: shelly@maturinlaw.com
Attorney for Plaintiffs

JOHN W. HOWARD (CA Bar 80200)
SCOTT J. STREET (CA Bar 258962)
(pro hac vice forthcoming)
JW HOWARD/ATTORNEYS, LTD.
600 West Broadway, Ste. 1400
San Diego, CA 92101
Telephone: (213) 205-2800
johnh@jwhowardattorneys.com
sstreet@jwhowardattorneys.com
Attorneys for Plaintiffs

JED RUBENFELD
(NY Bar 2214104)
(pro hac vice forthcoming)
1031 Forest Rd.
New Haven CT 06515
Tel: (203) 432-7631
jed.rubenfeld@yale.edu
Attorney for Children's Health Defense

ROBERT F. KENNEDY, JR.
(NY Bar 1999994)
(pro hac vice forthcoming)
48 Dewitt Mills Rd.
Hurley, NY 12433
Tel: (845) 481-2622
Attorney for Children's Health Defense

# TABLE OF CONTENTS

Page #

COMPLAINT ...................................................................................................1

NATURE OF THE ACTION .........................................................................1

PLAINTIFFS ..................................................................................................8

DEFENDANTS ...............................................................................................19

JURISDICTION AND VENUE .....................................................................20

INTERSTATE COMMERCE ........................................................................20

JOINT AND SEVERAL LIABILITY ...........................................................20

RELEVANT MARKETS ...............................................................................21

    *The Relevant Market* ...............................................................................22

    *Meaning of Terms "News," "COVID News," and "Political News"* ...................22

    *Distinctiveness of the Online News Market* .................................................24

    *Consequences of the Shift to Digital News* .................................................27

    *The Two Kinds of Members of the TNI* ......................................................28

    *The Legacy News Members of the TNI Compete with One Another* ...................29

    *and with Plaintiffs in the US Market for Online COVID and Political News* .....................29

    *The TNI's Big Tech Members Compete with One Another* ................................32

    *and with the TNI's Legacy News Members* ................................................32

    *The TNI's Big Tech Members Are "Platform Gatekeepers" in the Online News Market, with the Power To Cripple or Destroy Publishers by Excluding Them from Their Platforms* ...............................................................................................34

    *In Sum, All Elements of a Classic Per Se Unlawful Group Boycott Are Present Here* ........40

LEGACY NEWS ORGANIZATIONS FORM THE TNI TO EXCLUDE FROM THE WORLD'S DOMINANT INTERNET PLATFORMS RIVAL NEWS PUBLISHERS WHOSE REPORTING COMPETES AND CONFLICTS WITH THEIRS .......................41

    *The TNI's "Closed Door" Origins, Its Avowed Market-Exclusion Purpose, Its Admissions of Collusion, and Its Commercial Motivation* ...................................41

    *The TNI's Core Purpose Was and Is To Enlist Big Tech Companies into a Censorship Partnership with Legacy News Organizations to Damage and Suppress Rival Online News Publishers Threatening Their Reputations and Revenues* ...........................46

INFORMATION IMPROPERLY DEEMED "MISINFORMATION" BY THE TNI AND THE TNI'S BOYCOTT OF NEWS PUBLISHERS REPORTING SUCH INFORMATION ..............................................................................................49

TNI MEMBERS CONFER AND COORDINATE IN MAKING THEIR CENSORSHIP DECISIONS ...................................................................................................56

**TNI MEMBERS' PARALLEL TREATMENT OF PROHIBITED CLAIMS FURTHER EVIDENCES CONCERTED ACTION** ..............................................................57

**PLAINTIFFS HAVE BEEN DENIED ACCESS TO CRITICAL FACILITIES AND MARKETS AS A RESULT OF PUBLISHING PROHIBITED CLAIMS** .........................63

**COUNT ONE: PER SE VIOLATION OF THE SHERMAN ACT** ...................83

  *Allegations of Agreement* ..................................................................84

  *Direct Evidence of Agreement* ...........................................................85

  *Circumstantial Evidence of Agreement* ...............................................87

  *The Agreement Was Horizontal and Targeted Competitor Firms* ..............89

  *Further Elements of a Per Se Group Boycott Claim* ............................90

  *Economic Motivation* ......................................................................92

**COUNT TWO: RULE OF REASON VIOLATION OF THE SHERMAN ACT**................95

**JURY TRIAL DEMANDED** ..........................................................97

**PRAYER FOR RELIEF** ..............................................................97

**VERIFICATION**.........................................................................99

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**MONROE DIVISION**

---------------------------------------------------------

**CHILDREN'S HEALTH DEFENSE,**
**TRIALSITE, INC., CREATIVE**
**DESTRUCTION MEDIA, LLC,**
**ERIN ELIZABETH FINN,  JIM HOFT,**          **CIVIL ACTION NO. _____**
**DR. BEN TAPPER, BEN SWANN,**
**DR. JOSEPH MERCOLA,  TY**
**BOLLINGER, CHARLENE**
**BOLLINGER & JEFF CROUERE,**

          *Plaintiffs*,          <u>**VERIFIED COMPLAINT**</u>

      v.

**WP COMPANY, LLC D/B/A THE**
**WASHINGTON POST, THE BRITISH**
**BROADCASTING CORP., THE**          **JURY TRIAL DEMANDED**
**ASSOCIATED PRESS & REUTERS**
**NEWS & MEDIA, INC.,**

          *Defendants*.
---------------------------------------------------------


<u>**COMPLAINT**</u>

By and for their complaint herein, Plaintiffs allege as follows, on personal knowledge as to those

allegations concerning themselves, and on information and belief as to all others:


<u>**NATURE OF THE ACTION**</u>

1.     This is an antitrust action.

2.     It is also an action to defend the freedom of speech and of the press.

3.     In 2019 or 2020, some of the world's largest news publishers, including Defendants the

Washington Post, the British Broadcasting Corporation ("BBC"), Reuters, and the Associated

1

Press ("AP"), as well as behemoth Internet companies like Facebook, Google, Microsoft, and Twitter, entered into a self-described "industry partnership."

4.     They named their partnership the "Trusted News Initiative."

5.     By their own admission, members of the "Trusted News Initiative" ("TNI") have agreed to work together, and have in fact worked together, to exclude from the world's dominant Internet platforms rival news publishers who engage in reporting that challenges and competes with TNI members' reporting on certain issues relating to COVID-19 and U.S. politics.

6.     Federal antitrust law has its own name for this kind of "industry partnership": it's called a "group boycott" and is a *per se* violation of the Sherman Act.

7.     A classic *per se* unlawful group boycott involves "a concerted attempt by a group of competitors" to "disadvantage [other] competitors by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle" or by "cut[ting] off access to a supply, facility, or market necessary to enable the boycotted firm to compete." *Northwest Wholesale Stationers, Inc. v. Pacific Stationery Printing Co.*, 472 U.S. 284, 294 (1985), *quoted in Tunica Web Advertising v. Tunica Casino*, 496 F.3d 403, 413 (5th Cir. 2007).

8.     The world's dominant Internet platforms are facilities essential to the ability of small news publishers to compete and even to survive in the online news market.  Indeed, for all practical purposes, to be denied access to those platforms is to be denied access to the market itself.

9.     Thus the TNI is a classic group boycott: "a concerted attempt by a group of competitors" to "disadvantage [other] competitors" by "cut[ting] off access" to a "facility or market necessary to enable the boycotted firm[s] to compete." *Northwest Wholesale Stationers*, 472 U.S. at 294.

10.    Plaintiffs are among the many victims of the TNI's agreement and its group boycott.

11.    Plaintiffs are online news publishers who, as a result of the TNI's group boycott, have lost millions of dollars in revenue as a result of being censored, de-monetized, demoted, throttled, shadow-banned, and/or excluded entirely from platforms like Facebook, YouTube, Twitter, Instagram, and LinkedIn.[1]

12.    While the "Trusted News Initiative" publicly purports to be a self-appointed "truth police" extirpating online "misinformation," in fact it has suppressed wholly accurate and legitimate reporting in furtherance of the economic self-interest of its members.

13.    For example, TNI members have deemed the following to be "misinformation" that could not be published on the world's dominant Internet platforms: (A) reporting that COVID may have originated in a laboratory in Wuhan, China; (B) reporting that the COVID vaccines do not prevent infection; (C) reporting that vaccinated persons can transmit COVID to others; and (D) reporting that compromising emails and videos were found on a laptop belonging to Hunter Biden.

14.    All of the above was and is either true or, at a minimum, well within the ambit of legitimate reporting.

15.    The TNI did not only prevent Internet users from making these claims; it shut down online *news publishers who simply reported that such claims were being made by potentially credible sources*, such as scientists and physicians.

---

[1]    Facebook (now called "Meta") owns and operates several major social media platforms, including the social-networking sites Facebook and Instagram. Google owns and operates not only its famous search engine, but also the video-hosting platform YouTube.  Microsoft owns and operates the Bing search engine as well the social networking platform LinkedIn.  The terms "throttled" and "shadow-banned" refer to surreptitious actions taken by online platforms to reduce the distribution and visibility of users' content, without informing users of such adverse effects. *See, e.g.*, Nicholas, G., *Shedding Light on Shadowbanning*, Center for Democracy & Technology, https://cdt.org/insights/shedding-light-on-shadowbanning.

16.     Thus TNI members not only suppressed competition in the online news market but deprived the public of important information on matters of the highest public concern.

17.     And they did so out of economic self-interest.

18.     The TNI was spearheaded by legacy news organizations, like the Defendants, fearful of what they themselves described as an "existential threat" to their economic survival: the explosion online of thousands of new, rival sources of news threatening to take audience share away from traditional news organizations and to undermine consumers' trust in those organizations.

19.     This economic motivation was expressly admitted in 2022 by the founder of the TNI, the BBC:

> **Of course the members of the Trusted News Initiative are . . . rivals**. . . .  But in a crisis situation like this, absolutely, **organizations have to focus on the things they have in common, rather than . . . their commercial . . . rivalries. . . . [I]t's important that trusted news providers club together**. Because actually **the real rivalry now is not between for example the BBC and CNN globally, it's actually between all trusted news providers and a tidal wave of unchecked [reporting] that's being piped out mainly through digital platforms** . . . .  That's the **real competition** now in the digital media world. **Of course organizations will always compete against one another for audiences. But the existential threat I think is that overall breakdown in trust, so that trusted news organizations lose in the long term if audiences just abandon the idea of a relationship of trust with news organizations.** So actually **we've got a lot more to hold us together than we have to work in competition with one another**.

BBC & THE TRUSTED NEWS INITIATIVE, *Jamie Angus, Senior News Controller for BBC News, explains strategy to beat disinformation*, Mar. 30, 2022, at 21:50-23:26, https://www.bbc.co.uk/beyondfakenews/trusted-news-initiative/role-of-the-news-leader (emphasis added).

20.     This is a direct admission of: (A) the economic self-interest behind the TNI's group boycott; and (B) the anti-competitive purpose and effect of that boycott.

21.     In other words, instead of "work[ing] in competition with one another," TNI members agreed to "club together" to suppress the "real competition in the digital media world"—the "tidal

wave" of rival, "unchecked" online news publishers who undermine "trust" in legacy news publishers, take "audiences" away from them, and thereby pose an "existential threat" to them.

22.     The TNI is thus a paradigmatic antitrust violation: a horizontal agreement among competitor firms to cut off from the market upstart rivals threatening their business model.

23.     Every news company has the right to decide for itself what to publish, but they have no right to combine together to restrict what their rivals can publish.

24.     More than three-quarters of a century ago, the Supreme Court held that when news organizations combine to restrain what other, rival news suppliers can publish, antitrust law and the First Amendment speak with one voice in condemning such combinations. *Associated Press v. United States*, 326 U.S. 1, 20 (1945).

25.     *Associated Press* involved a news industry partnership (namely the Associated Press, the same entity that is one of the Defendants in this action) that prevented non-members from publishing certain stories.  When the excluded organizations sued under the Sherman Act, the defendants claimed their conduct was protected by the First Amendment.  The Supreme Court unequivocally rejected that claim.

26.     "That Amendment," said the Court, "rests on the assumption that ***the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public***, that a free press is a condition of a free society. ***Surely a command that the government itself shall not impede the free flow of ideas does not afford nongovernmental combinations a refuge if they impose restraints upon that constitutionally guaranteed freedom***. Freedom to publish means freedom for all, and not for some. ***Freedom to publish is guaranteed by the Constitution, but freedom to combine to keep others from publishing is not. Freedom of the press from governmental interference under the First Amendment does not sanction***

5

*repression of that freedom by private interests.*" *Id.* (emphasis added).

27.     The TNI was expressly formed to "impede the free flow of ideas," to "keep others from publishing," and to stifle "the widest possible dissemination of information from diverse and antagonistic sources." *Id*.

28.     Thus just as in *Associated Press*, Defendants have perpetrated a group boycott, both a Sherman Act violation and a "repression . . . by private interests" of the freedoms of speech and press.

29.     Indeed, as two of the giants in American jurisprudence—Justice Felix Frankfurter and Judge Learned Hand—put it in their *Associated Press* opinions, "restraints of trade" in the news industry "call[] into play considerations very different" from restraints of trade elsewhere; they are to be measured not solely in terms of dollars and cents, but also by reference to the First Amendment itself, to the injury imposed on the public, and to the fundamental role played by an untrammeled press in a free society.

30.     "[T]he freedom of enterprise protected by the Sherman Law necessarily has different aspects in relation to the press than in the case of ordinary commercial pursuits." *Associated Press*, 326 U.S. at 28 (Frankfurter, J., concurring) (emphasis added).

31.     "*[T]he business of the press*, and therefore the business of the Associated Press, *is the promotion of truth regarding public matters by furnishing the basis for an understanding of them. Truth and understanding are not wares like peanuts or potatoes. And so, the incidence of restraints upon the promotion of truth through denial of access to the basis for understanding calls into play considerations very different from comparable restraints in a cooperative enterprise having merely a commercial aspect*." *Id*. at 27-28 (emphasis added).

32.     "I find myself entirely in agreement with Judge Learned Hand that 'neither exclusively, nor even primarily, are the interests of the newspaper industry conclusive; for *that industry serves one of the most vital of all general interests: the dissemination of news from as many different sources, and with as many different facets and colors as is possible*. That interest is closely akin to, if indeed it is not the same as, the interest protected by the First Amendment; it presupposes that *right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. To many this is, and always will be, folly; but we have staked upon it our all*." *Id*. at 28 (quoting *United States v. Associated Press*, 52 F. Supp. 362, 372 (S.D.N.Y. 1943) (Hand, J.)) (emphasis added).

33.     "*A public interest so essential to the vitality of our democratic government may be defeated by private restraints no less than by public censorship*," and such private restraints "*are unreasonable because they offend the basic functions which a constitutionally guaranteed free press serves in our nation*." *Id*. at 28-29 (Frankfurter, J., concurring) (emphasis added).

34.     Like the Associated Press in 1945, the "Trusted News Initiative" rejects the core American belief on which "we have staked . . . our all"—that "right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection." *Id*.

35.     Thus the TNI's restrictions on what other news publishers can report online are doubly unreasonable restraints of trade.

36.     They are unreasonable not only because they collusively reduce output, increase consumer costs, lower product quality, generate inefficiency, and suppress market competition as economists understand that term.

37.     They are also unreasonable because they suppress competition in the marketplace of ideas.

38.     They "are unreasonable because they offend the basic functions which a constitutionally guaranteed free press serves in our nation."  *Id*.

## **PLAINTIFFS**

39.     PLAINTIFF CHILDREN'S HEALTH DEFENSE ("CHD") is a nonprofit organization incorporated in California and headquartered in New Jersey dedicated to informing the public of, and fighting against, various threats to children's health.  To that end, CHD publishes, *inter alia*, a weekly electronic newsletter, "The Defender," and a "weekly wrap up" with research articles and opinion pieces available at https://childrenshealthdefense.org/category/news/childrens-health, and prior to being censored and de-platformed by TNI members, CHD routinely cross-posted this content to social media platforms owned or controlled by TNI members.

40.     CHD conducts an internal editorial process prior to publication to confirm the accuracy of all its published news content.  CHD's online publications contain hyperlinks to peer-reviewed, published journals for assertions of fact, and label contributors' editorial viewpoints as opinion. Indeed, as the preeminent independent online publisher and advocacy group for children's health and policy reform, CHD's *raison d'etre* is to post only the most reliable, accurate, and up-to-date content for its online viewers.

41.     CHD's primary sources of revenue are private donations and membership dues through its website. Prior to the actions complained of infra, CHD attracted a large proportion of traffic to its website (with attendant donations or dues) from viewers of CHD content that CHD cross-posted to YouTube, Twitter, Facebook and Instagram. Such content garnered 325,000 followers on Instagram alone, and close to 50,000 subscribers, and millions of views of CHD content, on YouTube alone.

8

42.     Prior to being censored, shadow-banned, and/or de-platformed from Google/YouTube, Twitter, and Facebook/Instagram, CHD had a combined following of close to 680,000 individuals across those platforms, and derived substantial revenue therefrom.

43.     PLAINTIFF TRIALSITE, INC., is a medical news company incorporated and headquartered in Utah and the publisher of the news site TrialSite News (hereafter "TSN"). TSN publishes news, analysis and commentary with a special focus on clinical trials in the life sciences.

44.     TSN was launched in mid-2018 to drive greater interest and awareness in clinical research, and to develop trust and facilitate the engagement of researchers and the public. TSN launched its subscription-based news model in August, 2021.

45.     TSN's mission is to "drive awareness, introduce transparency, and facilitate engagement among people all over the world, from pharmaceutical professionals and academic researchers to regulators and healthcare professionals along with a wide array of the consuming public." The company values "transparency, objectivity, and the scientific method in pursuit of the truth wherever it may lead us."

46.     TSN's readership includes physicians, nurses, pharmaceutical and biotech executives and investors, governmental health organizations, and others interested in cutting-edge medical research.

47.     TSN's contributors include leading physicians and scientists from around the globe.

48.     TSN has been regularly linked to by the National Institutes of Health, for example as a source cited by the NIH on the government website "Keeping Doctors Up to Date on COVID-19 Treatments."

49.     Before being censored, shadow-banned and de-platformed, TSN had a significant presence on various social media platforms, including YouTube and Facebook.  TSN's YouTube presence was growing rapidly, which should have generated significant growth in revenue.

50.     Through YouTube and Facebook, TrialSite News published news in video and written form and attracted viewers to TSN.

51.     Beginning in 2020, TrialSite News became an important publisher of news related to COVID-19, with a special emphasis on news concerning potential treatments for the disease.

52.     By February 2021, TrialSite News's YouTube channel was reaching 33,000 subscribers, with approximately $18,000 per month in ad revenue.

53.     PLAINTIFF CREATIVE DESTRUCTION MEDIA, LLC ("CD Media") is a news company incorporated and headquartered in Wyoming.

54.     CD Media is 95% owned by Mr. L. Todd Wood, a Florida resident, writer and online publisher with expertise in military affairs, engineering, finance, and politics.

55.     After graduating from the United States Air Force Academy in Colorado Springs, Colorado in 1986 with a degree in aeronautical engineering, Mr. Wood entered flight school. He flew search and rescue helicopters in Alaska and was deployed throughout Asia. During this time, Mr. Wood earned a master's degree in engineering management from the University of Alaska.

56.     In 1990, Mr. Wood volunteered for Special Operations. After being assigned to the 20th Special Operations Squadron at Hurlburt Field, Fla., in 1991, he was deployed to Kuwait, flying MH-53J Pave Low combat helicopters.  For three years, Mr. Wood was active in classified missions, traveling throughout the world supporting counter-terrorism missions for SEAL Team Six and Delta Force.

57.     CD Media operates websites in several languages publishing reporting, analysis, and commentary on current events, with a focus on politics and cultural affairs, around the globe. For example, CD Media has investigated and posted articles about corruption in American politics, including articles about election fraud and corruption involving the Biden family.

58.     By 2019, CD Media had a significant presence on various social media platforms, including Twitter, Facebook, and Microsoft's LinkedIn. Additionally, CD Media used Google's advertising services, AdSense and AdManager, to generate revenue on CD Media websites.[2]

59.     Through Twitter, Facebook, and LinkedIn, CD Media regularly posted communications about politics, current events, and cultural affairs. These social media posts garnered a significant number of views and drove traffic to CD Media websites.

60.     Prior to being censored, shadow-banned, and de-platformed, Mr. Wood's Twitter accounts, which included Mr. Wood's personal account in addition to CD Media-related accounts, had a combined following of close to 200,000, and his Facebook accounts had tens of thousands of followers, and Mr. Wood derived substantial sponsorship and subscription revenues therefrom.

61.     PLAINTIFF ERIN ELIZABETH FINN, a natural person residing in Florida, is an online journalist and publisher of HealthNutNews, a news website started in 2014 with a focus on natural health and healthy living. In addition to publishing news on this website, Ms. Finn also sells health-related products.

62.     By 2019, Ms. Finn had a significant presence on various social media platforms owned or controlled by TNI members, including YouTube, Instagram, and Facebook.

---

[2]     When Google (YouTube's owner) approves a video under its "content guidelines," the video publisher earns 68% of the AdSense revenue (Google keeps the other 32%). On average, a YouTube Channel publisher can receive $18 per 1,000 ad views.

63.    Beginning in 2020, Ms. Finn became an important source of news for her followers on the subject of COVID-19.

64.    Prior to being censored, shadow-banned, and de-platformed, Ms. Finn reached large audiences on YouTube, Instagram, Twitter, and Facebook, where she regularly posted news items about a variety of COVID-related topics, driving traffic to her news website, which in turn boosted sales. Additionally, the social media postings generated ad revenues through sponsorships and monetization of videos.

65.    Ms. Finn had over 90,000 followers on Twitter.

66.    Ms. Finn's YouTube channels had tens of thousands of subscribers, with close to one billion views.

67.    Ms. Finn's Instagram account had more than 150,000 followers, and her Facebook pages had a combined seven-figure following, with over 1.2 million likes/followers on one of those pages alone.

68.    These social media accounts generated substantial revenue.

69.    PLAINTIFF DR. BEN TAPPER, a natural person residing in Nebraska, is a chiropractor, documentary filmmaker, and online news publisher.

70.    During the pandemic, Dr. Tapper became an important source of online news for large numbers of viewers on matters related to COVID-19.

71.    For example, an August 2020 video of Dr. Tapper addressing the Omaha, Nebraska City Council in opposition to mask mandates, was viewed by millions of individuals around the globe.

72.    By the summer of 2020, Dr. Tapper had a significant presence on various social media platforms, including Facebook, Instagram, Twitter, and YouTube, where he regularly published

news relating to recent events and developments in public health, including COVID-19-related public health measures.

73.     Dr. Tapper's social media postings were a main source of referrals to his chiropractic clinic. Additionally, they were the primary source of fundraising for his documentary filmmaking.

74.     Prior to being censored, shadow-banned, and de-platformed, Dr. Tapper's social media accounts reached hundreds of thousands of followers.

75.     PLAINTIFF JIM HOFT, a natural person residing in Missouri, founded, owns and operates the news website the Gateway Pundit.

76.     Since its founding in 2004, the Gateway Pundit has grown from a one-man blog to one of the Internet's most popular and important conservatively oriented destinations for news and commentary.

77.     In 2021, the Gateway Pundit was ranked fourth on a list of top ten conservative news websites, ranked by monthly web searches, with more than 2 million searches per month.

78.     The Gateway Pundit is clear about its commitment to truth above all other values: "All our content should be true. No value is more important than this."

79.     For years, the Gateway Pundit has distinguished itself by correctly reporting stories that much larger, better-known news organizations—including, prominently, numerous TNI members—got wrong or refused to cover.

80.     For example, in January 2019, TGP accurately recognized the Jussie Smollett hate-crime story as a hoax.  See https://www.thegatewaypundit.com/2019/01/hate-hoax-lefty-actor-claims-trump-supporting-homophobic-bigots-carrying-bleach-and-rope-beat-his-ass-at-2-am-in-chicago/.

81.     In April 2020, the Gateway Pundit reported accurately on coronavirus research conducted in Wuhan.  See https://www.thegatewaypundit.com/2020/04/huge-exclusive-chinese-doctor-shi-zhengli-ran-coronavirus-research-wuhan-us-project-shut-dhs-2014-risky-prior-leak-killed-researcher/.

82.     In June 2020, the Gateway Pundit accurately reported on the inflation of COVID-19 mortality through the practice of counting as COVID deaths all individuals who died *with* COVID (as opposed to *from* COVID).  *See* https://www.thegatewaypundit.com/2020/08/mortality-reporting-msm-related-coronavirus-overstated-needs-audited-death-rates-going-not; https://www.thegatewaypundit.com/2020/08/shock-report-week-cdc-quietly-updated-covid-19-numbers-9210-americans-died-covid-19-alone-rest-serious-illnesses; https://www.thegatewaypundit.com/2022/01/2020-broke-6-covid-deaths-caused-covid-finally-msm-catching.

83.     In October 2020, TGP accurately reported on the Hunter Biden laptop story. https://www.thegatewaypundit.com/2022/03/flashback-filthy-liar-joe-biden-said-hunter-bidens-laptop-story-russian-plant-presidential-debate-video;     https://www.thegatewaypundit.com/2020/10/breaking-exclusive-confirmed-wasnt-russia-hunter-biden-signed-off-request-repair-laptops-delaware-april-2019.

84.     Mr. Hoft has received major awards for accuracy in media and for excellence in online journalism.

85.     Prior to being censored, shadow-banned, and de-platformed, Mr. Hoft and the Gateway Pundit reached large audiences on Twitter, Facebook, and YouTube, and derived substantial revenue therefrom.

86.     Prior to the TNI's group boycott, the Gateway Pundit's Twitter account had over 400,000 followers, its Facebook account over 650,000 followers, its Instagram account over 205,000 followers, and its YouTube account over 98,000 followers.

87.     PLAINTIFF BEN SWANN, a natural person residing in Georgia, is the founder, owner, and chief executive of the news website Truth in Media.

88.     Mr. Swann has spent 20 years working in broadcast news, both behind and in front of the camera.  He has won numerous Associated Press awards as well as three Emmy Awards and is a two-time recipient of the prestigious Edward R. Murrow award.

89.     In 2013, Mr. Swann launched TruthinMedia.com, partnering with voices across the political spectrum.

90.     Truth in Media, which features the "Truth in Media with Ben Swann podcast," is committed to providing compelling reporting that transcends political, social, and geographic boundaries. It sees its mission as "upholding integrity and impartiality in the Fourth Estate with an exceptional lineup that shares an ambition to preserve candor in the media."

91.     In early 2020, Mr. Swann's accurate reporting began to cover a variety of health, economic, and social issues related to the pandemic, including masks, gain of function research, COVID-19 hospital protocols, and hospitals' extra pandemic earnings.

92.     Like the other news reports Mr. Swann produced throughout his career, each "Truth in Media with Ben Swann" podcast was and is heavily researched and documented.

93.     Mr. Swann distributed "Truth in Media with Ben Swann" through various social media platforms, including Facebook, Instagram, Twitter, and YouTube. His practice was to release a video on all four platforms simultaneously.

94.     Prior to being censored, demonetized, and de-platformed by the TNI, Mr. Swann amassed

a significant social media following, with over 750,000 combined social media followers, 120,000

YouTube subscribers, and monthly page views surpassing 2 million views per month.  In 2020,

his videos on Facebook were routinely receiving 2-5 million views per episode.

95.     Mr. Swann's income came from video sponsorships embedded in the podcasts. By March

of 2020, his audience was growing rapidly, as was the number of sponsorships.  At that time, Truth

in Media's projected sponsorship earnings alone were $1.2 million per year.

96.     PLAINTIFFS TY and CHARLENE BOLLINGER, natural persons residing in Tennessee,

are the co-founders of the health-advocacy groups The Truth About Cancer, CancerTruth, and The

Truth About Vaccines.  They are also the founders, owners, and operators of two news websites:

thetruthaboutcancer.com and thetruthaboutvaccines.com.

97.     The Bollingers are Christians, authors, filmmakers, and health-freedom advocates.  They

publish news, make films and write books to increase awareness of real health solutions and

advocate for the right of medical self-determination for all people.  The Bollingers' New York

Times best-selling book, "The Truth About Cancer," has sold over 250,000 copies.

98.     On thetruthaboutcancer.com, launched in 2014, the Bollingers offer news articles and

videos about cancer causes, prevention, and treatments.

99.     On thetruthaboutvaccines.com, launched in 2017, the Bollingers offer news articles and

videos about vaccines and vaccine safety.

100.    The Bollingers have used social media platforms to stay in touch with their fans, to connect

with other influencers, and to continue spread information about health freedom and solutions.

101.    Prior to the TNI's group boycott, the Bollingers' social media accounts were immensely

popular.  For example, the Bollingers' "The Truth About Vaccines" YouTube channel had some

16

70,000 subscribers, and their "The Truth About Cancer" YouTube channel had over 200,000 subscribers with over 40 million views.  Similarly, their Facebook accounts similarly had over 1.5 million followers.

102.    These social media accounts were substantial revenue generators, both in themselves and as drivers of traffic to the Bollingers' websites.

103.    PLAINTIFF DR. JOSEPH MERCOLA, the founder and owner of Mercola.com, is a board-certified family medicine osteopathic physician, three-time New York Times bestselling author, fellow of the American College of Nutrition since October 2012, and former Chairman of the Family Medicine Department at St. Alexius Medical Center.

104.    Dr. Mercola has conducted and written more than 30 scientific studies.  He has repeatedly warned the public of health and medicine dangers long before these dangers have been acknowledged by the pharmaceutical industry or by mainstream news media.

105.    In 1999, for example, Dr. Mercola reported on the dangers of the nonsteroidal anti-inflammatory drug Vioxx, five years before manufacturer Merck withdrew the drug from the market because of its potential to cause adverse cardiovascular effects. In 2001, he warned against the use of mercury in dentistry, 16 years before the Minamata Convention on Mercury banned the import and export of dental amalgam containing mercury. In 2006, he advised against ingestion of the artificial sweetener aspartame based on its connection to leukemia and other health conditions, nine years before The Washington Post reported on such dangers.

106.    In 1997, Dr. Mercola founded Mercola.com as a portal for natural health information and resources, one of the first websites established to serve users interested in holistic medicine. Mercola.com has routinely ranked as one of the top-ten natural health websites, with more than one million newsletter subscribers and more than 10 million page views per month.

107.   Through Mercola.com and in his individual capacity, Dr. Mercola is an online news publisher.

108.   Dr. Mercola's online news publishing has included accurate truthful commentary about and criticism of the government's response to the COVID-19 pandemic, including COVID's potential lab-leak origin, the comparative benefits of early treatment and natural immunity, and the risks or inefficacy of COVID vaccines mandated under emergency use authorizations.

109.   Mercola.com had a million-page-view presence on all the major social media platforms and used that presence for promoting articles from the Mercola health newsletter, which in turn leads to subscriptions to the newsletter and advertising.

110.   Prior to being censored, shadow-banned and de-platformed as a result of the TNI's group boycott, Dr. Mercola's social media accounts generated substantial revenue.

111.   PLAINTIFF JEFF CROUERE, a New Orleans native and resident of Louisiana, is an author, political columnist, podcaster, and for the last 24 years the host of "Ringside Politics," the popular and award-winning Louisiana-based radio and television show.  Mr. Crouere has appeared on major television news networks such as Fox News, CNN, CNN Headline News, and MSNBC.

112.   Mr. Crouere is also an online news publisher, providing reporting, analysis and commentary on his YouTube channel and his websites Crouere.net and www.ringsidepolitics.com.

113.   In 2010, Mr. Crouere created a personal Facebook account to which he regularly posted links and news content, attracting traffic to his websites and increasing the audience of Ringside Politics.

114.   In 2012, Mr. Crouere created a LinkedIn page, where he regularly posted links to his columns, videos, and other materials, attracting traffic to his websites and increasing the audience of Ringside Politics.

18

115.    Prior to being censored, shadow-banned and de-platformed as a result of the TNI's group boycott, Mr. Crouere's social media accounts significantly increased his audience and sponsorships, generating substantial revenue.

## **DEFENDANTS**

116.    DEFENDANT WP COMPANY, LLC D/B/A THE WASHINGTON POST, incorporated in Delaware and headquartered in Washington, D.C., is a diversified media organization and the owner of, among other things, The Washington Post, one of the nation's leading newspapers, which publishes its content both in print and online at the washingtonpost.com, transacting substantial business in every American state and district.

117.    DEFENDANT THE BRITISH BROADCASTING CORPORATION ("BBC"), the national broadcasting service of the United Kingdom, is a royally chartered UK public service corporation with a principal place of business in London.  It engages in very considerable commercial activity, including the operation of its U.S. online website, bbc.com, reaching an American audience of over fifty million and transacting substantial business in every American state and district.

118.    DEFENDANT THE ASSOCIATED PRESS, founded in 1846, is an American news agency headquartered in New York City, operating as a cooperative, unincorporated association. With news bureaus all over the world, the Associated Press ("AP") produces reporting published by its members and subscribers, totaling more than 1,300 newspapers and broadcasters, by major digital news aggregators such as Google and Facebook, and on its own news website, apnews.com, transacting substantial business in every American state and district.

119.    DEFENDANT REUTERS NEWS & MEDIA, INC., a New York corporation, is the owner of the Reuters news agency, founded in 1851 ("Reuters"), which distributes reporting to

newspapers and broadcasters all over the world, and operates a news website, reuters.com, transacting substantial business in every American state and district.

## JURISDICTION AND VENUE

120.    This action arises under the Sherman Act, 15 U.S.C. § 1.

121.    Subject matter jurisdiction lies under 28 U.S.C. § 1331, 28 U.S.C. § 1337, and the Clayton Act, 15 U.S.C. §§ 15, 26.

122.    Personal jurisdiction is conferred through the Clayton Act's nationwide service of process provision and its nationwide minimum-contacts test, 15 U.S.C. § 22, and by the fact that each of the Defendants transacts substantial business in this District and offers its products and services throughout this State.

123.    Venue is proper under both 28 U.S.C. § 1391 and 15 U.S.C. § 22 because all the Defendants transact substantial business in this District.

124.    In addition, although not legally necessary for venue purposes, every Plaintiff in this case transacts business in this District and throughout Louisiana, publishing news on websites and social media platforms available everywhere in the country, and Plaintiff Children's Health Defense has numerous members and subscribers specifically in the Amarillo area as well as elsewhere in this District.

## INTERSTATE COMMERCE

125.    The acts complained of herein have occurred in the flow of, and have substantially affected, interstate as well as international trade and commerce.

## JOINT AND SEVERAL LIABILITY

126.    Antitrust conspirators are jointly and severally liable for the acts of their co-conspirators. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 253-54 (1940).

127.    It is axiomatic that not all joint tortfeasors need be joined in one action.

128.    Accordingly, each Defendant is liable for all of Plaintiffs' damages (and attorneys' fees), and joinder of other TNI members is not necessary.

## RELEVANT MARKETS

129.    "A plaintiff is not required to define a particular market for a per se claim, *see NCAA v. Bd. of Regents*, 468 U.S. 85, 100 (1984), nor is it required to do so for a rule of reason claim based on evidence of the actual anticompetitive impact of the challenged practice, *see FCC. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986)."  *PLS.COM, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 838 (9th Cir. 2022) (cleaned up).  *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 & n.7 (2018) (plaintiffs required to define market in "rule of reason" cases (not per se cases), but exception exists when the case involves a horizontal agreement and direct evidence of actual adverse effects on competition).

130.    Because Plaintiffs here assert a per se claim against the TNI's group boycott, as well as a rule of reason claim based on evidence of actual anticompetitive impact, Plaintiffs need not define a particular market.

131.    Nevertheless, defining the relevant markets is useful both factually and legally.

132.    Explaining the relevant markets will make clear the serious economic challenge posed to traditional news organizations—such as Defendants The Washington Post, the BBC, the Associated Press, and Reuters—by new, non-mainstream, online news publishers like Plaintiffs.

133.    In addition, explaining the basic structure of the digital news market will demonstrate the existence here of every one of the factual predicates characteristic of per se unlawful group boycotts.

134.    In per se unlawful group boycotts, the boycotting group will typically (although not necessarily) include: (A) at least two firms that compete with each other (horizontal competition among at least some defendants); (B) at least one firm that competes with the plaintiffs (horizontal competition between plaintiffs and at least one defendant); and (C) one or more firms with a "dominant position" in the market or "exclusive access to an element essential to effective competition." *Northwest Wholesale Stationers,* 472 U.S. at 296; *MM Steel, L.P. v. JSW Steel (USA) Inc.,* 806 F.3d 835, 849 (5th Cir. 2015); *Tunica Web Advertising*, 496 F.3d at 413.

135.    As detailed below, all these factors are present here.

**The Relevant Market**

136.    The relevant markets for this action are the US online news market and specifically the US online market for COVID news and the U.S. online market for political news.[3]

**Meaning of Terms "News," "COVID News," and "Political News"**

137.    Although there is no doubt that anticompetitive combinations among news publishers violate the Sherman Act, *see, e.g.*, *Associated Press*, *supra*, there is no fixed definition of "news" in antitrust law.

138.    A respected dictionary offers the following definition of news: "material reported in a newspaper or news periodical or on a newscast." MERRIAM WEBSTER, "News," https://www.merriam-webster.com/dictionary/news.

139.    Defining "news" as whatever newspapers or news broadcasters say it is may be the most honest definition, but does not seem overwhelmingly useful for legal purposes.

---

[3] Although advertising is also sold, news markets are *not* analyzed as "two-sided markets" for antitrust purposes. *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2286 (2018).

140.    A FOIA regulation defines "news" as "information that is about current events or that would be of current interest to the public." 45 C.F.R. § 1602.2(k).

141.    Another valuable definition of "news" was stated by the editor of an online news website: "our definition of 'news' is information that enables citizens to govern themselves." *Hedges v. Obama*, No. 12 Civ. 331, 2012 U.S. Dist. LEXIS 68683, at *24 (S.D.N.Y. May 16, 2012).

142.    Following these definitions, this Complaint will use the word "news" to refer to information about current events, information of current interest to the public, and information that helps enable citizens in a free society to govern themselves.

143.    News publishers, however, often do more than report such information; they also, for example, publish analysis of and opinion on such information as well.

144.    Such news analysis and opinion is part of the competitive product offered by many news publishers, and as used in this Complaint, the word "news" includes such analysis and opinion.

145.    At the same time, "the news" contains numerous content-based subcategories—for example, sports news or weather news—that do not substitute for one another in a standard economic sense and hence can qualify as recognizable and separate antitrust markets.

146.    One such separate market, which developed beginning in 2020, is the market for *COVID news*—news concerning COVID-19.

147.    From almost the beginning of the pandemic and continuing to a large extent still today, there has been an intense and widespread demand among the public for the latest information, analysis, and opinion concerning COVID.

148.    So acute was this demand for COVID news that no news products on any other subject were substitutable for it; a consumer looking for COVID news did not and still today does not

regard sports news, weather news or other health-related news as an adequate alternative. Accordingly, COVID news is a distinct antitrust news market.

149.    Another distinct news market is the market for *political news*.

150.    Consumers looking for political news do not treat, *e.g.*, sports or weather news as a substitute.

151.    There is no recognized definition of political news, but the term will be used here to refer, roughly speaking, to news concerning politics, politicians, government policy, and elections.

***Distinctiveness of the <u>Online</u> News Market***

152.    While COVID news and political news are also available in legacy media such as printed newspapers and radio or television broadcasting, the online news market is separate and distinct for antitrust purposes. *See, e.g.*, *In re Local TV Adver. Antitrust Litig.*, No. 18 C 6785, 2020 U.S. Dist. LEXIS 208215 N.D. Ill. Nov. 6, 2020) (recognizing advertising on "digital media" as a well-pleaded "separate product market" from advertising in broadcast or print media).

153.    The reasons why the online news market is separate and distinct are many.

154.    "[W]ithin [a] broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).  The submarket's boundaries "may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.*

155.    Along all these axes, there are fundamental differences between the digital news market and the print and broadcast news markets.

156.    First and foremost, the online news market and its products have "peculiar characteristics," *id.*, radically differentiating them from traditional media news.   At least in the absence of censorship, these differentiating characteristics include the following.

157.    Online, consumers almost anywhere in the country can access news of their choice on any subject matter of interest to them, constantly updated from a wide variety of sources at any moment.

158.    Online, if a consumer wants COVID news, he can go directly to COVID news—or even more specifically, if he chooses, to news about COVID mortality rates, COVID vaccine effectiveness, COVID masking requirements, COVID's origins, and so on—offered by a wide variety of sources when and as he chooses.

159.    By contrast, broadcast news programming (whether on television or radio) offers content on subject matters of the producers' choice, bundled and sequenced as the producer sees fit, typically at fixed times of the producers' choice, and is limited to a relatively small number of networks or channels.

160.    As for print newspapers, a consumer of COVID news would find even less product available to him, because print newspapers are significantly limited geographically, contain only a small amount of content on the particular topic the consumer is looking for, and report news that is often not the latest information.

161.    The nationwide availability of voluminous, constantly updated content at any moment on exactly the subject of interest to the consumer gives online news "peculiar characteristics," *Brown Shoe*, 370 U.S. at 325, different from (and frequently superior to) the news product offered in other media.

162.    At the same time, online media have radically different "production facilities," *Brown Shoe*, 370 U.S. at 325, as compared to traditional news media.

163.    Online news publishing enjoys dramatically lower production costs, lower barriers to entry, and far lower distribution costs, and has given rise to: (A) a proliferation of new product formats (for example, blogs, short-form videos, podcasts); (B) the use of new, mobile devices (predominantly cell phones) to access the news; and (C) an explosion of new entrants into the news market.

164.    "From the outset, the internet represented an enormous potential for news outlets. It substantially reduced costs of publishing and distributing news content, allowing more frequent updates (Peitz and Reisinger, 2015, p. 451[11]) and increasing the (potential) geographic reach. It also lowered consumers' costs of searching and accessing news content (Martens et al., 2018, p. 40[12]). In addition to pre-existing news publishers transitioning from print-based distribution of content to a mix of print and online (or sole online) distribution, the internet allowed new entrants to establish [themselves] as digital-first publishers and to develop new publication formats (e.g. blogs or short news videos)."   OECD, COMPETITION ISSUES CONCERNING NEWS MEDIA AND DIGITAL PLATFORMS 9 (2021), https://www.oecd.org/daf/competition/competition-issues-concerning-news-media-and-digital-platforms-2021.pdf.

165.    There is also widespread "public recognition" of the Internet as a radically different "economic entity," *Brown Shoe*, 370 U.S. at 325, demonstrated by the massive public shift in news consumption away from traditional media—*i.e.*, broadcast and print—to the Internet.

166.    As of January 2021, over 85% of Americans were getting news from digital sources.  PEW RESEARCH CENTER, *More than eight-in-ten Americans get news from digital devices*, Jan. 12,

2021, https://www.pewresearch.org/fact-tank/2021/01/12/more-than-eight-in-ten-americans-get-news-from-digital-devices (hereafter PEW, *More than eight-in-ten*).

167.     The news industry has been well aware for years of this massive and ever-increasing shift to digital.  *See, e.g.*, REUTERS INST. FOR THE STUDY OF JOURNALISM, *Overview and key findings of the 2022 Digital News Report*, June 15, 2022, https://reutersinstitute.politics.ox.ac.uk/digital-news-report/2022/dnr-executive-summary ("this year's data confirm . . . further accelerated structural shifts towards a more digital, mobile, and platform-dominated media environment, with further implications for the business models and formats of journalism"); FORBES, *People Increasingly Turn to Social Media for News*, June 24, 2020, https://www.forbes.com/sites/mikevorhaus/2020/06/24/people-increasingly-turn-to-social-media-for-news/?sh=32faaca73bcc.

168.     Thus "industry . . . recognition of the [online] submarket as a separate economic entity," *Brown Shoe*, 370 U.S. at 325, is also ubiquitous.

### *Consequences of the Shift to Digital News*

169.     The shift to digital has had profound economic consequences for the news industry.

170.     "The transition of news from print, television and radio to digital spaces has caused huge disruptions in the traditional news industry." PEW, *More than eight-in-ten*, *supra.*

171.     For antitrust purposes, the major consequences of the digital transformation of the news market are twofold.

172.     First, it has been a tremendous boon to competition.

173.     "Digitalisation ultimately increased competition among news publishers as result of both the broader reach of professional news content (well beyond their domestic/local markets) and the increasing number of non-professional sources such as bloggers and citizen journalists." OECD, COMPETITION ISSUES CONCERNING NEWS MEDIA AND DIGITAL PLATFORMS, *supra*, at 9.

174.    Second, it has sent traditional news organizations into economic freefall.

175.    "Since 2006, the [traditional] news industry has been in economic freefall, primarily due to a massive decrease in advertising revenue. Both print and broadcast news organizations rely heavily on advertising revenue to support their operations, and as the market has shifted to digital platforms, news organizations have seen the value of their advertising space plummet steeply." UNITED STATES HOUSE OF REPRESENTATIVES, SUBCOMMITTEE ON ANTITRUST, INVESTIGATION OF COMPETITION IN DIGITAL MARKETS 57 (2020) (hereafter SUBCOMMITTEE ON ANTITRUST, COMPETITION IN DIGITAL MARKETS).

176.    For U.S. newspapers, between 2000 and 2020, advertising revenue dropped roughly 80%, from approximately $48.7 billion to $9.6 billion.  PEW RESEARCH CENTER, *Newspaper Fact Sheet*, Jun. 29, 2021, https://www.pewresearch.org/journalism/fact-sheet/newspapers.

177.    These economic realities further confirm the separateness of the online news market from broadcast and print news markets.  *See, e.g.*, *In re Local TV Adver. Antitrust Litig.*, No. 18 C 6785, 2020 U.S. Dist. LEXIS 208215, at *47 (N.D. Ill. Nov. 6, 2020) ("Given the opposite trajectory of broadcast media and digital media advertising, it is reasonable to assume that the products are not interchangeable.").

### *The Two Kinds of Members of the TNI*

178.    There are two main categories of TNI members, playing different but often complementary roles in the online news market: (A) large legacy news organizations (hereafter the TNI's "Legacy News Members") and (B) Big Tech platform companies (hereafter the TNI's "Big Tech Members").

179.    All the Defendants in this case—The Washington Post, the BBC, the Associated Press, and Reuters—are TNI Legacy News Members.

180.    The TNI's Legacy News Members are all publishers of original-content news.

181.    In addition to offering news in hardcopy print and/or broadcasting media, each of the Legacy News Members of the TNI operates its own news website, available nationwide in America, and each also publishes its news reporting on large Internet platforms such as Facebook, YouTube, and/or Twitter.

182.    By contrast, the TNI's Big Tech members—Facebook, Google, Twitter, and Microsoft— are first and foremost Internet companies, each of which is, owns or controls one or more behemoth Internet platforms, including social media platforms and search engines.

***The Legacy News Members of the TNI Compete with One Another
and with Plaintiffs in the US Market for Online COVID and Political News***

183.    The TNI's Legacy News Members, including all the Defendants in this case, compete with one another across various relevant markets, including online news markets.

184.    For example, The Washington Post, the BBC, Reuters and the Associated Press all offer independent online news websites, available throughout the US, in direct competition with each other.

185.    Moreover, Reuters and the Associated Press offer news content and "wire services" to other entities and news organizations, in direct competition with each other.

186.    The TNI's Legacy News Members all publish COVID and political news on their websites, and thus all compete with one another as original-content publishers in the US market for online COVID and political news.

187.    Plaintiffs are all original-content news publishers in the US online market for COVID and political news.

188.   Thus the TNI's Legacy News Members, including all the Defendants in this case, are in competition not only with each other, but with all the Plaintiffs in the US market for online COVID news.

189.   Plaintiffs Jim Hoft and L. Todd Wood are also publishers of original-content political news.

190.   Thus all the Legacy News Defendants are in competition not only with each other, but with Plaintiffs Hoft and Wood in the US market for online political news.

191.   Defendants may claim that online news publishers like Plaintiffs are too small to meaningfully compete with TNI's world-renowned Legacy News Members like the Washington Post and the Associated Press.

192.   That claim would be false, for three different reasons.

193.   *First*, while any one small online news publisher might not individually pose a threat to large legacy media organizations, the *aggregate* of small online news publishers, taken together, does pose such a threat.

194.   This is because the *combined* audience of the new, non-mainstream online news publishers is in the tens (or hundreds) of millions, and because their reporting frequently challenges and undermines legacy news reporting, repeatedly demonstrating to large sectors of the consuming public that legacy news organizations often report false, incomplete, or ideologically biased information, undermining trust in those organizations and thereby threatening their entire brand and business model.

195.   The fear of this competitive threat to legacy news organizations posed by small online news publishers is expressed in the above-quoted admissions by a senior BBC executive: "***the real rivalry now is not between for example the BBC and CNN globally***, *it's actually between all trusted news providers and a tidal wave of unchecked" reporting "that's being piped out mainly*

*through digital platforms* . . . .  That's the real competition now in the digital media world. Of course organizations will always compete with one another for audiences. ***But the existential threat I think is that overall breakdown in trust, so that trusted news organizations lose in the long term if audiences just—just abandon the idea of a relationship of trust with news organizations.***"

196.    *Second*, economists have long recognized a distinction between *tangible* "product markets" on the one hand and *intangible* "information markets" on the other, with one of the critical differences being that "small firms that are insignificant as product-market competitors can play outsized roles in the information market."  Matthew Gentzkow & Jesse Shapiro, *Competition and Truth in the Market for News*, 22 J. ECON. PERSPECTIVES 133, 150 (Spring 2008).

197.    In information markets, small publishers can compete with and indeed outcompete the largest publishers, in terms of finding and publishing highly important information that larger organizations fail to report; small news publishers can and do break major news stories, scooping large, legacy news organizations.  *Id.*

198.    *Third*, smaller online news publishers pose a threat to traditional news organizations because "small" online news sources can in the brave new digital world actually overtake in audience numbers even the largest legacy news broadcasts or newspapers.

199.    For example, the "Joe Rogan Experience" podcast, which often deals with news of high public interest, has an estimated audience of roughly 11 million per episode, dwarfing the numbers of nearly all competitors in any format.

200.    Mr. Rogan's audience is larger than the six million who on average watch the NBC Nightly News (the nation's most-watched news program), the three million who watch Tucker Carlson

Tonight (the most-watched cable news program), and the nine million who subscribe to the New York Times (the nation's most-read newspaper).

201.    For all these reasons, non-mainstream online news publishers represent, again quoting the senior BBC executive, an "existential" competitive threat to the primacy, revenues, and business model of legacy news organizations.

202.    Accordingly, the TNI's Legacy News Members—including Defendants the Washington Post, the BBC, the AP, and Reuters—are in competition not only with each other, but with Plaintiffs.

**The TNI's Big Tech Members Compete with One Another
and with the TNI's Legacy News Members**

203.    The TNI's Big Tech Members compete with one another, and with the TNI's Legacy News Members, across a variety of related markets.

204.    For example, Facebook, Google's YouTube, Twitter, and Microsoft's Linked In compete against one another as social media and/or social networking sites.

205.    In addition, Google and Microsoft compete with one another in the search engine market (Microsoft's Bing is a rival to Google's search engine).

206.    And the TNI's Big Tech Members are also online news publishers, competing with one another in many online news markets, including the markets relevant to this action.

207.    Twitter is a social media microblogging platform, but it is also—indeed for millions of people, it is primarily—a source of news.

208.    Twenty-three percent of American adults (about 48 million) use Twitter, and seventy percent of those users get news from Twitter, with about half saying that Twitter is an "important" source of news for them, especially for "breaking news."  PEW RESEARCH CENTER, *News on Twitter: Consumed by Most Users and Trusted by Many*, Nov. 15, 2021,

https://www.pewresearch.org/journalism/2021/11/15/news-on-twitter-consumed-by-most-users-and-trusted-by-many.

209.   In fact Twitter often breaks news faster than print or television news sources can.

210.   Thus Twitter competes with the TNI's Legacy News Members in the online news market.

211.   Google, Facebook, and Microsoft are also online news publishers, but generally speaking, they do not offer *original* content, as Defendants and Plaintiffs do.

212.   Rather, Google, Facebook, and Microsoft are news *aggregators*, "scraping" headlines and/or excerpts from other entities' news content and offering these excerpts to consumers in a consolidated format.

213.   News aggregation products are offered in several different ways by the TNI's Big Tech Members.

214.   For example, Google performs news aggregation for users of its search engine, both through its "News" search-filtering tab and through its "top stories" feature, which scrapes and excerpts third-party news stories, displaying them at or near the top of certain search results.

215.   In addition, Google, Facebook and Microsoft all offer news aggregation products operating under names such as "Google News," "Google Feed," "Facebook News," and "Bing News."

216.   Thus Google, Facebook and Microsoft all compete with one another as online news aggregators.

217.   News aggregators are not minor players in the news market.  On the contrary, news aggregation now dominates all other sources of online news.

218.   Overall, "news consumption has largely shifted to a model of content aggregation, through which platforms consolidate content from multiple news sources." SUBCOMMITTEE ON ANTITRUST, COMPETITION IN DIGITAL MARKETS, *supra*, at 59.

219.    News aggregators "attract 80% of the online news traffic in the United States." D. Jeon & N. Nasr, *News Aggregators and Competition among Newspapers*, 8 AM ECON. J.: MICRO-ECONOMICS 91, 91 (2016), https://pubs.aeaweb.org/doi/pdfplus/10.1257/mic.20140151 (hereafter Jeon & Nasr, *News Aggregators*).

220.    News aggregation is lucrative.  As explained by David Pitofsky, General Counsel of media giant NewsCorp (owner of, for example, the Wall Street Journal and the New York Post), big tech news aggregator platforms like Facebook and Google "deploy our highly engaging news content to target our audiences, then turn around and sell that audience engagement to the same advertisers news publishers are trying to serve. Dominant platforms take the overwhelming majority of advertising revenue." SUBCOMMITTEE ON ANTITRUST, COMPETITION IN DIGITAL MARKETS, *supra*, at 71.

221.    Because they often substitute for and take market share away from traditional news publishers, news aggregators compete not only with each other but with the TNI's Legacy News Members.  *See* Jeon & Nasr, *News Aggregators*, *supra*, at 91 (newspapers are in "stiff competition" with online media, including especially with "news aggregators.").

### The TNI's Big Tech Members Are "Platform Gatekeepers" in the Online News Market, with the Power To Cripple or Destroy Publishers by Excluding Them from Their Platforms

222.    Another critical consequence of the rapid transition of news consumption from legacy media to new, digital sources has been the "**emergence of platform gatekeepers—and the market power wielded by these firms**." SUBCOMMITTEE ON ANTITRUST, COMPETITION IN DIGITAL MARKETS, *supra*, at 57 (emphasis added).

223.    The most powerful "platform gatekeepers" are TNI members Facebook and Google, but the other TNI Big Tech Members—Twitter and Microsoft—play major platform gatekeeping roles as well.

224.   As a result, the TNI's Big Tech Members occupy a critical double role in the online news market.

225.   They not only publish news, but also serve as market gatekeepers with the power to cripple or destroy original-content news publishers by excluding them from their platforms.

226.   They possess this power from their combined functions as news aggregators, search engines, and hosts of third-party news publishers.

227.   Online news publishers like Plaintiffs gain access to huge potential audience markets—numbering in the hundreds of millions—they cannot otherwise reach when the Internet's "platform gatekeepers" open their gates to them, whether their reporting appears via news aggregation or is posted to (for example) the publisher's Twitter account, Facebook page, or YouTube channel.

228.   Conversely, online news publishers like Plaintiffs lose access to huge audience markets, numbering in the hundreds of millions, when the TNI's Big Tech Members shut their gates and exclude them from (or shadow-ban them on) their platforms.

229.   The Big Tech Members' platforms have stunning market power in certain markets, giving them this critical gatekeeping ability.

230.   YouTube, for example, has a market share of over 75% in the Internet video-hosting market.

231.   Facebook has a market share of close to 100% in the online social networking market.

232.   Google's search engine has a market share of over 90% the online search market.

233.   Through this market power, and through their combined roles as news aggregators and hosts of third-party news content, the TNI's Big Tech Members possess an overwhelmingly dominant position in the online news market, allowing them to dictate which news publishers receive access to, and which are denied access to, hundreds of millions of news consumers.

234.     Conservatively estimated, in their combined capacities (as news aggregators, platform hosts of third-party content, and search result generators), the TNI's Big Tech Members collectively have a gatekeeping power over at least 90% of online news traffic, *in the sense that a small news publisher de-platformed by the TNI's Big Tech Members loses at least 90% (and probably significantly more) of its traffic*.

235.     Even well-known major online news publishers can lose up to 50% of their traffic as a result of seemingly minor algorithmic changes to Google's search engine results, and smaller online news publishers like Plaintiffs can be and have been destroyed completely when shadow-banned, throttled, de-monetized, or de-platformed by Facebook, Google, or the TNI's other Big Tech Members.

236.     "Several *dominant* platforms function as intermediaries to news online. *Due to their outsized role as digital gateways to news, a change to one of these firms' algorithms can significantly affect the online referrals to news publishers, directly affecting their advertising revenue.* One news publisher stated in its submission to the Subcommittee that it and other news organizations '*depend on a few big tech platforms to help them distribute their journalism to consumers.' . . . [S]everal news publishers noted that the dominance of Google and Facebook allows them to 'pick winners' online by adjusting visibility and traffic. For example, an update to Google's search algorithm in June 2019 decreased a major news publisher's online traffic 'by close to 50%'* even as their referrals from other sources—such as their home page and apps— grew during the same period.  As they noted, *a 'smaller business would have been crushed' by this decline*."  SUBCOMMITTEE ON ANTITRUST, COMPETITION IN DIGITAL MARKETS, *supra*, at 63 (emphasis added).

237.    As Wired magazine editor-in-chief Nicholas Thompson puts it, "***Every publisher knows that, at best, they are sharecroppers on Facebook's massive industrial farm***. The social network is roughly 200 times more valuable than the Times. And journalists know that the man who owns the farm has the leverage. . . . *If Facebook wanted to, it could quietly turn any number of dials that would harm a publisher—by manipulating its traffic, its ad network, or its readers.*" *Id.* at 64 (emphasis added).

238.    "[T]he dominance of several online platforms has created a significant imbalance of bargaining power. . . . [D]ominant firms can impose unilateral terms on publishers, such as take-it-or-leave-it revenue sharing agreements. A prominent publisher described this relationship as platforms having a 'finger on the scales' ***with the ability to suppress publishers that do not 'appease platforms' business terms.'***" *Id.* (emphasis added).

239.    In the words of David Chavern, president of the News Media Alliance, "***no news organization on its own can stand up to the platforms. The risk of demotion or exclusion from the platforms is simply too great.***" *Id.* at 65 (emphasis added).

240.    Those who defend big tech censorship frequently assert that de-platformed news publishers remain free to publish whatever they like on their own independent websites.

241.    That's technically true, but the economic damage from de-platforming—typically a loss of over 90% of traffic—is devastating.

242.    In terms of economic reality, exclusion from the world's dominant Internet platforms means being shut out of the market.

243.    Defenders of big tech censorship also frequently claim that subscription-based business models offer a market alternative for de-platformed publishers.

244.    Again, in terms of economic reality, this is fantasy.

245.    In general, only news organizations with pre-existing national reputations and audiences, like the New York Times or Wall Street Journal, can survive the shift to behind-a-paywall, subscription-based business models.

246.    This is because most readers are "reluctant to pay for news, especially since they're bombarded with free content."  Discourse, *The Press Now Depends on Readers for Revenue and That's a Big Problem for Journalism*, July 8, 2021, https://www.discoursemagazine.com/culture-and-society/2021/07/28/the-press-now-depends-on-readers-for-revenue-and-thats-a-big-problem-for-journalism.

247.    "[A]side from the tiny number of national newspapers and magazines where subscriptions [are] booming," even "[r]egional newspapers that were formerly local powerhouses struggle to sign up online subscribers. As of last year [2020], the Los Angeles Times had only 257,000 subscribers, the Boston Globe 223,000 and the Chicago Tribune 125,000—numbers that are hundreds of thousands of subscribers below their peak print circulations." *Id*.

248.    Most small online news publishers who switched from the big tech platforms to a subscription-based model would lose upwards of 90% of their traffic and would not be able to compete effectively or even survive in the online news market.

249.    Moreover, the fee-paying subscription-based online news market is, for antitrust purposes, a market separate and distinct from the "free" or zero-monetary-price online news market, which is dominated by the TNI's Big Tech Members.

250.    Zero-monetary-price goods are well known to occupy a categorically different market position compared to functionally similar goods sold at a positive price.  *See, e.g.*, Michal S. Gal & Daniel L. Rubinfeld, *The Hidden Costs of Free Goods: Implications for Antitrust Enforcement*,

80 ANTITRUST L.J. 521 (2016); John M. Newman, *Antitrust In Zero-Price Markets: Applications*, 94 WASH. U.L. REV. 49 (2016).

251.    Of course "free" products—those offered for a zero monetary price—are not really "free." Consumers pay for such products in some other coin; online consumers, for example, pay to use the big tech platforms with their attention and personal information.  *See, e.g.*, *Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 803-04 (N.D. Cal. 2022) (Koh, J.) (for antitrust purposes, users obtain Facebook services in exchange for their attention and personal information).  That is the meaning of the adage, "If the product is free, you're product."

252.    Nevertheless, "zero pricing" places products in a different economic plane because of its nonlinear demand effects.

253.    The "zero price effect" describes the well-established economic fact that consumer demand for a product "skyrockets" when that product is offered for "free," even when other costs or product quality differences would suggest that rational consumers should prefer functionally similar but non-zero-price products.

254.    "A robust body of behavioral economics research points to the existence of the Zero Price Effect (ZPE). For ease of analysis, neoclassical economics often assumes that demand curves are linear. The ZPE, however, suggests that when prices reach zero, consumer demand skyrockets— even where a standard cost-benefit analysis seems to favor a non-zero-price alternative." Newman, *supra*, at 74.

255.    As a result, under standard market-definition antitrust tests, where some products are offered at zero-price but other, functionally similar products are offered for a non-zero price, the zero-price market is separate and distinct from the non-zero-price market.

256.    "Often, the free and paid goods share similar functionalities and characteristics,"

suggesting "that the products compete in the same market. Yet the result under the SSNIP test [*i.e.*,

the "Small but Significant and Non-transitory Increase in Price" test used throughout antitrust law

for market definition] . . . will often be different. Even if we apply the test from the paid good to

the free one, it will rarely be the case that a small but significant increase in price of the paid good

will create a significant switching effect. Rather, switching to the free good will often occur even

below the competitive level. In such situations ***the goods will not be considered in the same***

***market***." Gal & Rubinfeld, *supra* (emphasis added).

257.    Thus the existence of a subscription-based business model in online news, even if

economically feasible for small online news publishers—which it is not—would be a separate

antitrust market and would not eliminate the per se illegality of the TNI's group boycott in the

zero-price online news markets, where the TNI members have the power to dictate which

publishers survive and which do not.

***In Sum, All Elements of a Classic Per Se Unlawful Group Boycott Are Present Here***

258.    In sum, the TNI's Big Tech Members own and exclusively control behemoth Internet

facilities—social media, social networking, and search engine platforms—access to which is

essential to the ability of online news publishers, especially small online news publishers like

Plaintiffs, to compete, to reach the market, and even to survive.

259.    Accordingly, all the classic elements of a per se unlawful group boycott are present here.

The boycotting group—the TNI—includes: (a) firms horizontally competing with one another

across various markets, including the US market for online COVID and political news; (b) firms

competing with Plaintiffs; and (c) firms controlling "exclusive access" to facilities "essential to

effective competition" and occupying such a "dominant position" in the industry that the group's

boycotting activity cuts rivals off from the market and from facilities critical to their ability to compete or even survive.

### LEGACY NEWS ORGANIZATIONS FORM THE TNI TO EXCLUDE FROM THE WORLD'S DOMINANT INTERNET PLATFORMS RIVAL NEWS PUBLISHERS WHOSE REPORTING COMPETES AND CONFLICTS WITH THEIRS

*The TNI's "Closed Door" Origins, Its Avowed Market-Exclusion Purpose, Its Admissions of Collusion, and Its Commercial Motivation*

260.    In July 2019, then BBC director-general Tony Hall announced, "Last month I convened, behind closed doors, a Trusted News Summit at the BBC, which **brought together global tech platforms and publishers**. The goal was to arrive at a **practical set of actions we can take together**, right now, to tackle the rise of misinformation."

261.    By March 2020, these "global tech platforms and publishers" had formed the TNI.

262.    As described by a high-ranking BBC executive in 2020, the TNI is an "international partnership initiative convened by the BBC, which links media organisations and social-media platforms. The group has developed a shared early-warning system to alert partners about disinformation."  Transcript of address by Director of BBC World Service Group, Oct. 15, 2020, https://www.bbc.com/mediacentre/speeches/jamie-angus-yleisradio-bbc-finnish.

263.    According to the BBC, TNI members agreed in early 2020 that their "ground-breaking collaboration" would target online news relating to COVID-19 and that TNI members would "**work together to . . . ensure [that] harmful disinformation myths are stopped in their tracks**." BBC, *Trusted News Initiative (TNI) to combat spread of harmful vaccine disinformation*, Dec. 10, 2020, https://www.bbc.com/mediacentre/2020/trusted-news-initiative-vaccine-disinformation.

264.    On March 19, 2020, reflecting their membership in the TNI, Facebook, Google, YouTube, Microsoft, LinkedIn, and Twitter issued a collective statement announcing that they were "**working closely together" and "jointly combating fraud and misinformation about the virus**."

USA Today, *Amid coronavirus, Google, Microsoft, Facebook, Twitter and other tech companies ask for help to fight 'misinformation,'* Mar. 16, 2020, https://www.usatoday.com/story/tech/2020/03/16/coronavirus-tech-google-microsoft-facebook-misinformation/5064880002.

265.    In July 2020, the TNI "extended" its collaboration to cover so-called "disinformation" about the United States presidential election: "The Trusted News Initiative (TNI) is **extending the scope and ambition of its ground-breaking collaboration** to fight the most dangerous disinformation worldwide. At a recent summit chaired by the BBC's Director General, Tony Hall, the TNI committed to a **shared early warning system of rapid alerts to combat the spread of disinformation during the US presidential election**." EBU, July 13, 2020, https://www.ebu.ch/news/2020/07/trusted-news-initiative-steps-up-global-fight-against-disinformation-and-targets-us-presidential-election.

266.    In late 2020 and 2021, the BBC's Jessica Cecil, then the head of the TNI, made numerous public statements in print and at TNI conferences describing how the TNI functioned. *See, e.g.*, Jessica Cecil, Director, Trusted News Initiative, *Fighting disinformation fast when it matters most*, Oct. 8, 2020, https://www.bbc.co.uk/blogs/aboutthebbc/entries/2acce10f-85ff-4c4a-8be7-2011aa83c247; Jessica Cecil, Dec. 3, 2020 https://www.youtube.com/watch?v=AKBykItRfoU; Jessica Cecil, *Trust in News Conference*, Apr. 8, 2021, https://www.bbc.co.uk/mediacentre/articles/2021/trust-in-news-conference; Jessica Cecil, Sept. 28, 2021, https://www.youtube.com/watch?v=jH5VXgLj05E.

267.    Cecil stated that the TNI's members work together "in the fight against disinformation" by **"agreeing" to "standards" and to a "system" making possible a suppression of news content that, individually, TNI members "couldn't do on our own."**

268.    She stated that the TNI's members had agreed to adopt, and did adopt, a "fast alert" system in which members would alert one another to items of supposedly "unreliable" information that had appeared online.

269.    She stated that TNI members had "signed up" to a set of "expectations" about the actions they would take on their own to suppress reporting identified by the TNI as "misinformation." There were "clear . . . expectations," said Ms. Cecil, that all members had "signed up" for to "choke off" such reporting online.

270.    These "clear expectations" included a commitment by the TNI's Big Tech Members to censor such reporting on their platforms, to shadow-ban such content, to de-platform publishers who persisted in such reporting, and to work in tandem with one another to accomplish those ends.

271.    In October 2020, Ms. Cecil stated, "We have been sharing alerts over Covid-19 . . . . The Trusted News Initiative has evolved over the past year to become *the only place in the world where disinformation is discussed in real time, as it happens, by some of the most trusted global news organisations and the biggest tech platforms*. It is a significant step in the fight against disinformation . . . ."

272.    In April 2021, Ms. Cecil described the process in these terms: "It's about *agreeing [to] standards for countering some of the most harmful disinformation. But it is also about creating a system.* We have a fast alert."

273.    According to Cecil, TNI members "*working together achieves things we couldn't do on our own . . . . We don't fact check; but once we learn from a partner that something is unreliable, that's when we alert each other*," and "*all participants signed up to a clear set of expectations of how to act*."

274.    Cecil stated that the TNI "*tightly defines what cooperation and action looks like*" and that "*without that core specificity the TNI would never have got off the ground*."

275.    Commenting on Facebook's "Oversight Board," Cecil stated that "it deals with one platform, and *clearly what I've been talking about is cooperation across platforms as well*."

276.    She also described the TNI as "*cooperation between tech and media*."

277.    The goal of this cooperation "between tech and media" and "across platforms," according to Cecil, was to find "*practical ways to choke off*" the online publishing of news deemed by TNI members to be misinformation.

278.    Cecil took evident pride in the assertion that the TNI's suppression of others' online reporting did not "in any way muzzl[e] *our own* journalism"; it was apparently of no consequence that the TNI muzzles *others news publishers'* journalism.

279.    The TNI's "ground-breaking collaboration" is in fact a horizontal agreement among news-publishing organizations to suppress other, competitor news publishers, and it is motivated by the fear of the competitive threat posed to legacy news organizations by the explosion of non-mainstream news publishing online.

280.    As stated above, in 2022, Jamie Angus, then the senior BBC controller of news (Mr. Angus is no longer with the BBC, having taken a high-ranking position with Saudi Arabia's state broadcaster), made the following admissions:

> *Of course the members of the Trusted News Initiative are both peers and rivals*. And this is sort of the unique chemistry of what we're trying to do. And it's always been, you know, something we've discussed amongst us as a group.  But in a crisis situation like this, absolutely, *organizations have to focus on the things they have in common, rather than their necessarily their commercial . . . rivalries*. . . . [I]t's important at these moments of crisis that Trusted News providers club together. Because actually the real rivalry now is not between for example the BBC and CNN globally, it's actually between all trusted news providers and a tidal wave of unchecked, incorrect, or in fact explicitly-malicious nonsense that's being piped out mainly through digital platforms . . . .  *That's the real competition now in the*

*digital media world. Of course organizations will always compete with one another for audiences. But the existential threat I think is that overall breakdown in trust, so that trusted news organizations lose in the long term if audiences just—just abandon the idea of a relationship of trust with news organizations.* So actually we've got a lot more to hold us together than we have to work in competition with one another.[4]

281.    In other words, the TNI was formed to combat what the Legacy News Defendants viewed as an "existential threat" to their livelihood—the danger that a proliferation of supposedly "unchecked" reporting online could cause "audiences" to "abandon the idea" that the legacy "news organizations" were specially deserving of their "trust."

282.    This is an *economic* motivation.

283.    The TNI's "ground-breaking collaboration" was not ultimately about keeping harmful false information from the public; much of the information suppressed by the TNI was not false and was well within the bounds of legitimate debate in a vigorous free press.

284.    Instead, the TNI's "groundbreaking collaboration" was ultimately driven by what lies behind every combination of successful, large market competitors to injure smaller, potential rivals: the fear that those smaller rivals pose a threat to their economic dominance.

285.    The TNI's Legacy News Members hope and believe they can save their (self-imagined) reputation as "trusted news providers" by "clubbing" together and working jointly to disadvantage, injure, or shut down smaller online news publishers whose reporting challenges, contradicts, and competes with theirs.

---

[4] BBC & The Trusted News Initiative, *The role of the News Leader: Jamie Angus, Senior News Controller for BBC News*, *explains strategy to beat disinformation*, 2022, at 21:50-23:26, https://www.bbc.co.uk/beyondfakenews/trusted-news-initiative/role-of-the-news-leader.

*The TNI's Core Purpose Was and Is To Enlist Big Tech Companies into a*
*Censorship Partnership with Legacy News Organizations to Damage and Suppress*
*Rival Online News Publishers Threatening Their Reputations and Revenues*

286.    To achieve this goal, the TNI's Legacy News Members had to partner with Big Tech.

287.    As TNI director Cecil stated, the Legacy News Defendants had no ability to suppress online news competitors "on our own."

288.    Only the Big Tech platforms could do so.

289.    Hence the TNI.

290.    The TNI's core purpose, from the beginning, was to enlist the Big Tech platforms into a partnership with Legacy News publishers in order to achieve the suppression of competitively threatening online reporting—a suppression that the Legacy News Members could not achieve themselves.

291.    That's why the Legacy News Members persuaded the Big Tech Members to join their "collaboration."

292.    In October, 2020, Ms. Cecil described that the TNI's core purpose as bringing together "*the world's biggest tech platforms*" in combination with the Legacy News Members to take action "in real time" to suppress reporting that the TNI proclaimed "unreliable."

293.    "A year ago," said Ms. Cecil, "the BBC convened partners across the world in an urgent challenge: at times of highest jeopardy, when elections or lives are at stake, we asked, *is there a way that the world's biggest tech platforms from Google, YouTube, Facebook and Instagram to Twitter and Microsoft and major news organisations and others . . . can alert each other to the most dangerous false stories, and stop them spreading fast across the internet*, preventing them from doing real world harm?"

46

294.    The TNI is not merely an information-sharing entity.  Its members have agreed not only to share alerts, but to collaborate in deciding which (frequently accurate) reporting counts as "misinformation" and to take agreed-upon action against such reporting, including (in the case of the TNI's Big Tech Platform Members) by blocking and/or shadow-banning such reporting.

295.    From the beginning, the TNI's members committed to "moving quickly *and collectively to undermine disinformation before it can take hold*."  BBC, *New collaboration steps up fight against disinformation*, Sept. 7, 2019,  https://www.bbc.co.uk/mediacentre/latestnews/2019/disinformation (emphasis added). To "ensure" the achievement of this goal, the TNI conducted "'fire drills' before we roll out the *agreed actions*." *Id.* (emphasis added).  As noted above, in September 2021, Ms. Cecil stated of the TNI's members that "*all participants signed up to a clear set of expectations of how to act.*"  They collectively decided what to count as misinformation, and "*they decided what to do about it*."  The agreement entered into by the TNI's members "tightly defines what *cooperation and action* looked like," and "without that core specificity the TNI would never have got off the ground."  Distinguishing the TNI from Facebook's oversight board, which "deals with" censorship decisions on "one platform," Ms. Cecil added, "clearly what I've been talking about is *cooperation across platforms as well*."

296.    As formally acknowledged by the U.K. Information Commissioner's Office, the "stated" purpose of the TNI is not merely to share information, but "to *prevent* its members from disseminating falsehoods."  ICO Decision Notice, Aug. 25, 2022, https://ico.org.uk/media/action-weve-taken/decision-notices/2022/4021536/ic-185687-c4j8.pdf (emphasis added).

297.   Among the "clear . . . expectations," to which TNI members "signed up" at "closed door" meetings and/or in inter-firm communications were the following:

A.      That the TNI's Big Tech Members would use their dominant platform power in the online news market to censor and silence online news publishers whose reporting was prohibited by the TNI or any of its members.

B.      That the TNI's Big Tech Members would exclude from their platforms news content identified as prohibited by the TNI or any of its members.

C.      That the TNI's Big Tech Members would take action injuring and disadvantaging publishers of prohibited content by censoring those publishers, demonetizing them, shadow-banning them, disparaging them, and/or de-platforming them entirely.

298.    TNI members were and are aware that, while publicly claiming to censor only "false" claims, the TNI's Platform Members were in fact censoring claims that were not false.

299.    In March 2022, at a TNI conference video presentation called "Big Tech's Part in the Fight," a senior Facebook information-moderation officer made statements reflecting and confirming all of these understandings.  BBC, Trusted News Initiative, *Big Tech's Part in the Fight*, https://www.bbc.com/mediacentre/2020/trusted-news-initiative-vaccine-disinformation.

300.    He emphasized that it was a mistake to think of "misinformation" as consisting solely of "false claims," because a great deal of it is "not provably false."

301.    He further emphasized the importance not only of targeting specific items of misinformation, but of "banning" the sources thereof.

302.    He further stated that Facebook works together with its "industry partners" to combat "disinformation."

303.    Indeed, he stressed that "collaboration" among Internet platforms is critical in this endeavor, because otherwise sources banned from one platform would be able to move elsewhere and disseminate their content on other platforms.

304.    "As the established players are getting better at catching them," he stated, "they move to smaller platforms, to blogs, et cetera. ***This makes defender collaboration more important than ever and is going to continue to make it even more important going forward***."

305.    As of the filing of this complaint, the "core partners" listed by the TNI include the AP, Agence France Press, the BBC, CBC/Radio-Canada, the European Broadcasting Union (EBU), the Financial Times, First Draft, Google/YouTube, The Hindu, The Nation Media Group, Meta, Microsoft, Reuters, Reuters Institute for the Study of Journalism, Twitter, and The Washington Post.

### INFORMATION IMPROPERLY DEEMED "MISINFORMATION" BY THE TNI AND THE TNI'S BOYCOTT OF NEWS PUBLISHERS REPORTING SUCH INFORMATION

306.    From early 2020 to the present day, in furtherance of the TNI's joint agreement and of the "clear expectations" that TNI members agreed to, TNI members have deemed certain specific claims, facts, opinions and viewpoints concerning (among other things) COVID-19 and the 2020 U.S. presidential election to be prohibited on the platforms operated by the Big Tech Members (the "Prohibited Claims" or "Prohibited Reporting").

307.    The TNI's members have collectively agreed that the Prohibited Claims are to be publicly disparaged as "misinformation" and suppressed online.

308.    To accomplish this suppression, the TNI's Big Tech Members have agreed to keep other, rival online news suppliers from reaching the market if they publish Prohibited Claims.

309.    In execution of this agreement, when rival news publishers engage in Prohibited Reporting, the TNI's Big Tech Members subject such publishers to censorship, disparagement of their content as false or unreliable, de-monetization, invisibility or demotion (in search results), shadow-banning, throttling, and ultimately de-platforming.

310.    This concerted targeting and boycotting of rival, smaller online news publishers who engage in Prohibited Reporting is economically devastating to such publishers, destroying their ability to compete and to reach their markets.

311.    In addition, because of its devastating economic consequences, this concerted boycott has dissuaded numerous other online news publishers from engaging in Prohibited Reporting.

312.    This boycott has injured the American public by inhibiting "the dissemination of news from as many different sources, and with as many different facets and colors as is possible," contrary to this country's foundational belief that "right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection." *United States v. Associated Press*, 52 F. Supp. 362, 372 (S.D.N.Y. 1943) (Hand, J.), *aff'd, Associated Press v. United States*, 326 U.S. 1 (1945).

313.    Although the TNI calls the Prohibited Claims "misinformation," the Prohibited Claims have included many assertions that were and are not in fact false, but rather either provably true or, at the very least, open to legitimate debate, and in any event well within the bounds of robust news coverage dedicated to "the widest possible dissemination of information from diverse and antagonistic sources" that, as the Supreme Court has said, "is essential to the welfare of the public." *Associated Press*, 326 U.S. at 20.

314.    For example, without limitation, the Prohibited Reporting has included the following claims deemed "misinformation" by one or more TNI members:

    A.    Claims that COVID-19 was manmade;[5]

---

[5] *But see, e.g.*, BRITISH MED. J., *The COVID-19 lab leak hypothesis: did the media fall victim to a misinformation campaign?*, July 8, 2021, https://www.bmj.com/content/374/bmj.n1656 (lab-leak theory of COVID's origin was and is supported by substantial evidence "deserv[ing] serious investigation").

B.      Claims that COVID-19 was manufactured or bioengineered;[6]

C.      Claims that COVID-19 was created by a government or country;[7]

D.      Claims that "contradict" WHO or U.S. health officials' guidance on the treatment, prevention, or transmission of COVID-19;[8]

E.      Claims about the COVID vaccines that contradict "expert consensus" from U.S. health authorities or the WHO;[9]

F.      Claims that Hydroxychloroquine ("HCQ") is an effective treatment for COVID;[10]

G.      Claims that Ivermectin ("IVM") is an effective treatment for COVID;[11]

H.      Claims that HCQ or IVM is safe to use as a treatment for COVID;[12]

---

[6] *But see, e.g.*, *id.* (substantial evidence supports claim that COVID was manufactured or bioengineered through laboratory gain-of-function experiments).

[7] *But see, e.g.*, PROCEEDINGS OF THE NAT'L ACAD. OF SCIENCE, *A call for an independent inquiry into the origin of the SARS-CoV-2 virus*, May 19, 2022, https://www.pnas.org/doi/10.1073/pnas.2202769119 (substantial evidence supports claim that COVID-19 was created at a Chinese government-controlled virology laboratory in Wuhan, China, with the possible assistance of U.S. governmental funding).

[8] Governmental guidance and policy on COVID-19 has repeatedly been in error. *See, e.g.*, Scientific American, *How the U.S. Pandemic Response Went Wrong—and What Went Right—during a Year of COVID*, Mar. 11, 2021, https://www.scientificamerican.com/article/how-the-u-s-pandemic-response-went-wrong-and-what-went-right-during-a-year-of-covid/;   New   York Times, *The C.D.C. Waited 'Its Entire Existence for This Moment.' What Went Wrong?*, Aug. 14, 2020, https://www.nytimes.com/2020/06/03/us/cdc-coronavirus.html.

[9] The "expert consensus" on COVID has repeatedly been in error. *See, e.g.*, Washington Post, *Beware of 'expert' consensus. The covid-19 lab leak theory shows why*, May 30, 2021, https://www.washingtonpost.com/opinions/2021/05/30/beware-expert-consensus-covid-19-lab-leak-theory-shows-why/.

[10] But see this peer-reviewed, published 2021 study reporting that in a trial involving over 10,000 ambulatory patients in France, those treated with HCQ suffered a stunningly low .06% mortality rate, whereas in the control group (no HCQ), the fatality rate was *almost nine times higher*.

[11] But see this peer-reviewed, published meta-analysis of IVM clinical studies finding that IVM reduced mortality for COVID patients by roughly half or more.

[12] Both HCQ and IVM are well known to be extremely safe for human use at well-established dosages, both have been safely used for decades, and both have been approved for human use by the FDA. *See* OPINION OF THE ATTORNEY GENERAL OF NEBRASKA, *Prescription of Ivermectin or*

I.      Recommendations of the use of HCQ or IVM against COVID;[13]

J.      Claims that COVID is no more dangerous to some populations than the seasonal flu.[14]

K.      Claims that the mortality rate of COVID is for some populations the same or lower than that of the seasonal flu.[15]

L.      Claims suggesting that the number of deaths caused by COVID is lower than official figures assert.[16]

M.      Claims that face masks or mask mandates do not prevent the spread of COVID.[17]

---

*Hydroxychloroquine as Off-Label Medicines for the Treament or Prevention of COVID-19*, Oct. 14, 2021 at 17, 38, https://ago.nebraska.gov/sites/ago.nebraska.gov/files/docs/opinions/21-017_0.pdf.

[13] Hundreds of US doctors prescribe and many foreign health authorities have recommended IVM and/or HCQ for the treatment or prevention of COVID.  *See id*. at 29-30, 47.

[14] *But see, e.g.*, NATIONAL PUBLIC RADIO, *In Kids, The Risk of COVID-19 and the Flu Are Similar, But the Risk Perception Isn't*, May 21, 2021, https://www.npr.org/2021/05/21/999241558/in-kids-the-risk-of-covid-19-and-the-flu-are-similar-but-the-risk-perception-isn.

[15] In fact, for children and indeed all individuals under the age of 45, studies have shown that the infection mortality rate ("IFR") of COVID-19 is lower than the widely-reported IFR of the seasonal flu.  *See, e.g.*, A. Levin *et al.*, *Assessing the age specificity of infection fatality rates for COVID-19: systematic review, meta-analysis, and public policy implications*, Dec. 8, 2020, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7721859/ (reporting a COVID IFR of .004% for children and .068% for adults under 45, as compared to the widely-reported IFR of .1% for the seasonal flu).

[16] In fact, official COVID mortality figures frequently failed to distinguish between individuals who died *because* of COVID-19 and individuals who died *with* COVID-19, resulting in significant overstatements of COVID deaths. *See* AMERICAN ASSOCIATION OF MEDICAL COLLEGES, *How are COVID-19 deaths counted? It's complicated*, Feb. 18, 2021, https://www.aamc.org/news-insights/how-are-covid-19-deaths-counted-it-s-complicated.

[17] Numerous studies show that face mask mandates were not effective in preventing the spread of COVID-19.  *See* NEW YORK TIMES, *Why Masks Work, but Mandates Haven't*, May 31, 2022, https://www.nytimes.com/2022/05/31/briefing/masks-mandates-us-covid.html.

N.  Claims that wearing a face mask can make the wearer sick.[18]

O.  Claims that COVID vaccines have not been approved.[19]

P.  Claims that social distancing does not help prevent the spread of COVID.[20]

Q.  Claims that COVID-19 vaccines can kill or seriously harm people.[21]

R.  Claims that the immunity from getting COVID is more effective than vaccination.[22]

---

[18] *But see, e.g.*, CLEVELAND CLINIC, *Do Masks Make You Sick?*, Oct. 25, 2021, https://health. clevelandclinic.org/can-wearing-a-mask-make-you-sick (mask-wearing can cause sore throats, bacterial skin infections, and anxiety).

[19] The COVID-19 vaccines issued under an Emergency Use Authorization were not in fact approved by the FDA. *See* FDA, *What Is an emergency Use Authorization and How Is It Being Used To Respond to COVID-19*, https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/covid-19-frequently-asked-questions ("Under an EUA, the FDA may allow the use of *unapproved* medical products, or *unapproved* uses of approved medical products in an emergency to diagnose, treat, or prevent serious or life-threatening diseases or conditions") (emphasis added).

[20] *But see, e.g.*, STUDIES IN APPLIED ECONOMICS, *A Literature Review and Meta-Analysis of the Effects of Lockdowns on Covid-19 Mortality*, Jan. 2022, https://sites.krieger.jhu.edu/iae/files/2022/01/A-Literature-Review-and-Meta-Analysis-of-the-Effects-of-Lockdowns-on-COVID-19-Mortality.pdf (lockdowns and social distancing mandates were ineffective against mortality).

[21] In fact, the COVID-19 vaccines can cause myocarditis, a heart condition capable of leading to serious harm or death. *See, e.g.*, CDC, *Clinical Considerations: Myocarditis and Pericarditis after Receipt of mRNA COVID-19 Vaccines Among Adolescents and Young Adults*, https://www.cdc.gov/vaccines/covid-19/clinical-considerations/myocarditis.html#:~:text=In%20April%202021%2C%20increased%20cases,of%20mRNA%20COVID%2D19%20vaccines. In addition, the COVID vaccines have been found to increase the risk of serious neurological disorders and hemorrhagic stroke. *See, e.g.*, NATURE, *Neurological complications after first dose of COVID-19 vaccines and SARS-CoV-2 infection*, Oct. 25, 2021, https://www.nature.com/articles/s41591-021-01556-7); UNIV. COLL. LONDON, *Rise in Guillain-Barré syndrome following AstraZeneca vaccine*, May 30, 2022, https://www.ucl.ac.uk/news/2022/may/rise-guillain-barre-syndrome-following-astrazeneca-vaccine.

[22] In fact, natural immunity from being infected with COVID-19 was and is "much greater" than the immunity conferred by vaccination. *See, e.g.*, SCIENCE, *Having SARS-CoV-2 once confers much greater immunity than a vaccine—but vaccination remains vital*, Aug. 26, 2021, https://www.science.org/content/article/having-sars-cov-2-once-confers-much-greater-immunity-vaccine-vaccination-remains-vital.

S.      Claims that the COVID vaccines are not effective in preventing infection;[23]

T.      Claims that people who have been vaccinated against COVID can still spread the disease to others;[24]

U.      Claims that the COVID vaccines are toxic or harmful or contain toxic or harmful ingredients;[25]

V.      Claims that fetal cells were used in the manufacture or production of any of the COVID vaccines;[26] and

W.      Claims that a laptop belonging to Hunter Biden was found at a computer repair store in or around October, 2020 or that the contents reportedly found on that laptop, including potentially compromising emails, videos, and photographs, were authentic.[27]

---

[23] The COVID vaccines did not and do not prevent infection.  *See, e.g.*, BRITISH MED. J., *What do we know about COVID vaccines and preventing transmission?*, Feb. 4, 2022, https://www.bmj.com/content/376/bmj.o298.

[24] In fact, vaccinated people can and do spread the disease to others.  *Id.*

[25] Many physicians are concerned about the toxicity of the mRNA ingredient of the Pfizer and Moderna vaccines because it is designed to stimulate production of the COVID virus's "spike protein," the full dangers of which are not yet known.  *See, e.g.*, MOLECULAR BIOLOGY, *Could SARS-CoV-2 Spike Protein Be Responsible for Long-COVID Syndrome?*, Jan. 13, 2022, https://link.springer.com/article/10.1007/s12035-021-02696-0 ("there is urgent need to better understand the neurotoxic effects of the spike protein" that is "expressed in response to mRNA vaccines").

[26] In fact, fetal cell lines were and are used in the manufacture and production of the Johnson and Johnson COVID vaccine.  SCIENCE, *Abortion opponents protest COVID-19 vaccines' use of fetal cells*, Jun. 5, 2020, https://www.science.org/content/article/abortion-opponents-protest-covid-19-vaccines-use-fetal-cells.

[27] *But see, e.g.*, NEW YORK POST, *Washington Post joins New York Times in finally admitting emails from Hunter Biden laptop are real*, Mar. 30, 2022, https://nypost.com/2022/03/30/washington-post-admits-hunter-biden-laptop-is-real/.

315.   Each and every one of these Prohibited Claims was deemed misinformation by TNI members even though each was either provably true, supported by substantial evidence, or at the very least open to legitimate debate in a free press.

316.   In furtherance of the TNI agreements alleged above, TNI Big Tech Members Google, Facebook, Twitter, and Microsoft censored, shadow-banned, throttled, de-monetized, and de-platformed news publishers who engaged in Prohibited Reporting.

317.   In addition, Google and Microsoft acted to ensure that online news publishers who engaged in Prohibited Reporting would be artificially rendered invisible or demoted in search results. *See, e.g.*, New York Times, *YouTube bans all anti-vaccine misinformation*, Sept. 29, 2021, https://www.nytimes.com/2021/09/29/technology/youtube-anti-vaxx-ban.html ("In the past, the company simply removed" "borderline" videos that "discussed vaccine skepticism" "from search results and recommendations").

318.   The fact that this supposed "misinformation," banned and suppressed through the TNI partnership, was not in fact misinformation and would instead have been deemed by any independent objective analyst to be legitimate reporting or expression of opinion on matters of the highest public importance: (A) confirms that the TNI's Platform Members were acting in concert, rather than independently assessing accuracy; (B) demonstrates the harmfulness of suppressing competition in the marketplace of ideas; and (C) underscores the pretextuality of the TNI's purported "truth-police" justification for its group boycott.

319.   The TNI also caused third-party service providers to boycott news publishers who engaged in Prohibited Reporting.  For example, after YouTube de-platformed Plaintiff CHD in September 2021, PayPal—without explanation and against its own economic interest—terminated CHD's account just a few weeks later, in October 2021.

## TNI MEMBERS CONFER AND COORDINATE
## IN MAKING THEIR CENSORSHIP DECISIONS

320.   It is not legally necessary to Plaintiffs' antitrust claims that the TNI's Big Tech members conferred and coordinated with one another on specific decisions about what content or what persons to censor.

321.   On the contrary, having collectively agreed as members of the TNI to censor reporting deemed "misinformation" as TNI members defined that term, all censorship engaged in by each TNI Big Tech Member in furtherance and execution of that agreement was part of the TNI's group boycott.

322.   Nevertheless, the TNI's Big Tech Members did in fact regularly meet, confer and coordinate with respect to what particular content and which particular persons they would censor.

323.   As reported by journalist Matt Taibbi on December 24, 2022 (as part of the so-called Twitter Files), based on an extensive review of internal Twitter documents, Twitter, Facebook, Google and Microsoft "held regular meetings" to discuss censorship policies and decisions.  *See* https://twitter.com/mtaibbi/status/1606701431956049920.

324.   An internal Twitter report states that "Twitter, alongside other tech companies, including Google, Facebook, and Microsoft, participated" in "a standing weekly call" to discuss censorship policies and decisions.  https://twitter.com/davidzweig/status/1607378386338340867.

325.   The internal Twitter report further states that "[s]ome of the companies (not Twitter)" generated information to be used in determining censorship policies and that Twitter personnel "fed this information to the Twitter policy enforcement teams."  *Id*.

326.   This is an admission by one of the Defendants in this case that the TNI's Big Tech Members colluded, conferred, worked together and coordinated with respect to their censorship policies and decisions.

## TNI MEMBERS' PARALLEL TREATMENT OF PROHIBITED CLAIMS
## FURTHER EVIDENCES CONCERTED ACTION

327.    Because of the TNI Members' numerous direct admissions of collusive action and agreement, no further circumstantial evidence of agreement is necessary in this case.  Nevertheless, in fact there has been since early 2020 abundant circumstantial evidence of the TNI's members working in concert.

328.    Starting some time in 2020, the world's dominant online social media platforms—including Facebook, YouTube, and Twitter—began engaging in strikingly similar viewpoint-based censorship of plausible, legitimate news reporting relating to COVID-19.

329.    Previously, the major platforms had publicly announced varying but generally capacious approaches to free speech online and principled opposition to viewpoint-based or truth-police censorship.

330.    For example, Twitter's CEO as well as its general counsel once proclaimed Twitter "the free speech wing of the free speech movement," The Telegraph, *Twitter chief: We will protect our users from Government*, Oct. 18, 2011, and Facebook CEO Mark Zuckerberg declared as late as October, 2019, "I don't think people want to live in a world where you can only say things that tech companies decide are 100 percent true."  The Washington Post, *Facebook CEO Mark Zuckerberg says in interview he fears 'erosion of truth' but defends allowing politicians to lie in ads*, Oct. 17, 2019, https://www.washingtonpost.com/technology/2019/10/17/facebook-ceo-mark-zuckerberg-says-interview-he-fears-erosion-truth-defends-allowing-politicians-lie-ads.

331.    But shortly thereafter, that's exactly the world people came to live in.

332.    For example, notwithstanding evidence easily sufficient to make it a matter of legitimate debate, Facebook, Google, and Twitter all commenced viewpoint-based censorship of reporting about the lab-leak hypothesis of COVID's origins.

57

333.    Reporting about the lab-leak hypothesis was banned from all these platforms (unless the reporting condemned that hypothesis as "debunked," "racist," a "conspiracy theory," and so on).

334.    Strikingly, all three platforms not only banned the claim that COVID was *deliberately* created at a virology lab in or near Wuhan, China; they also banned the wholly plausible claim that COVID was *accidentally* created and released from a virology lab in or near Wuhan, China.

335.    Equally strikingly, all three platforms not only banned users from *making* these claims (as well as many others, detailed above); they blocked news publishers from *reporting* that such claims were being made by scientists and other potentially credible sources, thereby depriving the public of important news, information, and critical, diverse viewpoints.

336.    Moreover, all three of these platforms publicly declared—categorically, as if it were established fact—that the lab-leak hypothesis of COVID's origins was "false," even though: (a) it had not by any means been proven false; (b) numerous scientists were giving it serious consideration; (c) COVID was believed to be a bat-based virus, and it was known that COVID had originated in close proximity to a virology laboratory performing experiments on bat-based coronaviruses; and (d) the Chinese government was (and is, to this day) concealing information about the experiments being performed at that lab, preventing outsiders from assessing the connection (or lack of connection) between those experiments and the biological structure of COVID-19.

337.    No reasonable observer could have said in 2020 (or later) that the lab-leak theory had been proven false, and no reasonably objective news publisher would have reported as an established fact that the lab-leak theory was false.

338.    Yet strikingly, and strongly suggesting concerted conduct, all three platforms did exactly that, declaring as established fact that the lab-leak theory was "false" and, on that putative basis, prohibiting reporting about that theory.

339.    And at the same time, the TNI's Legacy News Members were doing the same thing— reporting, as if it were established fact, that the lab-leak theory was false.

340.    For example, in February 2020, just weeks into the pandemic, when virtually no solid information existed about COVID's true origins, TNI member the Canadian Broadcasting Corporation published a story flatly calling the lab-leak theory "false" and a "conspiracy theory." CBC, CBC Investigates, Feb. 24, 2020, https://www.cbc.ca/news/health/china-coronavirus-cover-up-claims-1.5471946.

341.    In April 2020, Defendant the BBC, founder of the TNI, published a news story—again, not as opinion, but as fact—under the headline: "Coronavirus: US and China trade conspiracy theories."  BBC MONITORING, *Coronavirus: US and China trade conspiracy theories*, Apr. 26, 2020, https://www.bbc.com/news/world-52224331. One of the "conspiracy theories" reported on by the BBC in that story was the hypothesis that COVID had "accidentally escaped" from the Wuhan virology laboratory, which the BBC (falsely) declared to be "unfounded."  *Id.*

342.    In May 2020, Defendant Reuters published a story referring to "conspiracy theories floated by anti-China activists and some supporters of President Donald Trump suggesting the new coronavirus was developed by Chinese scientists in a government biological weapons laboratory from which it then escaped."  Reuters, *Coronavirus was 'not manmade or genetically modified': US spy agency*, May 24, 2020,     https://www.reuters.com/article/us-health-coronavirus-usa-intelligence-idUSKBN22C2PN.

343.    On December 17, 2020, Defendant the Associated Press ran a story under the headline, "Debunked COVID-19 myths survive online, despite facts."   AP, *Debunked COVID-19 myths survive online, despite facts*, Dec. 17, 2020, https://apnews.com/article/debunked-coronavirus-myths-survive-212dfb8acbf8c759e869f8b391724873.

344.    The first sentence of that story reads: "From speculation that the coronavirus was created in a lab to hoax cures, an overwhelming amount of false information clung to COVID-19 as it circled the globe in 2020."  *Id*.

345.    The Associated Press story further reports the following "facts":

> MYTH: THE VIRUS WAS MAN-MADE
> It was not.
> Social media users and fringe websites weaved together a conspiracy theory that the virus was leaked — either accidentally or intentionally — from a lab in Wuhan, China, before the World Health Organization declared COVID-19 a pandemic in March. The falsehood was espoused by elected officials, including Trump.
> . . . [This] conspiracy theory continues to travel online, and made a resurgence in September when a Chinese virologist repeated the claim on Fox News.

346.    This strangely one-sided, incomplete, and unsubstantiated reporting in the AP appears not as opinion, but as fact, mirroring the strangely unfounded, equally categorical declarations of the lab-leak theory's falsity by other TNI Legacy News Members and by the TNI's Big Tech Members.

347.    The lab-leak theory of COVID's origins was by no means the only example of strikingly similar censorship engaged in by the TNI's Big Tech Members.

348.    For example, notwithstanding the fact that early in the pandemic, many highly reputable scientists began questioning the efficacy of COVID lockdown policies, Facebook, YouTube, and Twitter all banned (and continue to ban, to this day) reporting on claims that such policies were ineffective.

349.    Similarly, all three platforms censored the reporting of (entirely accurate) claims that the COVID vaccines did not prevent infection.

350.    Similarly, all three platforms censored the reporting of (entirely accurate) claims that vaccinated individuals could transmit COVID to others.

351.    Similarly, notwithstanding incontrovertible evidence of safety (at recommended dosages) and the existence of some clinical studies finding dramatic life-saving effects, making the subject at a minimum a matter of reasonable debate, all three platforms censored (and continue to censor, to this day) reporting of claims that the FDA-approved drug Hydroxychloroquine was safe and/or effective against COVID.

352.    Similarly, notwithstanding incontrovertible evidence of safety (at recommended dosages), as well as the existence of some clinical studies finding dramatic life-saving effects, all three platforms censored (and continue to censor, to this day) reporting of claims that the FDA-approved drug Ivermectin was safe and/or effective against COVID.

353.    Similarly, in October, 2020, all three platforms censored reporting that incriminating emails and videos had been found on a laptop allegedly belonging to Hunter Biden.

354.    And this censorship was often mirrored in similar, peculiarly one-sided "news" reporting by Legacy News members of the TNI.

355.    For example, Defendant the Washington Post has run stories evincing the same, strangely extreme and unsubstantiated anti-Ivermectin position taken by the Big Tech Members.

356.    In September 2021, the Washington Post reported that Ivermectin is "a drug intended for treating worms in livestock," when in reality Ivermectin is a drug that has saved so many (human) lives that its inventors received the Nobel Prize.  Washington Post, *As covid-19 surges in*

*Mississippi, some people are ingesting an unproven livestock dewormer*, Sept. 28, 2021, https://www.washingtonpost.com/nation/2021/08/21/mississippi-ivermectin-covid-surge-livestock.

357.    The Post story further reported that there is "*no* scientific evidence that ivermectin is effective at preventing or treating covid-19," *id.* (emphasis added), despite the fact that several published studies had found dramatic life-saving effects.

358.    The Post story contained such egregious misinformation about Ivermectin's supposed dangerousness—reporting that at least 70% of calls to one state's poison control center involved Ivermectin, when the true figure was only 2%—that it now carries a correction. *Id.*

359.    Again, Facebook, Google, and Twitter did not merely block users from *making* these various claims; they blocked news publishers on their platforms from *reporting* that such claims were being made by scientists, political leaders, respected newspapers, or other potentially credible sources, thereby depriving the public of important news, information, and critical, diverse viewpoints.

360.    In other words, online news publishers who reported wholly accurate information about COVID—for example, that numerous scientists believed the lab-leak theory of COVID's origin, or that Ivermectin was known from decades of use to be safe at established doses, or that many studies had found Hydroxychloroquine and Ivermectin to have saved lives when used against COVID—would find themselves shadow-banned, throttled, demonetized, and/or excluded completely on the world's dominant Internet platforms.

361.    In another striking parallel, Facebook, Google, and Twitter all adopted special, prohibited-claims policies for COVID-19, listing claims (detailed above) that could not be made or reported on their platforms, and these lists of prohibited claims were substantially similar.

362.   This strikingly similar censorship by the TNI's Big Tech Members of factual reporting under the guise of policing "misinformation"—in the teeth of significant contrary evidence making each of these prohibited claims a matter at a minimum of legitimate public debate—together with substantially similar reporting by the TNI's Legacy News Members, is further evidence of collusion.

## PLAINTIFFS HAVE BEEN DENIED ACCESS
## TO CRITICAL FACILITIES AND MARKETS
## AS A RESULT OF PUBLISHING PROHIBITED CLAIMS

363.   Each and every Plaintiff has been victimized by the TNI's joint agreement and concerted action described above.

364.   Like so many online publishers, Plaintiffs rely on the nation's dominant Internet platforms—both search engines and social media sites—to reach consumers.  Online publishers like Plaintiffs derive substantial revenue from, and often cannot survive without, access to the dominant Internet platforms.  Plaintiffs derive revenue from their social media accounts both through monetization opportunities such as advertising or fundraising functions embedded in their social media pages and by driving traffic to their websites, which in turn creates revenue in the form of on-website ads, subscriptions, membership fees, product sales, and donations.  As a result, for Plaintiffs, loss of viewership on search engines and social media platforms translates directly into loss of revenue.

365.   For each and every Plaintiff, the platforms owned and operated by the TNI's Big Tech Members, including Facebook, YouTube, Twitter, and LinkedIn, were and are facilities essential to their ability to compete, survive, and reach their market.

366.   Each and every Plaintiff has published one or more of the above-listed Prohibited Claims and was as a result, in furtherance of the TNI's unlawful agreement, censored, disparaged, shadow-

banned, and de-platformed on one or more TNI member platforms, causing Plaintiff substantial monetary loss.

367.    For example, without limitation:

368.    PLAINTIFF CHD has frequently posted accurate content related to the origins of COVID-19, the profit motive behind the COVID vaccines, the potential life-saving effects of alternative, cheaper medicines like Ivermectin, and vaccine injuries, including stories of individuals who suffered catastrophic neurological or cardiac side effects immediately after receiving the COVID vaccines, and a result of engaging in such Prohibited Reporting, CHD has been censored by Facebook, Google and Twitter, with damages to date of over $1,000,000.  Such censorship has included:

A.    On or around January 11, 2021, Twitter took action to throttle or shadow-ban CHD's account, resulting in a sudden loss of followers.

B.    One week later, on January 18, 2021, Google began censoring and removing COVID-related content from CHD's YouTube channel.

C.    On February 10, 2021, CHD's chairman and chief spokesman, Plaintiff Robert F. Kennedy Jr., was de-platformed from Instagram.

D.    The very next day, February 11, 2021 Google terminated CHD's ability to monetize or make use of Google Ads.

E.    On February 19, 2021, Facebook notified CHD that it was at risk of being "unpublished," causing CHD to engage in substantial self-censorship.

F.    Five days later, on February 24, Twitter restricted CHD's account for twenty-four hours without explanation.

G.    On March 18, 2021, Twitter locked CHD's account for seven days.

H.      About a week later, on March 25-27, 2021, Google repeatedly censored, restricted, and removed content from CHD's YouTube account.

I.      On September 14, 2021, Mr. Kennedy's Twitter account was suspended for 12 hours.

J.      Two or three weeks later, in late September or early October, 2021, YouTube de-platformed CHD, terminating its channel completely.

K.      Five days later, on October 4, 2021, Facebook temporarily shut down CHD's accounts.

L.      On August 17, 2022, Facebook de-platformed CHD.

M.      In addition, the TNI's Big Tech Members have throughout this period threatened, censored, suspended, or de-platformed third-party users who repost CHD content to their social media sites.

369.   The temporal proximity of many of the events set forth above plausibly suggests inter-firm communication and concerted action.

370.   But the TNI's group boycott is an antitrust violation regardless of whether the Big Tech platforms acted in unison when taking specific boycotting actions targeting the Plaintiffs.

371.   By (1) entering into a collusive agreement to exclude rival news publishers from market-critical facilities if those publishers engaged in Prohibited Reporting; and (2) taking action pursuant to and in execution of that agreement, the TNI's members engaged in a classic group boycott *whether or not they coordinated the circumstances or timing of specific boycotting activity directed at any particular Plaintiff*.

372.

373.    PLAINTIFF TrialSite, Inc., through its website TrialSite News ("TSN"), has frequently reported (accurately) on the use of Ivermectin in clinical trials and as an off-label treatment in various countries around the world, under provisional or emergency authorization, to treat COVID-19, as well as other COVID-19-related matters challenging the COVID narrative as reported by members of the TNI.

374.    For example, TSN posted on YouTube truthful videos including a documentary film about Peru's embrace of Ivermectin early on in the pandemic; a discussion of the authorization of Ivermectin for treatment of COVID-19 in Belize, Slovakia, India, El Salvadore, and other nations; an interview with Dr. Pierre Kory about his experience treating patients with COVID-19; a livestream of a presentation by the Frontline Critical Care Alliance; discussions of the British Ivermectin Recommendation Development Panel; Dr. Tess Lawrie's meta-analysis of Ivermectin's efficacy in treating COVID-19; a New York state court ruling about use of Ivermectin to treat COVID-19; Dr. Robert Malone's analysis of the spike protein; and Dr. Nikolai Petrovsky's development of a COVID-19 vaccine, among other topics.

375.    In 2020 and 2021, TSN published on Facebook accurate posts reporting on the use of Ivermectin in the U.S. and in other countries, including the provisional authorization of the drug in Slovenia during an earlier stage of the pandemic.

376.    This Prohibited Reporting has led to numerous acts of censorship against TSN by TNI Platform Members.  For example:

    A.    On August 4, 2020, Facebook removed a truthful post about Ivermectin as "violating community standards on misinformation that can cause physical harm."

    B.    On January 1, 2021, Facebook removed another truthful post about Ivermectin.

C.      On February 2, 2021, Facebook removed another truthful post about Ivermectin and issued a third "strike" against TSN. This "strike" put TSN at risk of being fully de-platformed on Facebook, forcing TSN to end all Facebook references to Ivermectin.

D.      On March 29, 2021, YouTube removed a video, a documentary about Ivermectin and COVID-19 in Peru, and issued a "warning."

E.      On July 9, 2021, YouTube removed nine videos in rapid succession, issuing strikes against the channel. The removed videos were "UK BIRD Panel Sends Ivermectin Recommendation to World Health Organization"; "News Roundup: Scientific Misconduct Accusation with Dr. Andrew Hill's Ivermectin Meta-Analysis" (restored after appeal); "Beyond the Roundup: Judge Orders Use of Ivermectin: 80-year Old Mom Now Home and Well" (restored after appeal); The FLCCC Alliance press conference from Houston, Texas; "Beyond the Roundup: Italian-led Ivermectin Meta-Analysis: Consider for Help Treating COVID-10?" (restored after appeal); "Dr. Pierre Kory Talks COVID-19, Ivermectin and the FLCCC"; "Beyond the Roundup: Did Cali Colombia Ivermectin Trial Include Protocol Deviations?" (restored after appeal); "News Roundup: Dr. Tess Lawrie Discusses her Ivermectin Meta-Analysis, the FDA, and Dr. Andrew Hill"; and "Beyond the Roundup: Central American Nation of Belize Authorizes Use of Ivermectin for COVID-19."

F.      On July 11, 2021, YouTube removed two TSN videos: "Dr. Robert Malone, Inventor of mRNA technology discusses the Spike Protein" (restored after appeal) and "Ralph Lorigo Talks NY Court Rulings Over Ivermectin Use in COVID-19 Treatment: Interview."

G.      On September 23, 2021, YouTube removed a TSN video entitled, "The Media's Viral Lie about Ivermectin Overdoses & Horse Medicine: Dr. Kory Responds" and issued another strike against the TSN channel.

H.      On September 26, 2021, YouTube removed a TSN video entitled "Medical News: Australian Researcher: Triple Therapy (Ivermectin, Zinc, Doxycycline) for COVID-19."

I.      On November 19, 2021, YouTube removed a TSN video entitled "News Roundup: COVID-19 Infection Rate Skyrockets in America's Most Vaccinated State: Vermont" (restored after appeal).

J.      On November 21, 2021, YouTube removed a TSN video entitled "Dr. Niklai Petrovsky Discusses his Novel Vaccine for COVID-19: Interview," and issued a strike against TSN's channel.

K.      On March 18, 2022, YouTube removed a TSN video entitled "News: Autopsy: Post-Vaccination Myocarditis 'Primary Cause' of Two Teens' Deaths," and issued a strike against TSN's channel.

L.      During portions of the timeframe described above, YouTube also engaged in shadow-banning of TSN's channel.

377.    In addition, the TNI's Big Tech Members throughout this period threatened, censored, suspended, and/or de-platformed third-party users and consumers who attempted to repost TSN content to their own social media sites.

378.    As a result, TSN has suffered damages to date of between $580,000 and $720,000, together with lost in-video sponsorship opportunities of $30,000-40,000 per month.

379.    PLAINTIFF CD Media has frequently reported opinion and truthful content about politics, current events, and cultural affairs.

380.   In particular, CD Media has investigated and reported truthfully on the doings of the Biden family in the United States and abroad, including Hunter Biden, and on the origins and treatment of COVID-19.

381.   As a result of engaging in such Prohibited Reporting, CD Media's owner, L. Todd Wood, has been censored and de-platformed by Defendants.   Such censorship has included the following:

382.   In August 2020, Twitter shadow-banned CD Media accounts, and then suspended seven CD Media and staff accounts, leaving only Mr. Wood's personal account, due to CD Media reporting about the Biden family.

383.   On October 12, 2020, LinkedIn de-platformed CD Media for allegedly violating LinkedIn's user agreement based on two posts: "Chinese Virologist Dr. Li-Meng Yan Confirms COVID-19 Created in Lab And Intentionally Released…This Is An Act of War," and "New Biden Audio Tape Released in Ukraine shows VP Trashing Incoming Trump Admin To Foreign Leader, Says He'll Stay Involved in Ukraine After Inauguration, Discusses Jointly Damaging Trump."

384.   On October 20, 2020, Twitter locked Mr. Wood's personal account after Mr. Wood posted a tweet linking to truthful information about to the Hunter Biden laptop story.

385.   On October 25, 2020, Facebook blocked all CD Media content after a post that included images of Hunter Biden from LinkedIn and Facebook and stated, "we have the Hunter Biden sex tapes…one per hour being released."

386.   On November 4, 2020, Facebook reduced distribution of CD Media posts and imposed other restrictions because of "repeated sharing of false news," as determined by "an independent fact-checker."

387.   On December 27, 2020, without explanation, Google de-platformed CD Media from ad revenue by preventing CD Media from serving ads via AdSense on its main website.

69

388.    On November 22, 2021, Google again de-platformed CD Media from AdSense, claiming this was due to "dangerous or derogatory content" and "unreliable and harmful claims," when in fact the content targeted consisted of wholly accurate reporting about an individual who had suffered injuries as a result of a COVID vaccination.

389.    On April 12, 2022, Google ended CD Media's ability to use Ad Manager, due to CDMedia's coverage of vaccine injuries, which included interview with individuals injured by the COVID-19 vaccine.

390.    In addition, the TNI group boycott caused the following additional injuries.  On August 19, 2020, PayPal froze CD Media funds for 21 days.  On September 9, 2020, Patreon froze CD Media funds and Stripe de-platformed CD Media for credit card processing.  On January 20, 2021, Mailchimp suspended CDMedia.  On June 24, 2021, PayPal blocked CD Media accounts and seized its funds.

391.    CD Media's revenues depend on website traffic: the more traffic, the greater the revenue. The website revenues include both subscription revenue and ad revenue.

392.    The TNI group boycott resulted in reduced traffic to CD Media websites and also reduced CD Media's ability to serve ads on its websites.

393.    In March 2020, CD media websites had at least 1.2 million unique views per month, and anticipated continued growth of its website traffic and revenues.

394.    However, as a result of TNI Members' actions, including the de-platforming of Mr. Wood and CD Media accounts, instead of growing, traffic was reduced by at least two thirds, resulting in an average of 400,000 views per month.

395.    The reduction in views translated into losses of revenue in the millions of dollars.

396.   In addition to lost revenue from reduced website traffic, the TNI Members' actions truncated CD Media's effort to obtain investment capital, resulting in a loss of $600,000 in expected investment, and reducing CD Media's ability to grow.

397.   Moreover, the TNI group boycott caused Mr. Wood to lose an estimated $10,000/month in book sales.

398.   In total, as the result of the TNI's unlawful group boycott, CD Media has suffered damages of at least $10,000,000.

399.   PLAINTIFF Erin Elizabeth Finn reported (accurately) on the lab-leak theory of COVID-19's origins among other legitimate but Prohibited Claims and as a result she was censored and shadow-banned by TNI members.

400.   For example, on May 16, 2022, at approximately 6:00 p.m., Facebook removed millions of Ms. Finn's followers across many pages and multiple platforms, including the hundreds of thousands of people who followed her on her main Instagram page and her product page.

401.   Later in 2022, Ms. Finn's Twitter account was censored.

402.   Due to this and other censorship and de-platforming by TNI members, Ms. Finn has suffered damages to date of at least $2,000,000.

403.   PLAINTIFF Dr. Ben Tapper has frequently reported critically on masking and other COVID-19 policies.

404.   Such reporting has included: an August 2020 video of his address to the Omaha, Nebraska City Council in opposition to mask mandates; links to studies demonstrating the inefficacy of masking in preventing COVID-19 infection and transmission; inquiry into the reason for increases in neurological and inflammatory disorders, especially among children; a statement about the importance of informed consent and the free inquiry that is its necessary foundation; and a

discussion of adverse reactions discussed in documents relating to Pfizer's COVID-19 vaccine clinical trials, released by the FDA in March, 2022.

405.    As a result of engaging in such Prohibited Reporting, Dr. Tapper has been censored and de-platformed by TNI Big Tech Members, including censorship of the above-mentioned posts.

406.    For example, Twitter and/or Instagram removed truthful posts made by Dr. Tapper on numerous occasions in 2020 and 2021, including but not limited to the following:

A.      "It amazes me how people have more faith in Pfizer and Moderna's vaccine than they do the innate intelligence inside the body. That same innate intelligence has a 99% success rate at fighting this virus. That there lies the elephant in the room. Time for a discussion."

B.      "The 'I believe in science' bumper sticker slogan will only hold up for so long until it's met with concrete observational science. The 'science' they claim to believe in is tailored and doctored for the desired outcome that fits the narrative and agenda."

C.      "With all the thousands of side-effects being reported and all the evidence being ignored, is avoiding an infection with a 99% survival rate worth the risk of the vaccine?"

D.      "Science is learning through the lenses of observation with a healthy dialogue, and it's not settled. Truth never minds being questioned hence why censorship should raise an eyebrow. People don't want to be informed they prefer to be validated in their current belief system."

E.      "'Anyone can test positive for practically anything with a PCR test, if you run it long enough…with PCR if you do it well, you can find almost anything in anybody…it doesn't tell you that you're sick.' — Dr. Kary Mullis, PhD, creator of the PCR test."

F.      "In 2015, a baby girl was aborted. A 'water bag' abortion was specifically selected so that she would be alive when her organs were harvested. Her name is Walvax-2. She's a new fetal cell line in vaccines."

407.    The TNI's censorship actions targeting Dr. Tapper also include the following:

A.      In August 2020 and October 2020, Facebook censored a video of Dr. Tapper's public presentation about masks to the Omaha, Nebraska City Council, and imposed limits on his account.

B.      In December 2020 Facebook locked Dr. Tapper's account for 24 hours after a post describing people who refuse to wear a mask as being caring for other people, but intolerant of lies perpetrated by a medical dictatorship.

C.      In March 2021, Instagram deleted Dr. Tapper's main account and two backup accounts. Additionally, when other Instagram users attempted to tag one of Dr. Tapper's accounts, Instagram delivered a message indicating "Can't @mention dr.bentapper" and "can't be @mentioned."

D.      On April 10, 2021, Twitter temporarily limited some account features, eliminating the ability to like and comment, after Dr. Tapper posted "[t]o those  who got the experimental shot, what research did you do?"

E.      In July 2021, Twitter suspended Dr. Tapper's account for violating Twitter rules. Twitter eventually reinstated the account but required Dr. Tapper to delete most posts having anything to do with COVID-19 or the COVID-19 vaccine.

F.      Roughly two months later, Twitter permanently removed the account.

G.      On July 18, 2021, Facebook restricted Dr. Tapper's ability to post or comment because "a post from the last year didn't follow our standards."

H.      On August 5, 2021, Facebook censored Dr. Tapper's post about studies of the efficacy of masks in preventing COVID-19 transmission and infection, and concerns about the effects of masks on children.

I.      On October 7, 2021, Facebook censored Dr. Tapper's post questioning the rise in neurological and inflammatory disorders.

J.      Around October 2021, YouTube removed videos of Dr. Tapper's COVID-19-related speeches, as well as an interview with former United States Representative Ron Paul.

K.      On October 19, 2021, after Dr. Tapper reshared a video discussing vaccines that been posted on his page since October 2019, Facebook deleted the video and temporarily suspended Dr. Tapper's account.

L.      On December 10, 2021, Facebook censored Dr. Tapper's post discussing the importance of informed consent, raising questions about Pfizer's history, including bribery and the imposition of large fines, and discussing a defamatory article that falsely labeled Dr. Tapper as one of the twelve greatest spreaders of COVID-19 misinformation.

M.      On May 10, 2022, just weeks after Dr. Tapper posted about the FDA's release of the Pfizer EUA approval documents, Facebook restricted Dr. Tapper's account, indicating "your posts will be moved lower in News Feed for at least 90 days."

408.   In addition, the TNI Members' actions described herein caused PayPal and Venmo in the summer of 2021 to delete or freeze Dr. Tapper's accounts without warning or explanation.

409.   As a result of TNI censorship and de-platforming, Dr. Tapper has suffered damages in excess of $15,000 per month in fundraising losses, as well as significant revenue loss from his chiropractic practice.

410. Dr. Tapper's social media accounts were the main source of fundraising for a documentary film he was producing.

411. Prior to such censorship, Dr. Tapper was raising $15,000-30,000 per month towards funding the film.

412. Dr. Tapper's ability to fundraise online for the documentary was lost as a result of censorship and de-platforming by TNI Members.

413. In addition to being a source of fundraising, Dr. Tapper's social media accounts helped to bring new patients to his chiropractic clinic.

414. The TNI's censorship and de-platforming of Dr. Tapper eliminated his ability to reach new patients through social media, leading to significant loss of clinic revenue.

415. As a result of the TNI's censorship and de-platforming, Dr. Tapper has suffered damages of at least $7,125,000.

416. PLAINTIFF Jim Hoft, through his website, the Gateway Pundit ("GP"), has repeatedly reported accurate but TNI-prohibited information and claims concerning COVID and the 2020 US presidential election and as a result has been punished and censored by the TNI's Big Tech Members. For example, without limitation:

417. On or about January 2, 2021, Twitter suspended GP's Twitter account (@gatewaypundit) after it posted a tweet that stated, "Then It's Not a Vaccine: Crazy Dr. Fauci Says Early COVID Vaccines Will Only Prevent Symptoms and NOT Block the Infection …What?"

418. On or about January 29, 2021, Twitter suspended GP's Twitter account again after it posted a tweet that stated, "Five Days After Biden Inauguration, Judge Rules Late Changes To VA Election Law That Allowed Late Mail-In Ballots Without Postmark To Be Counted is ILLEGAL @100percFEDUP via @gatewaypundit."

419.    On or around February 6, 2021, GP's Twitter account was permanently banned after it posted video footage from security cameras in the TCF Center in Detroit from Election Night 2020 that showed two deliveries of vans driving to the building around 3:30 am bringing shipments of first more than 50 boxes, and then, roughly one hour later, more boxes of ballots.

420.    In connection with this video, GP tweeted "Just an FYI – The fake news media and others challenged our TCF Center video report from Friday. That was a bad move. We have much more coming!" Promptly after this tweet, GP's Twitter account was permanently suspended, preventing GP from tweeting the additional content to its 400,000+ followers.

421.    On or about August 29, 2020, Joe Hoft, Plaintiff Jim Hoft's brother, who blogs for the Gateway Pundit, tweeted from his @joehoft account a series of posts indicating that COVID-19 deaths are over-counted because the counts include deaths of people who died with COVID-19, not just those who died because of COVID-19 (a fact subsequently acknowledged as true by major leading health authorities).  These tweets went viral and were heavily re-tweeted.  As a result of these tweets, Twitter partially censored @joehoft by posting public advisories "warning" the public that the tweet was misinformation.

422.    On or about December 31, 2020, Joe Hoft tweeted content related to Hunter Biden's laptop, stating "Where's Hunter? How is Hunter Biden Celebrating the New Year? New Photos of Hunter Biden Pushing Drugs on Women Emerge via @gatewaypundit."  Afterwards, Twitter suspended Joe Hoft's account.

423.    During 2020 and 2021, the Gateway Pundit experienced repeated instances of censorship by Facebook.

424.    Facebook frequently imposed warning labels and other restrictions on Gateway Pundit our content, particularly content related to election integrity and COVID-19.

425.    Facebook's censorship was so aggressive that Plaintiff Hoft was forced to hire an assistant to monitor and address censorship on Facebook.

426.    The Gateway Pundit also experienced censorship on YouTube.

427.    For example, on or about May 14, 2022, Gateway Pundit received a strike on YouTube, and YouTube removed a video posted by the Gateway Pundit, showing an interview it had conducted with Idaho Lieutenant Governor and gubernatorial candidate Janice McGeachin.  In the video, Lt. Gov. McGeachin discussed the problem of election fraud and raised questions about the outcome of the 2020 Presidential election, including money Idaho illegally received from Mark Zuckerberg and other problems relating to voter fraud. YouTube promptly removed the video and issued a strike against the Gateway Pundit's account.

428.    The TNI's Big Tech Members have extended their censorship policies to GP's followers as well.  The Gateway Pundit has received numerous reports from followers that they have received temporary suspensions or other adverse actions from TNI Big Tech Members (such as seven-day suspensions of their Facebook accounts) for re-posting or amplifying Gateway Pundit content.

429.    Such adverse action chills Gateway Pundit followers from re-posting, re-tweeting, or otherwise amplifying GP content, which reduces the Gateway Pundit's traffic and lowers revenue.

430.    TNI censorship of the Gateway Pundit has caused the Gateway Pundit substantial losses of traffic and revenue.  For example, without limitation:

431.    After a Facebook algorithm change, overall traffic to the Gateway Pundit's website dropped by approximately 25%.

432.    After Twitter banned Plaintiff Hoft's account, traffic to the Gateway Pundit website from Twitter dropped by 67%.

433.    After an advertising ban imposed by Google, Gateway Pundit revenue dropped by 35%.

434. But for Facebook's and Twitter's censorship and shadow-banning, overall traffic to thegatewaypundit.com website would be at least 49% higher than it currently is.

435. If Google had not refused to provide advertising services, overall revenue would be at least 54% higher than it is.

436. In total, Gateway Pundit's revenue would be at least 130% higher but for TNI Members' collusive censorship, and overall, as a result of the TNI's unlawful group boycott, Mr. Hoft has suffered damages of at least $25,000,000.

437. PLAINTIFF Ben Swann's truthful reporting included discussions about health, economic, and social issues related to the pandemic, including masks, EcoHealth Alliance and gain of function research, COVID-19 hospital protocols, and hospitals' extra pandemic earnings.

438. On May 18, 2020, Facebook blocked one of Mr. Swann's podcasts about H.R. 6666, a $100 billion dollar federal contact-tracing bill. Over the next 30 days, video traffic was dramatically reduced, and Mr. Swann's Facebook page was shadow-banned.

439. On July 23, 2020, Facebook demonetized another mask-related podcast, this one, about a CDC/WHO study of the efficacy of face masks.

440. On September 10, 2020, Facebook demonetized a podcast about a vaccine study that was halted due to adverse events.

441. On September 23, 2020, Facebook deleted a podcast about Kyle Rittenhouse that had been posted a year earlier.

442. Similarly, by September 2020, in addition to labeling truthful information as "false," Instagram was blocking Mr. Swann's ability to be tagged and mentioned.

443. On December 31, 2020, Facebook demonetized a podcast titled "The Biggest Problem With COVID Vaccines."

444. On June 1, 2021, Facebook demonetized a podcast about the origins of COVID-19.

445. Each time Facebook took such action, the views and sharing of subsequent podcasts were dramatically reduced.

446. By October 2022, Mr. Swann's Facebook page had virtually no viewership left, almost entirely wiping out all revenue therefrom.

447. YouTube also blocked Mr. Swann's podcasts.

448. For example, YouTube blocked podcasts that included the following, wholly legitimate news reporting: "Doctors: Data Proves That Covid Death Rate is Very Similar to the FLU," "Why Face Masks DON'T Work, According to SCIENCE," "Gates Foundation Behind Completely WRONG Coronavirus 'Death Toll' Numbers," "Judge Dismisses Nurses 'Vaccine Rights' Case," "Norway Warns 'Very Frail' People NOT to Get COVID Vaccine After Investigating Series of Deaths," "Science Has Proven Mask Mandates Are More Harmful to Children than COVID," and "43% of Parents Say They Will Pull Their Child Out of School Over Vax Mandate."

449. In mid-2021, YouTube removed Mr. Swann's channel without warning, after a podcast that shared CDC statistics about masking children in schools. Over ten years of podcasts were deleted.

450. The financial success of Mr. Swann's podcast depended on his ability to distribute it through social media channels.

451. As the result of Defendants' unlawful boycott, Mr. Swann has suffered damages to date of at least $20,000,000.

452. PLAINTIFFS Ty and Charlene Bollinger, on grounds of supposed "misinformation" in their reporting, were subjected to the following acts of censorship and de-platforming by TNI members.

453.    They were de-platformed from five Twitter channels, each of which had tens of thousands of followers, shortly after March 30, 2021.

454.    Their The Truth About Vaccines account was de-platformed from Instagram on March 25, 2021.

455.    Their personal Instagram accounts were de-platformed on October 21, 2021.

456.    Their The Truth About Vaccines channel was de-platformed from YouTube on May 17, 2021.

457.    Their The Truth About Cancer channel, which had more than 200,000 subscribers and more than 40 million views, was de-platformed from YouTube on July 22, 2021.

458.    Their The Truth About Vaccines account was de-platformed from Vimeo on May 13, 2022.

459.    They continue to be heavily shadow-banned on Facebook and can no longer effectively communicate with their millions of followers.

460.    These acts of censorship, shadow-banning, and de-platforming have to date caused financial damage to the Bollingers of at least $22,000,000.

461.    PLAINTIFF Dr. Joseph Mercola published Prohibited Reporting on his social media accounts such as truthful commentary about and criticism of the government's response to the COVID-19 pandemic, including COVID's potential lab-leak origin, the comparative benefits of early treatment and natural immunity, and the risks or inefficacy of COVID vaccines mandated under emergency use authorizations.

462.    As a result, Dr. Mercola was subjected to censorship, shadow-banning, and de-platforming by TNI Big Tech Members.

463.    For example, Facebook "graylisted" or "ghosted" Mercola.com accounts, making them more difficult to find and lowering their place in algorithm results.

464.    On April 20, 2021, Facebook banned Dr. Mercola's Chinese, Japanese, and Korean foreign-language accounts. No advance notice was provided, no specific posts were mentioned as the cause, and the accounts were permanently suspended.

465.    Twitter has also "graylisted" or "ghosted" Mercola.com's accounts, making them more difficult to find and lowering their place in algorithm results.

466.    Moreover, beginning late in 2020, without providing any notification, Twitter began blocking users from sharing any links to the Mercola.com website or articles thereon.

467.    As of September 2021, Mercola.com had more than 300,000 subscribers to its YouTube channel, and its video content had garnered 50,000,000 or more separate views.

468.    As with other platforms, Google graylisted Mercola so that a search of his name yielded no results.

469.    On September 29, 2021, YouTube de-platformed Mercola.com without prior notice, notwithstanding the fact that Dr. Mercola had conscientiously abided by YouTube's Community Guidelines.

470.    Dr. Mercola first learned of this de-platforming from Defendant and TNI Member the Washington Post, which reported the de-platforming before it happened, demonstrating that Google/YouTube and the Washington Post were in communication with one another about the de-platforming before it occurred.

471.    Specifically, at 9:00 am EDT on September 29, 2021, *The Washington Post* published an article titled "YouTube is banning Joseph Mercola and a handful of other anti-vaccine activists."[28]

---

[28] THE WASHINGTON POST, *YouTube is banning prominent anti-vaccine activists and blocking all anti-vaccine content*, Sept. 29, 2021, https://www.washingtonpost.com/technology/2021/09/29/youtube-ban-joseph-mercola.

472.    Six minutes later, at 9:06 am EDT, Dr. Mercola received an email from YouTube stating that the Mercola channel was de-platformed and banned.

473.    Based on that de-platforming, Dr. Mercola and Mercola.com have filed an action against Google for breach of contract, among other counts, in the United States District Court for the Northern District of California.

474.    As the result of the shadow-banning, greylisting, censorship and de-platforming by TNI Members pursuant to their unlawful agreement, Dr. Mercola has suffered damages to date in the millions of dollars.

475.    PLAINTIFF Jeff Crouere has also been targeted by TNI Platform Members because of Prohibited Claims published on his websites and social media accounts.

476.    For example, in late 2021, Mr. Crouere posted content and links to content on his social media sites criticizing mandatory vaccine measures and asserting (accurately) that some people had reported that family members and friends had died after receiving the vaccine.  He also posted content and links to content criticizing the failure of authorities to investigate the Hunter Biden laptop emails.

477.    In November 2021, without offering any detail or examples, Facebook terminated Mr. Crouere's personal Facebook page for "dangerous content."  The account remained shut down for eight months.  This eight-month de-platforming caused Mr. Crouere significant losses of audience and sponsorships.  By reasonable inference, Facebook took this action because of Mr. Crouere's publication of Prohibited Claims.

478.    On September 16, 2022, Mr. Crouere added a post to his LinkedIn page describing and linking to an interview he'd done discussing "injection safety and how the FDA turned a blind eye to it."  Shortly thereafter, LinkedIn shut down his account, and on October 4, 2022, citing the

September 16 post, LinkedIn sent Mr. Crouere a message explaining the de-platforming on the ground that he had published "misleading or inaccurate information." Mr. Crouere's LinkedIn account remained shut down for approximately two months, and Mr. Crouere was required to delete the "offending" posts as a condition of reopening it.

479.     Because of these de-platformings, Mr. Crouere has stopped posting political content on his Facebook and LinkedIn pages, resulting in significant decreases in traffic to his websites and significant decreases in audience and sponsorships for Ringside Politics.

480.     In 2021 and 2022, Mr. Crouere posted videos to his YouTube Channel questioning the safety and efficacy of the COVID vaccines and criticizing the failure of authorities to investigate the Hunter Biden laptop emails. Throughout that period, and continuing today, Google has shadow-banned Mr. Crouere's content, causing significant decreases in audience and sponsorships for Ringside Politics.

481.     As a result of these actions by TNI members pursuant to and in execution of their unlawful agreement, Mr. Crouere suffered monetary damages in excess of $75,000.

## COUNT ONE:
## PER SE VIOLATION OF THE SHERMAN ACT

482.     All preceding allegations are incorporated herein by reference.

483.     Group boycotts are per se violations of Section 1 of the Sherman Act.

484.     A classic *per se* unlawful group boycott "involves joint efforts by a firm or firms to disadvantage competitors by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle" or by "cut[ting] off access to a supply, facility, or market necessary to enable the boycotted firm to compete." *Northwest Wholesale Stationers, Inc. v. Pacific Stationery Printing Co.*, 472 U.S. 284, 294 (1985), *quoted in Tunica Web Advertising v. Tunica Casino*, 496 F.3d 403, 413 (5th Cir. 2007).

485.    In addition, in a per se unlawful group boycott, the boycotting firms typically include: (A) at least two firms that compete with each other (horizontal agreement between at least some defendants); (B) at least one firm that competes with the plaintiffs (horizontal competition between plaintiffs and at least one defendant); and (C) one or more firms with a "dominant position" in the market or "exclusive access to an element essential to effective competition." *Northwest Wholesale Stationers,* 472 U.S. at 296; *MM Steel, L.P. v. JSW Steel (USA) Inc.,* 806 F.3d 835, 849 (5th Cir. 2015); *Tunica Web Advertising*, 496 F.3d at 413.

486.    As long as at least two firms in the boycotting group compete with each other, establishing the existence of a horizontal agreement, it does not legally matter whether other members of the boycotting group are also competitors, and all members of the combination are per se liable. *MM Steel*, 806 F.3d at 849 ("a non-competitor participant in a horizontal conspiracy [is] per se liable because '[i]f there is a horizontal agreement between A and B, there is no reason why others joining that conspiracy must be competitors') (quoting *United States v. MMR Corp. (LA)*, 907 F.2d 489, 498 (5th Cir. 1990)).

487.    As detailed above and summarized here, all the above-listed factors are present in this case.

***Allegations of Agreement***

488.    As with any other combination violating the Sherman Act, the first element of a group boycott is an agreement.

489.    To allege an agreement in antitrust cases, plaintiffs may rely on circumstantial evidence. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007); *Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n*, 776 F.3d 321, 330 (5th Cir. 2015).

490.    However, if plaintiffs' properly and plausibly allege ***direct evidence*** of a horizontal agreement, no circumstantial evidence is necessary.

491.    "A plaintiff may plead an agreement by alleging direct or circumstantial evidence, or a combination of the two. If a complaint includes non-conclusory allegations of direct evidence of an agreement, a court need go no further on the question whether an agreement has been adequately pled." *W. Penn Allegheny Health Sys. v. UPMC*, 627 F.3d 85, 99 (3d Cir. 2010); *see, e.g.*, *Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig. v. Samsung Elecs. Co.*, 28 F.4th 42, 47 (9th Cir. 2022) ("*In the absence of direct evidence of an agreement*, certain plus factors may elevate allegations of parallel conduct to plausibly suggest the existence of a conspiracy.") (emphasis added).

492.    Plaintiffs here have pleaded ample non-conclusory allegations of direct evidence of an agreement among the members of the TNI.

### Direct Evidence of Agreement

493.    "Direct evidence of a conspiracy is that which 'explicitly refers to an understanding' between the alleged conspirators." *Southway Theatres, Inc. v. Ga. Theatre Co.*, 672 F.2d 485, 493 n.8 (5th Cir. 1982).

494.    An admission by one or more of the parties that an agreement was made, or that concerted action was taken, is direct evidence of agreement. *See, e.g.*, *United States v. Sutherland*, 656 F.2d 1181, 1189 (5th Cir. 1981) (admission is direct evidence).

495.     TNI Members have repeatedly and publicly admitted their collaboration, partnership, and joint agreements not only to share "alerts" about supposed "misinformation" but to take action against TNI-identified "misinformation."  Such admissions include:

    A.    The admission in a joint statement issued in March 2020 by Facebook, Google, YouTube, Microsoft, LinkedIn, and Twitter that they "***work*[] *closely together*," "jointly combating fraud and misinformation about the virus."

B.      The description issued by the BBC in July 2020 of the "Trusted News Initiative (TNI)" as a "***ground-breaking collaboration*** to fight the most dangerous disinformation worldwide."

C.      The statement by Jessica Cecil (then the head of the TNI) in December 2020 and September 2021, referring to the TNI's Members, that "***working together achieves things we couldn't do on our own***. . . . ***We don't fact check; but once we learn from a partner that something is unreliable, that's when we alert each other***," and "***all participants signed up to a clear set of expectations of how to act***."

D.      The further statements by Cecil that the TNI "***tightly defines what cooperation and action looks like***," that TNI members not only collectively decided what counted as misinformation but also "***decided what to do about it***," that "***without that core specificity the TNI would never have got off the ground***," that the TNI involves "***cooperation across platforms***," and that the TNI involves "***cooperation between tech and media***," all with the goal of finding "***practical ways to choke off***" the online publishing of news deemed by TNI members to be Prohibited Reporting.

E.      The admission by a senior BBC executive in March 2022 that the members of the Trusted News Initiative have "***club[bed] together***" to combat an "existential threat" posed to "trusted news providers" by "unchecked" online news publishers.

F.      The admission by the BBC that the TNI's members committed to "moving quickly ***and collectively to undermine disinformation before it can take hold***" and that to "ensure" achievement of that goal, the TNI conducted "'fire drills'" before "roll[ing] out the ***agreed actions***."

G.      The admission by an officer of Facebook at a March 2022 TNI conference that Facebook works together with its "industry partners" to de-platform news publishers who violate TNI prohibitions; and that "collaboration" among Internet platforms is critical in this endeavor, because a violator excommunicated from only one platform can continue to publish on other platforms, which "**makes defender collaboration more important than ever and is going to continue to make it even more important going forward**."

H.      The admission in an internal Twitter document that in meetings with Facebook, Google, and Microsoft, other companies (not Twitter) would generate research and Twitter would incorporate that research into its own censorship protocols.

***Circumstantial Evidence of Agreement***

496.    Although the above admissions render further, circumstantial evidence of agreement unnecessary, Plaintiffs have alleged abundant circumstantial evidence of agreement.

497.    In antitrust cases, such circumstantial evidence typically includes allegations of parallel conduct in addition to "plus factor" allegations supporting the inference that the parallel conduct took place pursuant to an agreement. *See, e.g., Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig. v. Samsung Elecs. Co.*, 28 F.4th 42, 47 (9th Cir. 2022).

498.    Parallel conduct—strikingly similar, near-contemporaneous censorship of legitimate reporting by TNI Big Tech Members, together with strikingly parallel treatment of the Prohibited Claims by TNI Legacy News Members—has been alleged in detail above.

499.    The "plus factors" include:

(A) weekly meetings held by the TNI, including "closed-door" meetings admitted to by the TNI's founding member, Defendant the BBC, as well as annual conferences publicized and carried on TNI web pages hosted by the BBC;

(B) the copious evidence, including admissions, of communication among them, including communications pursuant to what the TNI openly describes as its "fast alert system," in which TNI members alert one another to reporting deemed to be "misinformation" so that TNI platform members can then take action to "choke off" such "misinformation";

(C) the fact that the Prohibited Claims, as announced and enforced by all the TNI's Big Tech Members' social media platforms, have included so many claims that were either true or, at a minimum, plainly within the ambit of legitimate public debate, which undermines the notion that the Defendants were each independently assessing accuracy and instead supports the inference that they were acting collusively; and

(D) the "regular meetings" held by the TNI's Big Tech Members to share information about and coordinate their censorship policies and decisions.

500.    The "plus factors" also include the fact that the concerted conduct would not have been in the economic self-interest of TNI Members unless accomplished collectively.

501.    Suppression of controversial, attention-attracting news is contrary to the individual economic self-interest of any one news organization or Big Tech platform.

502.    Controversial, hot-button news reporting, such as reporting that COVID originated in a lab in Wuhan, China or that a computer belonging to Hunter Biden has been discovered containing scandalous documents potentially incriminating then-candidate Joe Biden, attracts enormous attention and viewership.  If only one TNI Legacy News Member or Big Tech Member had suppressed such reporting, while the others did not, the suppressing Member would have lost viewership to its rivals.

503.    In other words, from the perspective of individual self-interest, each entity stands to gain viewership if it *publishes* such claims.

504. Thus if a news publisher or social media platform wants to censor such claims, it can avoid the loss of viewership to rivals that will be caused by such censorship only if other, competing entities join it in such censorship. This means that to achieve suppression without sacrificing viewership, collective action is necessary, which further supports the inference of agreement and concerted action here.

505. For all these reasons, an agreement has been more than adequately pleaded.

**The Agreement Was Horizontal and Targeted Competitor Firms**

506. Moreover, the TNI's Legacy News Members, including all the Defendants herein, are original-content online publishers of political and COVID news and as such compete with one another in the US online market for COVID and political news.

507. In addition, the TNI's members compete with one another across a variety of other relevant markets, as detailed above.

508. Hence the TNI agreement was **horizontal** for antitrust purposes—*i.e.*, an agreement among competitor firms.

509. At the same time, Plaintiffs are also original-content online publishers of COVID and political news, so the TNI includes—indeed, was spearheaded by—firms (including the Defendants herein) that compete with Plaintiffs.

510. Thus the core horizontal elements of a per se unlawful group boycott were and are present here: (A) horizontal agreement (the boycotting firms included firms in competition with each other); and (B) horizontal competition with the boycott victims (the boycotting firms included firms in competition with Plaintiffs).

***Further Elements of a Per Se Group Boycott Claim***

511.    As well as agreement, the allegations plead adequately, plausibly, and in detail all the other elements typical of a per se violation of the Sherman Act.

512.    A "group boycott 'generally' falls into the per se category if 'the boycotting firms possess[] a dominant position in the relevant market,' [and] they 'cut off access to a supply, facility, or market necessary to enable the boycotted firm to compete' . . . .  At the same time, 'a concerted refusal to deal need not necessarily possess all of these traits to merit per se treatment.'" *PLS.COM, LLC,* 32 F.4th at 835 (quoting *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co*., 472 U.S. 284, 294-95 (1985)).

513.    The TNI's members include firms that, collectively, have a dominant position—indeed much more than dominant—in the relevant markets.

514.    Determining dominance in the relevant markets, in the context of per se group boycotts, is not the same as determining "market power" or "monopoly power" as those terms are used elsewhere in federal antitrust law.  *See Toys "R" Us v. FTC*, 221 F.3d 928, 936 (7th Cir. 2000).

515.    Rather, for purposes of per se group boycott analysis, dominance in the relevant markets is a measure of the ability of the boycotting firms to coerce or "devastate" the targeted firms through their boycotting activity.  *See, e.g.*, *Northwest Wholesale Stationers*, 472 U.S. at 291 ("Because the New York Stock Exchange occupied such a dominant position in the securities trading markets that the boycott would devastate the nonmember, the Court concluded that the refusal to deal with the nonmember would amount to a per se violation of § 1 . . . .").

516.    Although monopoly power is not necessary to establish dominance, TNI Member Facebook in fact has monopoly power in the U.S. and global social network market, with nearly a 100% market share, as measured both by time spent by users and by advertising revenue.

517.   TNI Member YouTube has market power in the online long-form video market, with over 75% market share, as measured by the percentage of such videos disseminated.

518.   TNI Member Twitter is by far the dominant firm in the English-speaking microblogging market.

519.   TNI Member Google has monopoly power in the search engine market, with an almost 90% share in the U.S. and a 95% share worldwide.

520.   Collectively, TNI Big Tech Members have market power in the global and U.S. social media market, with over 90% of market share, as measured by users and revenues.

521.   Roughly 60% of Americans regularly get their news from social media websites, and within that submarket, TNI Members command an 85% market share.

522.   Individually and taken together, the Internet platforms owned and controlled by the TNI's Big Tech Members (including their social networking and social media websites, search engines, video-hosting websites, microblogging websites, and search engines) are critical to any small online news supplier's ability to compete and survive in the relevant US news markets.

523.   News publishers cut off from, shadow-banned or demoted on the platforms owned and operated by the TNI's Big Tech Members, including Facebook, Instagram, YouTube, Twitter, LinkedIn, and search engines Google and Bing, lose 90% or more of their traffic and therefore cannot effectively compete (or even survive) in the online news market.

524.   By and through its censorship, manipulation of search results, and de-platforming, the TNI's group boycott cut off Plaintiffs from markets and facilities essential to Plaintiffs' ability to compete.

525.   A group boycott remains per se unlawful under the Sherman Act even if the boycotting firms do not unconditionally or completely cut off the boycotted firms' access to essential

facilities, but instead "merely" require the boycotted firms to agree to the boycotters' unfavorable terms as a condition of access. *See PLS.COM, LLC*, 32 F.4th at 835 ("a group of competitors coercing a competitor's suppliers to sell to that competitor only on 'unfavorable terms' constitutes a group boycott even if the competitors do not completely cut off the competitor's access to inputs it needs") (citing *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 209 (1959)).

526.    No pro-competitive or efficiency justification exists for the TNI's boycotting activity.

527.    Rather, the TNI's putative justification for their censorship and de-platforming is that it improved the quality of the news and information being offered to the public.

528.    A justification based on putatively improving the "quality" of a product does not insulate a group boycott from per se unlawfulness under the Sherman Act; on the contrary, a putative quality-based rationale for a horizontal agreement in restraint of trade is anti-competitive and an assault on the basic policy of the Sherman Act.

529.    "[J]ustifying a restraint on competition based on an assumption it will improve a product's quality 'is nothing less than a frontal assault on the basic policy of the Sherman Act.' *Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679 (1978). The antitrust laws assume that 'competition will produce not only lower prices, but also better goods and services.' *Id.*" *PLS.COM, LLC*, 32 F.4th at 836.

***Economic Motivation***

530.    The TNI's group boycott was and is driven by economic and commercial motivations.

531.    Without limitation, the TNI's group boycott was intended to further the Defendants' economic and commercial interests in the following ways.

532.    As alleged above, legacy news organizations are today facing, and know they are facing, a profound competitive threat from the proliferation of smaller online news publishers, which

frequently engage in reporting that directly contradicts and competes with mainstream news reporting and that has repeatedly revealed the bias or ideological slant behind mainstream news reporting.  As a result, rival non-mainstream online news publishers pose an existential economic threat to legacy news media, eroding trust in legacy news organizations, taking audience share from them, and undermining their reputation.

533.    As admitted by a senior TNI member executive, this rivalry is perceived by legacy news organizations as the "real competition" in the news industry today, posing an "existential threat" to legacy news organizations and their business model.

534.    The formation of the TNI was motivated by this economic fear, and the TNI's censorship activity is intended to suppress, disadvantage, and damage rival news publishing, while supposedly bolstering the claim made by all TNI members to be "trusted news" providers.

535.    The TNI's group boycott blocked stories and facts that, by undermining the credibility of TNI reporting, would have done reputational and market damage to TNI members, demonstrating that Legacy News reporting is frequently unworthy of trust.  For these reasons, the TNI members specifically targeted the named Plaintiffs, all of whom are prominent publishers of original content in the relevant online news submarkets, and deterred numerous other online publishers from attempting to venture into those submarkets.

536.    Moreover, the TNI's group boycott had the purpose and effect of disparaging and destroying competing news publishers, in a deliberate attempt to paint TNI members as "trusted" news providers.

537.    Moreover, the TNI's group boycott promoted widespread COVID vaccination, while undermining alternative COVID treatments, helping to generate hundreds of billions of dollars in profits to vaccine manufacturers and other large pharmaceutical companies, which in turn pay the

TNI Big Tech Members billions of dollars for advertising.  *See, e.g.*, Washington Post, *Facebook has a prescription: More pharmaceutical ads*, Mar. 4, 2020, https://www.washingtonpost.com/technology/2020/03/03/facebook-pharma-ads ("Spending on Facebook mobile ads alone by pharmaceutical and health-care brands reached nearly a billion dollars in 2019, nearly tripling over two years").

538.    By colluding to suppress information that could have undermined pharmaceutical companies' hundred-billion dollar profits from new, expensive COVID vaccines and treatments, the TNI's Big Tech Members placated their largest advertisers and increased their revenues from those advertisers.

539.    Indeed, several of the Big Tech Members, including Facebook and Microsoft, and/or their largest individual shareholders, have direct or indirect massive pharmaceutical investments that stood to increase, and did increase, in value from promotion of the COVID vaccines.

540.    In addition, the principal owner of one of the Defendants, the Washington Post, owns over 12% of the shares (worth over a hundred billion dollars) of Amazon, Inc., a company whose profits and share price skyrocketed as the result of the lockdown policies that the TNI promoted and prevented others from criticizing.

541.    Finally, several of the TNI Big Tech Members, including Facebook, Twitter, and Google, had been threatened with financially catastrophic, adverse governmental legislative or regulatory action if they failed to aggressively suppress so-called COVID misinformation.  Such adverse governmental action would have cost the TNI's Big Tech Members billions of dollars in fines, liabilities, or lost revenues.  Hence for these TNI members, joining the TNI, agreeing to stamp out COVID "misinformation" and censoring such supposed misinformation furthered their economic interest in avoiding devastatingly costly governmental regulation.

542.     As detailed above, by excluding Plaintiffs (and other boycott victims) from the world's dominant Internet platforms for online news, including Facebook, Google, and Twitter, the TNI cut Plaintiffs off from facilities and markets essential to their ability to compete.

543.     Accordingly, the TNI engaged in a per se unlawful group boycott.

544.     Each participant in an antitrust conspiracy is jointly and severally liable for all the damages (including treble damages and attorneys' fees) caused by the conspiracy, and the victims of an unlawful antitrust conspiracy are not required to sue all participants therein.

545.     Hence each Defendant is liable to each Plaintiff for three times the damages each Plaintiff suffered as the result of the TNI's group boycott as well as for attorneys' fees.

## COUNT TWO:
## RULE OF REASON VIOLATION OF THE SHERMAN ACT

546.     All preceding allegations are incorporated herein by reference.

547.     Combinations in restraint of trade that are not per se unlawful still violate the Sherman Act when they violate "the rule of reason."

548.     "To determine whether a restraint violates the rule of reason, . . . a three-step, burden-shifting framework applies. Under this framework, the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market. If the plaintiff carries its burden, then the burden shifts to the defendant to show a procompetitive rationale for the restraint. If the defendant makes this showing, then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) (citations omitted); *see, e.g.*, *Impax Labs., Inc. v. FTC*, 994 F.3d 484, 492 (5th Cir. 2021); *PLS.COM, LLC*, 32 F.4th at 834.

549.    **"**A plaintiff can establish a substantial anticompetitive effect for purposes of the first step of the rule of reason analysis either 'directly or indirectly.'" *PLS.COM, LLC*, 32 F.4th at 834 (quoting *Ohio v. Am. Express*, 138 S. Ct. at 2284).

550.    To *directly* prove a substantial anticompetitive effect, the plaintiff must provide "proof of actual detrimental effects [on competition] such as reduced output, increased prices, or decreased quality in the relevant market.  When a plaintiff does so, no 'inquir[y] into market definition and market power' is required."  *Id.* (internal quotations and citations omitted); *see also, e.g.*, *Consolidated Metal Products, Inc. v. American Petroleum Institute*, 846 F.2d 284, 293 (5th Cir. 1988) (to state a rule of reason group boycott claim, plaintiffs must allege "a concerted attempt to reduce output" or "otherwise reduce consumer welfare").

551.    Here, the allegations set forth in this Complaint establish the direct anticompetitive effects of "reduced output," "decreased quality," and other harms to "consumer welfare."

552.    The TNI's collusive group boycott has manifestly reduced the *output* of news available to consumers by (A) removing reporting of the Prohibited Claims from the world's dominant Internet platforms, (B) de-platforming online news publishers who engaged in Prohibited Reporting, (C) dissuading (through the threat of de-platforming) numerous other online news publishers from engaging in Prohibited Reporting, and (D) restricting, rendering more difficult, or preventing consumer access to reporting of Prohibited Claims.

553.    In addition, the TNI's collusive group boycott has substantially reduced the *quality* of news and of competition in online news markets by preventing rival online news suppliers from publishing competing content, by blocking consumers' access to competing news, and by suppressing facts, analysis, assertions, and opinion challenging governmental COVID-19 policy.

554.     Finally, the TNI's group boycott has reduced *consumer welfare* by deliberately stifling "the widest possible dissemination of information from diverse and antagonistic sources," which "is essential to the welfare of the public." *Associated Press v. United States*, 326 U.S. 1, 20 (1945).

555.     Accordingly, Plaintiffs need not engage in precise market definition or allege market power.

556.     Nevertheless, Plaintiffs have defined the relevant markets, and as alleged above, TNI members collectively have an 85% market share of the U.S. online social media news market, a 90% share of the overall social media market, a more than 90% share of the social networking market, an over 75% share of the video-hosting market, and an over 90% share of the search engine market.

557.     As alleged above, no procompetitive rationale justifies the TNI's boycott.

558.     Thus the TNI's group boycott violates the Sherman Act under the rule of reason, and each Defendant is jointly and severally liable to each Plaintiff for treble damages and attorneys' fees.

## JURY TRIAL DEMANDED

559.     Plaintiffs hereby demand a trial by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in their favor as follows:

A.     An order declaring Defendants' conduct to be unlawful;

B.     An order enjoining Defendants from acting in furtherance of the TNI's agreement and from continuing to work together or continuing to work with Internet companies to boycott and censor other online news publishers;

C.     An order awarding Plaintiffs treble damages and attorneys' fees and stating that each

Defendant is jointly and severally liable therefor; and

      D.    Any other relief the Court judges to be proper.


RESPECTFULLY SUBMITTED,

DATED: May 31, 2023


_____

G. SHELLY MATURIN, II
(La. Bar 26994)
Maturin Law
322 Heymann Blvd., Suite 1
Lafayette, LA 70503
Telephone: (337) 362-3514
E-mail: shelly@maturinlaw.com
Attorney for Plaintiffs


_____

JED RUBENFELD
(NY Bar 2214104)
(pro hac vice forthcoming)
1031 Forest Rd.
New Haven CT 06515
Tel: (203) 432-7631
jed.rubenfeld@yale.edu
Attorney for Children's Health Defense


_____

JOHN W. HOWARD (CA Bar 80200)
SCOTT J. STREET (CA Bar 258962)
(pro hac vice forthcoming)
JW HOWARD/ATTORNEYS, LTD.
600 West Broadway, Ste. 1400
San Diego, CA 92101
Telephone: (213) 205-2800
johnh@jwhowardattorneys.com
sstreet@jwhowardattorneys.com
Attorneys for Plaintiffs


_____

ROBERT F. KENNEDY, JR.
(NY Bar 1999994)
(pro hac vice forthcoming)
48 Dewitt Mills Rd.
Hurley, NY 12433
Tel: (845) 481-2622
Attorney for Children's Health Defense

## VERIFICATION

I, Laura Bono, declare under penalty of perjury as follows:

1.      I am Acting President of Children's Health Defense, one of the Plaintiffs in this action.

2.      I have reviewed the foregoing Complaint and declare that the facts set out therein are true to the best of my knowledge and belief.

Executed this 31st day of May 2023.

Laura Bono
Acting President, Children's Health Defense