IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

| | | |
|---|---|---|
| CHILDREN'S HEALTH DEFENSE, TRIALSITE, INC., CREATIVE DESTRUCTION MEDIA, LLC, ERIN ELIZABETH FINN, JIM HOFT, DR. BEN TAPPER, BEN SWANN, DR. JOSEPH MERCOLA, TY BOLLINGER, CHARLENE BOLLINGER, & JEFF CROUERE | ) ) ) ) ) ) ) ) | |
| | ) | Civil Action No. 3:23-cv-00720 |
| *Plaintiffs,* | ) ) | Judge Terry A. Doughty |
| v. | ) ) | Magistrate Judge Kayla D. McClusky |
| WP COMPANY LLC D/B/A THE WASHINGTON POST, THE BRITISH BROADCASTING CORP., THE ASSOCIATED PRESS, & REUTERS NEWS & MEDIA INC., | ) ) ) ) ) ) | |
| *Defendants.* | ) ) | |

**BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

**<u>TABLE OF CONTENTS</u>**

INTRODUCTION ........................................................................................................... 1

BACKGROUND ........................................................................................................... 3

      A.    Plaintiffs ......................................................................................................... 3

      B.    The Trusted News Initiative ............................................................... 5

ARGUMENT ................................................................................................................. 6

I.      THE COMPLAINT FAILS TO PLAUSIBLY PLEAD A CONSPIRACY
      TO ACHIEVE AN UNLAWFUL OBJECTIVE. ........................................ 7

II.    THE COMPLAINT FAILS TO PLEAD A PLAUSIBLE
      UNREASONABLE RESTRAINT OF TRADE. ..................................... 13

      A.    The Complaint Fails To Plead the Elements of a *Per Se* Group
            Boycott. ..................................................................................... 14

            1.    The Complaint Fails To Allege TNI Members Have a
                 Dominant Position in a Defined, Relevant Market. ......................... 14

            2.    The Complaint Fails To Allege TNI Members Cut Off
                 Plaintiffs' Access to Any Facility Necessary To Compete,
                 or That Plaintiffs Were Foreclosed from a Relevant
                 Market. ............................................................................... 17

            3.    The Complaint Fails To Allege Facts Demonstrating That
                 the TNI Lacked Any Plausible Procompetitive
                 Justifications. ..................................................................... 19

      B.    The Complaint Fails To Plead a Rule of Reason Violation. ......................... 20

III.   THE COMPLAINT FAILS TO PLEAD INJURY OR HARM TO
      COMPETITION. ........................................................................... 22

      A.    The Complaint Fails To Plead That Plaintiffs Suffered Antitrust
            Injuries. ..................................................................................... 22

      B.    The Complaint Fails To Plausibly Plead Injury to Competition. ................. 24

IV.   THE COMPLAINT FAILS TO PLAUSIBLY ALLEGE ACTIONABLE
      CONDUCT BY EACH OF THE DEFENDANTS. ..................................... 24

CONCLUSION ........................................................................................................... 25

## **TABLE OF AUTHORITIES**

### **CASES**

*Adams v. Am. Bar Ass'n.*, 400 F. Supp. 219 (E.D. Pa. 1975) .........................................22

*Am. Needle, Inc. v. NFL*, 560 U.S. 183 (2010) ............................................................13

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .........................................................................6

*Boyd v. Canadian Indep. Sch. Dist.*, 2022 WL 837933 (N.D. Tex. Feb. 17, 2022) ..............16, 18

*BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*, 563 F. Supp. 3d 578 (W.D. La. 2021), *aff'd*, 49 F.4th 520 (5th Cir. 2022) ........................................................... *passim*

*Broyles v. Wilson*, 3 F.3d 439 (5th Cir. 1993) ................................................................9

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) ............................................22

*DataCell ehf. v. Visa, Inc.*, 2015 WL 4624714 (E.D. Va. July 30, 2015) ..............................20, 22

*Dedication & Everlasting Love to Animals v. Humane Soc'y of the U.S., Inc.*, 50 F.3d 710 (9th Cir. 1995).........................................................................................................23

*Ferguson v. Bank of N.Y. Mellon Corp.*, 802 F.3d 777 (5th Cir. 2015).....................................4, 5

*Fisher v. City of Berkeley*, 475 U.S. 260 (1986)..............................................................7

*Flaa v. Hollywood Foreign Press Ass'n.*, 55 F.4th 680 (9th Cir. 2022)......................................17

*Force v. Facebook, Inc.*, 934 F.3d 53 (2d Cir. 2019) .......................................................10

*FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447 (1986)........................................................14

*Gen. Elec. Co. v. W. Feliciana Par. Hosp. Serv. Dist. No. 1*, 2016 WL 7007504 (M.D. La. Nov. 29, 2016) .................................................................................................12

*Ginzburg v. Mem'l Healthcare Sys.*, 993 F. Supp. 998 (S.D. Tex. 1997) ....................................24

*Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.3d 266 (5th Cir. 2008)..................................9

*Hughes v. Tobacco Inst., Inc.*, 278 F.3d 417 (5th Cir. 2001)...............................................23

*In re Zoom Video Commc'ns Inc. Priv. Litig.*, 525 F. Supp. 3d 1017 (N.D. Cal. 2021) ..............19

*Johnson Bros. Liquor Co. v. Bacardi U.S.A., Inc.*, 830 F. Supp. 2d 697 (D. Minn. 2011) .....18, 19

*Johnson v. Comm'n on Presidential Debates*, 869 F.3d 976 (D.C. Cir. 2017) ......................22, 23

*Lifeway Foods, Inc. v. Millenium Prods., Inc.*, 2016 WL 7336721 (C.D. Cal. Dec. 14, 2016) ................................................................................................................16

*Litovich v. Bank of Am. Corp.*, 568 F. Supp. 3d 398 (S.D.N.Y. 2021) ......................................8, 9

*Marucci Sports, L.L.C. v. NCAA*, 751 F.3d 368 (5th Cir. 2014) ......................................... *passim*

*McCormack v. NCAA*, 845 F.2d 1338 (5th Cir. 1988) ................................................................23

*MM Steel, L.P. v. JSW Steel (USA), Inc.*, 806 F.3d 835 (5th Cir. 2015) ....................................6

*Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752 (1984) .............................................7, 8, 9

*Norris v. Hearst Tr.*, 500 F.3d 454 (5th Cir. 2007) ................................................................22, 23

*Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284 (1985) ..................................................................................................13, 17, 18, 19

*Okavage Grp., LLC v. United Wholesale Mortg., LLC*, 2022 WL 17478298 (M.D. Fla. July 27, 2022) .......................................................................................................17

*Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379 (5th Cir. 1994) .............................24

*SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412 (4th Cir. 2015) ...............................24, 25

*Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Disc. Ctrs., Inc.*, 200 F.3d 307 (5th Cir. 2000) .................................................................................................................6

*Tesla, Inc. v. Louisiana Auto. Dealers Ass'n*, 2023 WL 4053438 (E.D. La. June 16, 2023) ....9, 25

*Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430 (6th Cir. 2008) ................................................................................................3, 24, 25

*Trudeau v. Google LLC*, 349 F. Supp. 3d 869 (N.D. Cal. 2018), *aff'd*, 816 F. App'x 68 (9th Cir. 2020) ..........................................................................................................10

*Tunica Web Advert. v. Tunica Casino Operators Ass'n*, 496 F.3d 403 (5th Cir. 2007) ..........13, 14

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................ *passim*

*United States ex rel. Jamison v. Career Opportunities, Inc.*, 2020 WL 520590 (N.D. Tex. Jan. 31, 2020) ...........................................................................................................5

*Vulcan Materials Co. v. City of Tehuacana*, 238 F.3d 382 (5th Cir. 2001) ...............................14

*Witches Brew Tours LLC v. New Orleans Archdiocesan Cemeteries*, 2022 WL 3586757 (E.D. La. Aug. 22, 2022) .......................................................................................20

## STATUTES AND RULES

47 U.S.C. § 230(b)(2) ...................................................................................................19

47 U.S.C. § 230(c)(2) ...................................................................................................19

Fed. R. Civ. P. 12(b)(6)...........................................................................................1, 4, 12

## INTRODUCTION

Plaintiffs allege that they are online news publishers who had content they posted online removed or unfavorably treated by Internet platforms such as Facebook, Instagram, LinkedIn, Twitter, and YouTube (the "Platforms"). *See* Compl. ¶ 11, ECF No. 1. None of those Platforms is named as a defendant here.

Instead, with this antitrust lawsuit, Plaintiffs have wrongly targeted four news organizations that do not own, operate or control any of the Platforms: The Associated Press ("The AP"), the British Broadcasting Company ("the BBC"), Reuters News & Media Incorporated ("Reuters"), and WP Company LLC d/b/a The Washington Post ("the Post") (collectively, "Defendants"). The Complaint alleges that Defendants, along with other news organizations and the technology companies operating the Platforms, participated in an industry information-sharing partnership called the Trusted News Initiative ("TNI") aimed at identifying harmful disinformation. *See id.* ¶¶ 3–5. The Complaint characterizes this initiative as a "group boycott" of "smaller online news publishers who engage in Prohibited Reporting," in violation of Section 1 of the Sherman Act. *Id.* ¶¶ 6, 310. For four independently dispositive reasons, the Complaint fails to plausibly allege an antitrust violation and should be dismissed in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6).

*First*, the Complaint fails to plausibly allege that the Platforms *agreed* with any Defendant that the Platforms would take action against the Plaintiffs or anyone else. As the Supreme Court explained in *Bell Atlantic Corp. v. Twombly*, a claim under Section 1 of the Sherman Act must have "enough factual matter (taken as true) to suggest that *an agreement was made*." 550 U.S. 544, 556–57 (2007) (emphasis added); *see also id.* ("[P]arallel conduct does not suggest conspiracy."). Rather than give rise to the plausible inference of a conspiracy to ban Plaintiffs from the Platforms, Plaintiffs' allegations instead reflect nothing more than the Platforms taking

independent action consistent with their own individual content moderation policies or business reasons.  At most, the Complaint speculates that TNI members "collectively decided what to count as misinformation" and that some Defendants *flagged* certain unidentified content as such.  Compl. ¶¶ 294–297.  But that suggestion is insufficient to plausibly allege an *agreement* to achieve an unlawful purpose, particularly in the absence of allegations that any Defendant flagged content posted by Plaintiffs, or that any Platform agreed to take action as a result.  Plaintiffs cannot plausibly allege a "conscious commitment to a common scheme designed to achieve an unlawful objective."  *Marucci Sports, L.L.C. v. NCAA*, 751 F.3d 368, 375–76 (5th Cir. 2014).

*Second*, the Complaint fails to allege facts showing that the TNI unreasonably restrained trade in any properly defined relevant antitrust market.  The "marketplace of ideas" from which Plaintiffs feel excluded is not an antitrust market that the antitrust laws reach.  In any case, Plaintiffs cannot make out a *per se* violation of the Sherman Act (Count 1) because they do not plausibly allege that Defendants had a dominant position in the expansive market for online news or that Plaintiffs have been excluded from that market.  Nor can they show that the alleged restraint violated the rule of reason (Count 2).  As in *Marucci Sports*, Plaintiffs "allege[] no factual information about other competitors dropping out of the market, significant price changes, or diminution in . . . quality."  *Id.* at 377.  Thus, the TNI's alleged "anticompetitive evils, pursuant to the information in the . . . Complaint, are virtually non-existent."  *Id.* (affirming dismissal).

*Third*, the Complaint fails to plead antitrust injury.  It does not assert that Plaintiffs experienced any plausible economic injury that is directly attributable to Defendants' alleged conduct, much less that the alleged injury reduced competition in a relevant antitrust market.

*Fourth*, the Complaint fails to plead specific action consistent with the alleged conspiracy by any of the four Defendants.  The Complaint does not allege facts that any Defendant (as opposed

to the Platforms) took any action against Plaintiffs whatsoever. Such "[g]eneric pleading, alleging misconduct against defendants without specifics as to the role each played in the alleged conspiracy, was specifically rejected by *Twombly*." *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 436 (6th Cir. 2008).

The Complaint should be dismissed in its entirety.

## BACKGROUND

### A.    Plaintiffs

Plaintiffs are eleven individuals and entities that claim to operate as "original-content news publishers" "in the U.S. market for online COVID news." *See* Compl. ¶¶ 187–188. They allege that they frequently posted content on social media sites including Facebook, LinkedIn, Twitter, and YouTube, among other channels. *See id.* ¶¶ 41, 49, 50, 64, 74, 83, 94, 100–101, 109.

Plaintiffs allege that they suffered repercussions because they "published one or more" of a set of "Prohibited Claims" generally relating to their views about COVID-19, including "Claims that the COVID vaccines are not effective in preventing infection." *See id.* ¶¶ 306, 356. They contend that because they published such content, they were "censored, de-monetized, demoted, throttled, shadow-banned, and/or excluded entirely from platforms like Facebook, YouTube, Twitter, Instagram and Linked-In." *Id.* ¶¶ 11, 366. In addition, they either allege or otherwise do not contest that these allegedly adverse actions were taken pursuant to the Platforms' respective content moderation policies. *Id.* ¶¶ 367–481. Plaintiffs assert they were damaged by the Platforms' actions because the Platforms are "market gatekeepers with the power to cripple or destroy original-content news publishers by excluding them from their platforms." *Id.* ¶ 225. However, none of the Platforms is a defendant here.

As laid out in Defendants' Motion To Transfer, filed simultaneously herewith, Plaintiffs initially filed this lawsuit in the United States District Court for the Northern District of Texas (the

"Prior Complaint"). After that court granted Defendants' Motion To Transfer to the Southern District of New York, Plaintiffs voluntarily dismissed their claims and refiled the current, substantively identical Complaint in this Court. Tellingly, however, Plaintiffs' current Complaint removes their prior citation to Facebook's "Content Demotion Guidelines,"[1] which illustrates the point: Facebook will "remove misinformation where it is likely to directly contribute to the risk of imminent physical harm . . . [or] is likely to directly contribute to interference with the functioning of political processes and certain highly deceptive manipulated media."[2]

Some of the Plaintiffs or their counsel have engaged in other litigation related to actions taken by platforms in response to their views about COVID and COVID-related treatment. For example, "Dr. Mercola and Mercola.com have filed an action against Google for breach of contract, among other counts" "[b]ased on [the same] de-platforming" at issue here. *Id.* ¶ 47; Compl., ECF No.1, *Mercola.Com, LLC v. Google, LLC*, 3:22-CV-05567 (N.D. Cal. Sept. 28, 2022). Similarly, Robert F. Kennedy, Jr. and others sued dozens of government entities in this Court alleging the federal government waged a "systematic campaign to induce [Facebook, Google, and Twitter] to censor speech." Compl. ¶ 11, ECF No. 1, *Robert F. Kennedy Jr. v. Joseph R. Biden Jr.*, 3:23-CV-00381 (W.D. La. Mar. 24, 2023). In that suit, plaintiffs allege that government officials, not Defendants here, "succeeded in inducing major social-media platforms

---

[1] Compl. ¶ 11 n.1, ECF No.1, *Children's Health Defense v. The Washington Post Co.*, No. 2:23-cv-0004-Z (N.D. Tex. filed Jan. 10, 2023). "[P]leadings filed in state or other federal district courts are matters of public record and the Court may take judicial notice of those documents in connection with a Rule 12(b)(6) motion to dismiss." *BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*, 563 F. Supp. 3d 578, 589 (W.D. La. 2021), *aff'd*, 49 F.4th 520 (5th Cir. 2022), *cert denied*, 2023 WL 3440574 (U.S. May 15, 2023). A court may also "consider documents attached to a Rule 12(b)(6) motion to be part of the pleadings if the plaintiff refers to those documents and they are central to the claim." *Id.*; *Ferguson v. Bank of N.Y. Mellon Corp.*, 802 F.3d 777, 780 (5th Cir. 2015) (similar).

[2] Misinformation: Policy Rationale, Meta Transparency Ctr., https://transparency.fb.com/policies/community-standards/misinformation (visited July 6, 2023).

to censor" a list of 23 "COVID-related claims" that is nearly identical to the list of 24 "Prohibited Claims" in this case. *Compare id.* ¶ 429(A)–(V) *with* Compl. ¶ 314(A)–(W). The Court may take judicial notice of all of these pleadings. *See, e.g.*, *BRFHH Shreveport*, 563 F. Supp. 3d at 589.

### B.     The Trusted News Initiative

The Complaint alleges that various publishers, including Defendants, other news organizations, and several platforms, started a group called the "Trusted News Initiative," with a goal of collaborating to ensure credibility in news and to combat the spread of disinformation. *See* Compl. ¶¶ 3, 262–265. The TNI allegedly "developed a shared early warning system to alert partners about disinformation," including disinformation concerning the 2020 presidential election. *Id.* The Complaint cites remarks given on a panel by Jessica Cecil, the BBC's Head of Business Management, who explained that the alert system was designed with "a deliberately high bar to be used only rarely," such as in cases of "an immediate threat to life" or "an immediate threat to the integrity of the democratic process." *See* Inst. for Pub. Pol'y Rsch. Labour Conf., *Technology, Democracy and Trust: Creating a More Democratic Online World*, at 12:50–13:05 (Sept. 28, 2021), https://www.youtube.com/watch?v=jH5VXgLj05E, *cited in* and *quoted in part in* Compl. ¶ 266.[3] Cecil explained that the TNI featured a "clear set of expectations" such that members would "inform[] each other when they came across that extreme disinformation." *Id.*[4]

---

[3] Cecil's remarks are excerpted throughout and incorporated into the Complaint. *See, e.g.*, *Ferguson*, 802 F.3d at 780. A transcript of the remarks is attached. Ex. A.

[4] The Complaint suggests that the TNI also "collaborate[d] in deciding which … reporting counts as 'misinformation' and to take agreed-upon action against such reporting." Compl. ¶ 294. But Plaintiffs' allegation rests on a misleading excerpted portion of Cecil's remarks. Cecil did not say that TNI members "collectively decided what to count as misinformation," *id.* ¶ 295; to the contrary, she stated that "[m]embers *informed each other* when they came across … disinformation, and *when informed they* [*i.e.*, individual members] decided what to do about it," Ex. A at 7 (emphases added); *see United States ex rel. Jamison v. Career Opportunities, Inc.*, 2020 WL 520590, at *6 (N.D. Tex. Jan. 31, 2020) ("If allegations in a complaint are contradicted

Plaintiffs do not allege that any Defendant identified or shared with other members online news content from any Plaintiff in connection with the TNI.

The TNI allegedly holds meetings and public conferences for participants to discuss their efforts and best practices to combat the spread of harmful disinformation. *Id.* ¶ 266. Plaintiffs do not allege any instance in which a TNI member discussed any Plaintiff at any such meeting.

## ARGUMENT

At a bare minimum, a Sherman Act Section 1 plaintiff must show that "the defendants (1) engaged in a conspiracy (2) that restrained trade (3) in a particular market." *MM Steel, L.P. v. JSW Steel (USA), Inc.*, 806 F.3d 835, 843 (5th Cir. 2015) (internal quotation marks omitted). Antitrust plaintiffs must also prove they have suffered an antitrust injury stemming from the complained-of anticompetitive behavior. *See Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Disc. Ctrs., Inc.*, 200 F.3d 307, 312 (5th Cir. 2000).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). The complaint "must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Twombly*, 550 U.S. at 562. "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (alteration omitted).

The Complaint should be dismissed because it fails to plausibly allege: (1) a conspiracy; (2) a restraint of trade, under either a *per se* (Count 1) or rule of reason (Count 2) analytical

---

by documents incorporated into the complaint, the Court need not consider those allegations as true for the purposes of a motion to dismiss.").

framework; (3) antitrust injury to Plaintiffs; or (4) concerted conduct by any individual Defendant.

## I.    THE COMPLAINT FAILS TO PLAUSIBLY PLEAD A CONSPIRACY TO ACHIEVE AN UNLAWFUL OBJECTIVE.

Plaintiffs are missing a fundamental and necessary component of their antitrust claims: any plausible allegation that Defendants and the Platforms entered into an agreement to take unlawful action against Plaintiffs.   The Complaint fails to allege that any Defendant agreed with any Platform that the Platform would take action as a result of TNI alerts.  Plaintiffs' allegations instead are entirely consistent with the Platforms taking independent action consistent with their own content moderation policies.  The claims thus fail at the first step of the Section 1 analysis because they do not sufficiently allege that Defendants adopted a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Marucci*, 751 F.3d at 375–76.

"Independent action is not proscribed" by Section 1 of the Sherman Act.  *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984).  An entity "generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently." *Id.*  The "distinction between unilateral and concerted action is critical." *Fisher v. City of Berkeley*, 475 U.S. 260, 266 (1986).  To survive a motion to dismiss, a Section 1 claim must have "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556–57; *see also id.* ("[P]arallel conduct does not suggest conspiracy."); *BRFHH Shreveport*, 563 F. Supp. 3d at 596 ("Absent any agreement, there is no Section 1 claim, because an anticompetitive agreement is the *sine qua non* of a Section 1 violation." (citation omitted)).  The complaint must set forth sufficient allegations to establish an agreement.  *Marucci*, 751 F.3d at 376.  "[C]onclusory allegations that support one of many inferential possibilities" are insufficient.  *Id.* at 375.  "An inference of conspiracy will not arise when the alleged conspirators' conduct made perfect business sense, or where there are obvious alternative explanations for the facts alleged." *Litovich v. Bank of Am.*

*Corp.*, 568 F. Supp. 3d 398, 417 (S.D.N.Y. 2021) (citation omitted) (granting motion to dismiss group boycott claim).

Here, the Complaint "does not set forth facts that demonstrate a 'meeting of the minds'" between the alleged group boycott members to take action against any Plaintiff. *Marucci*, 751 F.3d at 375 (quoting *Twombly*, 550 U.S. at 557). None of the factual allegations in the Complaint give rise to a plausible inference that the Platforms agreed with Defendants to do *anything* (let alone "de-platform" anyone) as a result of alleged TNI alerts.

The Complaint does not allege that Defendants ever asked the Platforms to limit access to the Plaintiffs' content in any way, much less that the Platforms agreed to do so. Indeed, Plaintiffs acknowledge that the Platforms have preexisting policies to address content they deem objectionable. *See, e.g.*, Compl. ¶¶ 275, 323–24, 329. The Complaint asserts no explanation whatsoever, much less a plausible one, for why the Platforms would ever agree to cede their own unilateral authority to determine whether content violates their own policies (and the Platforms did no such thing), let alone why they would cede such authority to a small group of publishers that lack any actual or perceived power over them.

The most Plaintiffs plausibly allege is that TNI members, including Defendants, agreed to *notify* each other of content they considered to be disinformation. *See, e.g.*, *id.* ¶¶ 262, 268. There is no allegation that any Defendant ever did so regarding any particular content, much less an allegation pertaining to Plaintiffs' content. Moreover, as a matter of law, mere notifications are insufficient to establish a group boycott. As the Supreme Court has emphasized, "[p]ermitting an agreement to be inferred merely from the existence of complaints, or even from the fact that termination came about 'in response to' complaints, could deter or penalize perfectly legitimate conduct." *Monsanto*, 465 U.S. at 763–64; *see also Tesla, Inc. v. La. Auto. Dealers Ass'n*, 2023

WL 4053438, at \*13 (E.D. La. June 16, 2023) (granting motion to dismiss, emphasizing that "the Fifth Circuit has made clear that one-sided complaint[s] [are] just not a suitable basis for an inference of conspiracy") (alteration in original) (internal quotations omitted).

Accordingly, multiple courts have held that allegations of sharing complaints within a group are insufficient to establish an anticompetitive group boycott.  For example, in *Broyles v. Wilson*, the Fifth Circuit found that an attorney did not sufficiently plead an agreement because the attorney did not plead "specific facts" to "demonstrate any intention on the part of [the defendants] to join a conspiracy," where he merely alleged that one defendant referred a complaint to the other, which unilaterally decided to take action.  3 F.3d 439 (5th Cir. 1993), 1993 WL 347222, at \*4; *see also, e.g.*, *Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.3d 266, 272 (5th Cir. 2008) (affirming summary judgment where evidence of complaints "amount[ed] to an exchange of information, followed by parallel conduct when the Appellees (and over 100 other companies) unanimously voted to remove [plaintiff], and it does not refute the likelihood of independent action"); *Tesla, Inc.*, 2023 WL 4053438, at \*13–14 (granting motion to dismiss where Tesla alleged auto commission had "fielded concerns" filed by defendants, but had not "plausibly alleged that the commissioners reached an *agreement* with [defendants] to investigate Tesla's business operations in Louisiana, much less that any such agreement was made with the intention 'to achieve an unlawful objective'") (emphasis added); *Litovich*, 568 F. Supp. 3d at 423.

Thus, even if, as Plaintiffs suggest, TNI members agreed to *notify* each other of content they considered to be disinformation, this agreement does not in any way give rise to the inference that Defendants and the Platforms "engaged in concerted action, defined as having 'a conscious commitment to a common scheme designed to achieve an unlawful objective.'"  *Golden Bridge Tech.*, 547 F.3d at 271 (quoting *Monsanto*, 465 U.S. at 764).  On the contrary, the Complaint is

rife with allegations that the non-party Platforms acted independently to remove content. The Complaint cites statements made by the Platforms about their own efforts to fight misinformation, separate and apart from Defendants or the TNI. *See, e.g.*, Compl. ¶ 495 (A) (joint statement by various platforms discussing their work "together" to combat misinformation, apart from the TNI), (G) (internal Twitter document noting shared research among platforms, again apart from the TNI).

Plaintiffs cannot escape the reality that the Platforms' alleged conduct was independent responses to violations of their respective content moderation policies or other business imperatives.[5] While Plaintiffs may disagree about whether their content should be deemed violative of those policies, or whether the Platforms should have the unfettered ability to remove their content, they have not plausibly alleged that the Platforms agreed to remove their content for any reason attributable to Defendants.[6] Thus, Plaintiffs' theory is "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by [the Platforms' own] perceptions of the market." *Twombly*, 550 U.S. at 554.

To attempt to avoid this inevitable conclusion, Plaintiffs' Complaint in this case adds the unsupported allegation—not present in the Prior Complaint—that "[t]he TNI is not merely an information-sharing entity" because "[i]ts members have agreed not only to share alerts, but to

---

[5] They acknowledged as much in their Prior Complaint, which cited Facebook's policy. *See supra* note 2. The moderation policies of other Platforms are also publicly available. *E.g.*, Misinformation policies, YouTube, https://support.google.com/youtube/answer/10834785?hl=en, visited June 21, 2023 ("Certain types of misleading or deceptive content with serious risk of egregious harm are not allowed," including "certain types of misinformation that can cause real-world harm, like promoting harmful remedies or treatments."). Notwithstanding Plaintiffs' attempt to obscure the existence of these policies in their Complaint, the Court can take judicial notice of them. *E.g., Force v. Facebook, Inc.*, 934 F.3d 53, 60 n.5 (2d Cir. 2019) (taking judicial notice of Facebook's Terms of Service); *Trudeau v. Google LLC*, 349 F. Supp. 3d 869 (N.D. Cal. 2018) (taking judicial notice of Google's Terms of Service), *aff'd*, 816 F. App'x 68 (9th Cir. 2020).

[6] Indeed, they have alleged elsewhere that the *government* waged a "systematic campaign to induce [social media] companies to censor speech." *See supra* 4–5.

collaborate in deciding which . . . reporting counts as 'misinformation' and to take agreed-upon action against such reporting, including (in the case of the TNI's Big Tech Platform Members) by blocking and/or shadow-banning such reporting." Compl. ¶ 294.[7] Although the Complaint cites as support the September 2021 remarks of BBC official Jessica Cecil, *id.* ¶ 260, her full comments show that she said no such thing. To the contrary, she stated that "[m]embers *informed each other* when they came across . . . disinformation, and *when informed they* [*i.e.*, individual members] decided what to do about it," *i.e.*, acted independently. Ex. A at 7 (emphases added). Nor did Cecil state, as the Complaint alleges without quotation, that TNI's expectation was that the Platforms "would exclude from their platforms news content identified as prohibited by the TNI or any of its members." Compl. ¶¶ 266, 297. The allegation of a direct agreement to exclude content from the market is nothing more than Plaintiffs' own conclusory concoction.

Devoid of any direct evidence, the Complaint turns to circumstantial allegations of an unlawful agreement, but these are equally insufficient. Although the Complaint alleges the Platforms' conduct reflects "strikingly similar" parallel conduct, *id.* ¶¶ 328, 347, 362, 498, the allegations illustrate that the opposite is true, for two reasons.

First, these allegations cannot support a claim of an unlawful agreement because they are devoid of any action by either the Defendants, or the TNI group, directed at the Plaintiffs. There is no fact alleged anywhere in the Complaint that any Defendant *ever* flagged a Plaintiff, or that any Platform *ever* acted on such a notification.[8] Indeed, there is not so much as a plausible

---

[7] *Compare* Am. Compl. ¶¶ 280–97, ECF No. 39, *Child. Health Def. v. WP Co. LLC*, No. 2:23-cv-0004-Z (N.D. Tex. filed Mar. 9, 2023), *with* Compl. ¶¶ 286–305.

[8] The only circumstantial allegation involving a Defendant is an allegation that the Post had advance notice regarding YouTube's alleged "de-platforming" of Dr. Mercola's account, because it published an article at "9:00 AM EDT," shortly before YouTube emailed him. Compl. ¶¶ 469–472. But Plaintiffs ignore that at least one other non-TNI publisher reported the news contemporaneously with the Post. *See* Mark Bergen & Naomi Nix, *YouTube Will Remove Videos*

allegation that the TNI group even *discussed* Plaintiffs.  The Plaintiffs' inference that the TNI had anything to do with them is not even circumstantial—it is speculation.

Second, while the Complaint includes a supposed timeline of the Platforms' alleged adverse content moderation across Plaintiffs' various accounts, *id.* ¶¶ 367–481, these allegations illustrate widely differing approaches taken by the Platforms.  The Complaint alleges that while some Platforms removed individual posts, others variously suspended accounts, "shadow-banned" accounts, or "de-platformed" accounts to address offending content.  For example, while CHD claims it was de-platformed from YouTube and Facebook (almost a year apart), *id.* ¶ 368 (J), (L), Twitter only temporarily suspended CHD's account for a few days, *see id.* ¶ 368 (F), (G).  These responses simply underscore that the Platforms were acting independently pursuant to their own judgments and policies.  And "when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557.

Plaintiffs have "used a broad brush to paint all unfavorable decisions as ones caused by a conspiracy against [them]," but "broad brushes and generalized theories . . . cannot withstand Rule 12(b)(6) scrutiny." *BRFHH Shreveport*, 563 F. Supp.3d at 595.  Because the Complaint does not plausibly allege that Defendants entered into an unlawful group boycott agreement against Plaintiffs, the case should be dismissed. *Marucci*, 751 F.3d at 376.

---

*with Misinformation About Any Vaccine*, Bloomberg (Sept. 29, 2021 9:00 AM EDT), https://www.bloomberg.com/news/articles/2021-09-29/youtube-will-remove-videos-with-misinformation-about-any-vaccine; *see Gen. Elec. Co. v. W. Feliciana Par. Hosp. Serv. Dist. No. 1*, 2016 WL 7007504, at *14 n.11 (M.D. La. Nov. 29, 2016) ("[T]he Court may take judicial notice of stories in newspapers and on Internet news sites.").  Notably, Bloomberg is *not* alleged to be in the TNI, which proves that Plaintiffs' allegations are consistent with regular news reporting activity, not a conspiracy.  But even if the Post had reported exclusively, such fundamental newsgathering activity would not support a plausible claim of an unlawful agreement.

## II.  THE COMPLAINT FAILS TO PLEAD A PLAUSIBLE UNREASONABLE RESTRAINT OF TRADE.

To survive dismissal, the Complaint must also allege facts plausibly showing that the TNI unreasonably restrained trade.  *Marucci*, 751 F.3d at 374 (citing *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 190 (2010)).  "Once a plaintiff establishes that a conspiracy occurred, whether it violates § 1 is determined by the application of either the *per se* rule or the rule of reason."  *Id.* (citation omitted).  Plaintiffs' claims cannot satisfy either test.

The *per se* rule is applied when "conduct [is] so pernicious and devoid of redeeming virtue that it is condemned without inquiry into the effect on the market in the particular case at hand." *Id.* (alteration in original) (citation omitted).  The Supreme Court constricted the category of group boycotts that warrant *per se* treatment in *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284 (1985).  The Court observed that, while courts must analyze the vast majority of purported "group boycotts" under the rule of reason, a small minority of "group boycott" cases could qualify for *per se* treatment to the extent the purported boycott:  (1) involved boycotting firms that "possess[] a dominant position in the relevant market"; (2) "cut off access to a supply, facility, or market necessary to enable the boycotted firm to compete"; and (3) involved "practices [that] were generally not justified by plausible arguments that they were intended to enhance overall efficiency and make markets more competitive."  *Id.* at 294 (citation omitted); *see, e.g.*, *Tunica Web Advert. v. Tunica Casino Operators Ass'n*, 496 F.3d 403, 414–15 (5th Cir. 2007) (requiring district court to consider these three factors on remand).

A plaintiff who fails to make a *per se* showing must instead demonstrate that the alleged restrictive practice imposes a substantial, unreasonable restraint on competition under the rule of reason test.  *Marucci*, 751 F.3d at 374.  "The rule of reason is designed to help courts differentiate between 'restraints with anticompetitive effect that are harmful to the consumer and restraints

stimulating competition that are in the consumer's best interest.'" *Id.* (citation omitted).

The Complaint fails to assert a plausible claim under either standard.

A.    **The Complaint Fails To Plead the Elements of a *Per Se* Group Boycott.**

The Complaint's attempt to invoke the small category of *per se* unlawful group boycotts fails at each step of the *per se* test. Calling this a "*per se* unlawful group boycott," Compl. ¶ 7, does not make it so. *See Vulcan Materials Co. v. City of Tehuacana*, 238 F.3d 382, 387 (5th Cir. 2001) ("While it is true that [the] complaint faithfully recites the . . . standard, it is equally true that it does no more than that.").

1.    **The Complaint Fails To Allege TNI Members Have a Dominant Position in a Defined, Relevant Market.**

Plaintiffs' *per se* claim is insufficient from the start as Plaintiffs fail to plausibly allege that TNI members have a dominant position in their claimed market for "US online news."

Plaintiffs attempt to define the "relevant market" as the "US online news market." Compl. ¶ 136. But the Complaint's allegations make plain that the alleged market is extremely broad (if not limitless), featuring content published by virtually anyone with Internet access through a multitude of platforms, ranging from private social media users, to individual websites, to major news organizations like Defendants, to the Platforms themselves. *See, e.g.*, *id.* ¶¶ 137–177, 206.

The Complaint fails to plausibly establish that TNI members have the requisite "dominant" positions in this market.[9] "[T]he *per se* approach has generally been limited to cases in which firms with market power [at the same level of distribution] boycott suppliers or customers in order to discourage them from doing business with a competitor." *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 458 (1986); *Tunica Web Advert.*, 496 F.3d at 414 (directing district court to assess

---

[9] Defendants' arguments apply with equal force to Plaintiffs' alleged sub-markets for "online COVID news," Compl. ¶ 188, and "online political news," *id.* ¶ 190.

"whether the casinos hold a dominant position in the relevant market"). Based on Plaintiffs' own allegations, it is implausible that the TNI members maintain any kind of dominance in the broad market for online news. The Complaint admits that market is expansive and that there has been an "explosion online of thousands of new, rival sources of news," enabled by "dramatically lower production costs, lower barriers to entry, and far lower distribution costs." Compl. ¶¶ 18,163.

The Complaint's market dominance theory rests on its thesis that "TNI's Big Tech Members possess an overwhelmingly dominant position in the online news market." *Id.* ¶ 233. But Plaintiffs support this claim with statistics purportedly showing that the TNI Platforms have power in *other* unrelated markets, including, for example, the social network market, the online long-form video market, and the search engine market. *Id.* ¶¶ 516–521. These have no bearing on market power in the alleged relevant market for online news. Although Plaintiffs allege that the Platforms participate in the alleged online news market by aggregating others' content, they plead no facts to establish that they are dominant in the online news market.

In fact, while the Complaint alleges that "several dominant platforms function as intermediaries to news online," *id.* ¶ 236, the very authorities cited show that multiple of those "dominant platforms" are *not* TNI members, which defeats their theory. For example, the Complaint heavily cites a *Competition in Digital Markets* Congressional report. *Id.* ¶¶ 236–238. But two of the four "Dominant Online Platforms" discussed in the report, Amazon and Apple, are not TNI members. *See* Staff of H. Comm. on the Judiciary, 117th Cong., Investigation of Competition in Digital Markets 247–29 (Amazon), 330–73 (Apple) (2020).[10] For instance, the

---

[10] Numerous other platforms that Plaintiffs themselves use, such as Gettr, Rumble, and Truth Social, are not members of the TNI. *See, e.g.*, CD Media, Truth Social, https://truthsocial.com/@CDMedia; CD Media, Gettr, https://gettr.com/user/cdmedia; CD Media, Rumble, https://rumble.com/c/CDMedia. As the existence of Plaintiffs' social media profiles on these sites are publicly available and Defendants offer them simply for their existence, the Court

Complaint quotes the report's assertion that "dominant firms can impose unilateral terms on publishers," but ignores that the reference is about *Apple*. *Id.* at 50 & n.300. Similarly, the Complaint alleges that news aggregators "attract 80% of the online news traffic in the United States," Compl. ¶ 219, but three of the five aggregators underlying that statistic are not TNI members: Yahoo! News, Buzzfeed, and Huffington Post, *see* Doh-Shin Jeon & Nikrooz Nasr, *News Aggregators and Competition Among Newspapers on the Internet*, 8 Am. Econ. J.: Microeconomics 91, 91 (2016).

In addition, the Complaint's attempt to quantify the market power of the "TNI Big Tech Members" (*i.e.*, the Platforms) is plainly deficient. The Complaint contends that "the TNI's Big Tech Members collectively have a gatekeeping power over at least 90% of online news traffic, in the sense that a small news publisher de-platformed by the TNI's Big Tech Members loses at least 90% (and probably significantly more) of its traffic." Compl. ¶ 222. But there are two problems with this assertion. First, the amount of traffic that comes from Platforms says nothing about market power in the alleged relevant market for online news, *i.e.*, the entities that actually publish news. Plaintiffs need to plausibly assert that Defendants have market power in this market, but do not (and cannot). Second, even if looking at distribution channels were relevant to assess market power, the 90% figure is irrelevant because it describes only traffic to "small news publisher[s]," not the market as a whole. Any meaningful assessment of market power must reflect the entire actual market, including, for example, not only Defendants and Platforms, but also countless online news publishers and news aggregators that are not TNI members.

---

may properly take judicial notice of them. *See, e.g.*, *Lifeway Foods, Inc. v. Millenium Prods., Inc*., 2016 WL 7336721, at *1 (C.D. Cal. Dec. 14, 2016) (determining public social media page "properly subject to judicial notice" when offered to illustrate the public nature of the page); *Boyd v. Canadian Indep. Sch. Dist*., 2022 WL 837933, at *1 (N.D. Tex. Feb. 17, 2022) (taking judicial notice of a social media post).

Because TNI members comprise only a small subset of online news publishers and specifically exclude numerous other popular publishers and aggregators of online news content, such as ABC, Apple, CBS, CNN, FOX, NBC, and Yahoo, Plaintiffs cannot establish that the alleged group has sufficient market power to support a *per se* claim. *See, e.g.*, *Flaa v. Hollywood Foreign Press Ass'n.*, 55 F.4th 680, 690 (9th Cir. 2022) ("[T]he complaint does not plausibly allege that the HFPA—a group of 85 entertainment journalists, only half of whom are 'active' journalists—possesses market power in any reasonably defined market."); *Okavage Grp., LLC v. United Wholesale Mortg., LLC*, 2022 WL 17478298, at *17 (M.D. Fla. July 27, 2022) (granting motion to dismiss where plaintiff failed to plead what percentage of the market had "joined the boycott" or quantify "what the effect of the boycott was vis-à-vis the relevant market").

### 2.    The Complaint Fails To Allege TNI Members Cut Off Plaintiffs' Access to Any Facility Necessary To Compete.

The second *per se* factor is whether the alleged boycott "cut off access to a supply, facility, or market necessary to enable the boycotted firm to compete." *Nw. Wholesale Stationers*, 472 U.S. at 294. The Complaint fails to allege sufficient facts to plausibly establish that the TNI boycott prevented them from competing in the alleged online news market. Plaintiffs' own allegations show that they are still generally able to publish their own content (and thus, compete) both on their own websites and even on TNI member Platforms, not to mention on other "dominant" platforms outside the TNI group.

The Complaint itself illustrates that Plaintiffs continue to post their own content. For example, it alleges that Jim Hoft's Gateway Pundit website is "one of the Internet's most popular and important conservatively oriented destinations for news and commentary," Compl. ¶ 76, which proves that he still is able to compete in the alleged online news market. The other Plaintiffs continue to publish their own content through their own websites as well. *Id.* ¶¶ 39, 57, 64, 87,

96, 112.  Plaintiffs continue to have access to the Internet and audiences.

While the Complaint alleges that "exclusion from the world's dominant Internet platforms means being shut out of the market[,]" *id.* ¶ 242, for the reasons discussed *supra*, Plaintiffs have not been.  Plaintiffs cannot show that they were excluded from alleged "dominant" platforms or news aggregators identified in the Complaint that are not TNI members, such as Apple, Yahoo! News, Buzzfeed, and Huffington Post (and if they were, it was not as a result of an alleged TNI boycott).  *See supra* at 15–16.  Nor does the Complaint address Plaintiffs' ongoing access to numerous other popular social media platforms, such as Gettr, Rumble, and Truth Social.  *See supra* note 9.  Thus, the Complaint does not and cannot allege that the TNI member Platforms "have *exclusive* access to an element essential to effective competition."  *Johnson Bros. Liquor Co. v. Bacardi U.S.A., Inc.*, 830 F. Supp. 2d 697, 709–11 (D. Minn. 2011) (emphasis added).

In fact, Plaintiffs continue to have access to the very TNI-member Platforms that they claim are indispensable.  *E.g.*, Compl. ¶ 112.  Even accepting as true Plaintiffs' allegations that they occasionally had content removed, *id.* ¶¶ 368–481, Plaintiffs do not and cannot allege that they have been "de-platformed" or excluded from a critical mass of the TNI member Platforms.  Rather, they all maintain access to the overwhelming majority of their accounts.[11]

Because they maintain substantial access to publish online news, Plaintiffs cannot plausibly establish that the alleged boycott "cut off access . . . necessary . . . to compete[.]"  *Nw. Wholesale*

---

[11] Every Plaintiff maintains at least three active Platform accounts across Facebook, Instagram, LinkedIn, Twitter, and YouTube.  For example, Dr. Joseph Mercola maintains all five.  *See, e.g.*, https://www.facebook.com/doctor.health;  https://www.instagram.com/drmercola/; https://www.linkedin.com/in/drmercola/;  https://www.youtube.com/@mercolapromos;  and https://twitter.com/mercola.  And every Plaintiff other than CD Media maintains an active Twitter account, while every Plaintiff other than Erin Finn has an active Facebook account.  Because Plaintiffs have incorporated the status of their social media accounts into the Complaint, the Court can take judicial notice that they remain active.  *See Boyd*, 2022 WL 837933, at *1.

*Stationers*, 472 U.S. at 294; *see Johnson Bros.*, 830 F. Supp. 2d at 709–11.

> **3.    The Complaint Fails To Allege Facts Demonstrating That the TNI Lacked Any Plausible Procompetitive Justifications.**

The third *per se* factor is whether plaintiffs sufficiently allege "practices [that] were generally not justified by plausible arguments that they were intended to enhance overall efficiency and make markets more competitive." *Nw. Wholesale Stationers*, 472 U.S. at 294. Plaintiffs do not and cannot allege that the supposed agreement lacked plausible procompetitive justifications.

Information-sharing regarding objectionable content is procompetitive because it enables website operators, including Platforms, to more effectively identify that content (as they define it), and moderate it consistent with their own policies. Congress has protected websites' right to moderate content consistent with their terms of service in this way. *See* 47 U.S.C. § 230(c)(2). Specifically, Section 230's "Good Samaritan" provision was designed "to encourage and immunize content moderation." *In re Zoom Video Commc'ns Inc. Priv. Litig.*, 525 F. Supp. 3d 1017, 1031 (N.D. Cal. 2021) (emphasis and citation omitted). Congress designed the law to allow websites "to restrict or to enable restriction of access to objectionable online material." *Id.* (quoting the bicameral Report).

Here, at most, the Complaint alleges that Defendants agreed to inform the Platforms about certain content that they considered to be disinformation. *See supra* Section I at 8–10. Providing such information to allow the Platforms to assess whether the content violates their policies is procompetitive, as the Platforms cannot flag all potentially objectionable content on the Internet. It is then up to the Platforms to independently determine whether or not the content violates their polices, and if so, the appropriate remedy. This is entirely consistent with Congress' own design to protect a "vibrant and competitive free market" on the Internet. *See* 47 U.S.C. § 230(b)(2).

Because there are plausible procompetitive justifications for the alleged conduct, the

Complaint fails to plead allegations sufficient to satisfy the third prong of the *per se* test.

**B.    The Complaint Fails To Plead a Rule of Reason Violation.**

Because Plaintiffs cannot satisfy the *per se* requirements, their case should be dismissed unless they can plausibly allege a rule of reason violation, *i.e.*, "that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Witches Brew Tours LLC v. New Orleans Archdiocesan Cemeteries*, 2022 WL 3586757, at *4 n.54 (E.D. La. Aug. 22, 2022) (citation omitted) (granting motion to dismiss), *aff'd*, 56 F.4th 1026 (5th Cir. 2023). To succeed, they must demonstrate that the "anticompetitive evils" of the alleged conduct outweigh "its procompetitive benefits." *Marucci*, 751 F.3d at 376. "A restraint should not be deemed unlawful, even if it eliminates a competitor from the market, so long as sufficient competitors remain to ensure that competitive prices, quality, and service persist." *Id.* at 377.

The Complaint attempts to satisfy the rule of reason standard by alleging the TNI's alleged boycott has reduced the output of news available to consumers, the quality of the news, and consumer welfare. Compl. ¶¶ 546–558. These conclusory allegations fail to satisfy Plaintiffs' rule of reason burden because the alleged harm to Plaintiffs is insufficient to demonstrate a material impact on the market or competition, and, as described below, Plaintiffs fail to allege harm to any other competitors and indeed competition itself in the so-called market.

First, the Complaint alleges that the "output of news available to consumers" has decreased. *Id.* ¶ 552. But the Complaint fails to quantify this supposed reduction in output or otherwise offer any plausible allegations about any publishers other than Plaintiffs themselves. That is, as a matter of law, "insufficient." *See, e.g.*, *BRFHH Shreveport, LLC*, 563 F. Supp. 3d at 590 n.4 ("[A]ntitrust laws protect competition, not the competitor."); *DataCell ehf. v. Visa, Inc.*, 2015 WL 4624714, at *6 (E.D. Va. July 30, 2015) (dismissing complaint where plaintiff claimed lost donations to controversial website, but failed to plausibly allege "facts supporting the assertion that the 'media

market' felt any impact from Defendants' actions").  As in *Marucci*, Plaintiffs offer "no factual information about *other competitors* dropping out of the market."  751 F.3d at 377 (emphasis added).  The Complaint at most makes vague references to harms felt by anonymous "other online news publishers."  Compl. ¶ 552.  But these allegations are conclusory; the "Complaint fails to provide the identity of the [publishers] or demonstrate when and how" they were harmed.  *Marucci*,  751 F.3d at 377.  They are also implausible; a few unnamed publishers who were dissuaded from entering the market cannot have an anticompetitive effect on a market Plaintiffs have separately alleged is "explo[ding]" with new entrants.  Compl. ¶ 163.  Because Plaintiffs have not established that the actions taken against them have had any material impact on overall market output, they have not pled harm to the overall market and competition therein.

Second, the Complaint alleges a loss in "quality."  *Id.* ¶ 551.  But once again, the Complaint offers no factual allegation to suggest that there was any impact beyond Plaintiffs' own publications.  The Complaint's assertion that Defendants somehow prevented "rival online news suppliers from publishing competing content," *id.* ¶ 553, is conclusory; no different than in *Marucci* where the plaintiff failed to offer sufficient "factual information" regarding "diminution in the quality of bats."  751 F.3d at 377.

Third, the Complaint makes a conclusory allegation that TNI members reduced "consumer welfare."  Compl. ¶ 554.  But the only support is a bare conclusion that the alleged boycott stifled speech, which is untethered to any economic effect.  The Complaint makes no allegation, whatsoever, of "significant price changes" in online news.  *Marucci*, 751 F.3d at 377.

Because the Complaint alleges "no factual information about other competitors dropping out of the market, significant price changes, or diminution in the quality," the restraint's "anticompetitive evils . . . are virtually non-existent," and Plaintiffs' rule of reason claim fails.  *Id.*

III.    **THE COMPLAINT FAILS TO PLEAD INJURY OR HARM TO COMPETITION.**

As the Fifth Circuit has explained: "The Supreme Court has long held that suits under section 4 of the Clayton Act (15 U.S.C. § 15(a)) for violation of either Section 1 or Section 2 of the Sherman Act require not only injury to the plaintiff's business or property resulting from the alleged violation, but also a showing of antitrust injury and standing." *Norris v. Hearst Tr.*, 500 F.3d 454, 465 & n.16 (5th Cir. 2007). A successful plaintiff must plead more than just the injuries it has sustained; it must also show that defendants' conduct negatively affects competition. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488–89 (1977). Plaintiffs must "show an actual or threatened injury 'of the type the antitrust laws were intended to prevent' that was caused by the defendant's alleged wrongdoing." *Johnson v. Comm'n on Presidential Debates*, 869 F.3d 976, 982 (D.C. Cir. 2017) (citation omitted). Where, as here, the Complaint has failed to plausibly allege that Defendants' alleged conduct caused antitrust injury and harm to competition, the case should be dismissed. *See, e.g.*, *id.*; *Norris*, 500 F.3d at 468.

A.    **The Complaint Fails To Plead That Plaintiffs Suffered Antitrust Injuries.**

Plaintiffs' alleged injuries do not give rise to antitrust standing because they are not the kind of economic injuries that "antitrust laws were intended to prevent," *Brunswick*, 429 U.S. at 489, or were not plausibly caused by Defendants.

Most of the injuries alleged cannot constitute antitrust injury as a matter of law. The Complaint alleges that Defendants caused injury by "suppressing competition in the marketplace of ideas," but this is not a cognizable antitrust injury. *See* Compl. ¶¶ 37, 318. These alleged harms are harms to the free expression of viewpoints, like ideas, and therefore fall outside of the purview of antitrust laws. *See Adams v. Am. Bar Ass'n*, 400 F. Supp. 219, 223 (E.D. Pa. 1975) ("The antitrust laws . . . clearly do not reach . . . 'free trade in ideas.'"); *Johnson*, 869 F.3d at 983 (the "marketplace of ideas" is not "regulated by the antitrust laws"); *DataCell*, 2015 WL 4624714, at

*9 ("Congress created antitrust laws to protect free market competition, not to protect the free exchange of ideas."). Plaintiffs also allege that they lost expected "private donations." Compl. ¶ 41. But lost donations cannot constitute antitrust injury for the simple reason they are "not trade or commerce." *Dedication & Everlasting Love to Animals v. Humane Soc'y of the U.S., Inc.*, 50 F.3d 710, 712 (9th Cir. 1995) ("[T]he Sherman Act has no application to such activity."). Finally, Plaintiffs also cannot support a claim with losses suffered outside the relevant market for online news, such as those allegedly incurred by a chiropractic practice or documentary film. Compl. ¶¶ 409–410. Injuries "experienced in another market" do not qualify. *Hughes v. Tobacco Inst., Inc.*, 278 F.3d 417, 423 (5th Cir. 2001).

The only injuries the Complaint alleges that might arguably be considered cognizable economic harm in the relevant market are loss of advertising or subscription revenues. *See, e.g.*, Compl. ¶ 378, 481. But the Complaint does not plausibly assert that these injuries flow from the alleged efforts of *Defendants*. Plaintiffs fail at the first step because the Complaint does not allege that any Defendant ever flagged any Plaintiff's content to the Platforms that resulted in the alleged instances of demotion or "de-platforming." *Norris*, 500 F.3d at 465 & n.16 (plaintiff must show injury "resulting from the alleged violation"); *Johnson*, 869 F.3d at 982. They also fail at the second step because their alleged injuries are speculative and remote. There are too many intervening junctures and decisions between Defendants' participation in the TNI and any customer's decision to advertise or subscribe with Plaintiffs. *See McCormack v. NCAA*, 845 F.2d 1338, 1342 (5th Cir. 1988) ("The alleged connection, moreover, between [the Defendant's] actions and the [claimed injury] presents the sort of 'speculative' and 'abstract' causal chain that the Supreme Court has held insufficient to support antitrust standing.") (citation omitted). At bottom, the injuries claimed by Plaintiffs are not antitrust injuries because they simply do not

flow from any alleged restraint on trade in the alleged market for online news.

**B.      The Complaint Fails To Plausibly Plead Injury to Competition.**

Further, even if the injuries the Complaint alleges were sufficient antitrust injuries, the Complaint does not plausibly plead that these injuries (e.g., reduced visibility on one Platform of one of Plaintiffs' posts) will have any impact on overall competition in any relevant antitrust market.  Plaintiffs' "predominate focus on [their] own injury is misguided because antitrust laws are designed to protect competition, not competitors." *Marucci*, 751 F.3d at 376.  "[A]n antitrust plaintiff must prove that the challenged conduct affected the prices, quantity or quality of goods or services and not just his own welfare." *Ginzburg v. Mem'l Healthcare Sys., Inc.*, 993 F. Supp. 998, 1015 (S.D. Tex. 1997) (citations omitted).  For the reasons discussed *supra* Section II(B), the Complaint alleges no plausible harm to competition.  "Accordingly, relief is not available for [them]." *Marucci*, 751 F.3d at 376; *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379, 1385 (5th Cir. 1994) (plaintiffs' "speculation about anticompetitive effects is not enough.").

**IV.    THE COMPLAINT FAILS TO PLAUSIBLY ALLEGE ACTIONABLE CONDUCT BY EACH OF THE DEFENDANTS.**

All claims against named Defendants should be dismissed for the additional reason that the Complaint fails to plead that each Defendant engaged in any relevant conduct.  "Generic pleading, alleging misconduct against defendants without specifics as to the role each played in the alleged conspiracy, was specifically rejected by *Twombly*." *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 436–37 (6th Cir. 2008); *see also SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015) (Where the complaint "fails to allege particular facts against a particular defendant, then the defendant must be dismissed.").  A plaintiff must allege "specific *facts* demonstrating an intention on the part of [each defendant] to engage in a conspiracy." *Marucci*, 751 F.3d at 375 (emphasis in original).  Here, the Complaint fails to make

plausible allegations to tie any of the Defendants to an unlawful group boycott.

Although the Complaint contains hundreds of paragraphs of allegations, it describes very little conduct undertaken by individual Defendants, as opposed to the Platforms. Compl. ¶¶ 367–481. In support of the Complaint's allegation that "[e]ach and every Plaintiff has been victimized by the TNI's joint agreement and concerted action," Plaintiffs point to no conduct undertaken specifically by Defendants. *Id.* ¶¶ 363–481. There is no plausible allegation that any Defendant ever took any action with regard to Plaintiffs' online content. This "fall[s] significantly short of the required pleading threshold." *Total Benefits*, 552 F.3d at 436.

The allegations regarding The AP, Post, and Reuters are especially barren, with little beyond allegations of their mere membership in the TNI and status as publishers. But "federal courts across the country have concluded that '[m]ere membership in associations is not enough to establish participation in a conspiracy.'" *Tesla, Inc.*, 2023 WL 4053438, at *13 (citing cases). Each of these Defendants is mentioned fewer than ten times in the Complaint and never alleged to have notified anyone about any content—let alone Plaintiffs' content—pursuant to the TNI. Nor are they alleged to have coordinated censorship decisions. *See* Compl. ¶¶ 320–326. For The AP and Reuters, the only other specific allegations are that they each published news articles about the origin of COVID-19. *Id.* ¶¶ 342–346. Similarly, the only specific allegations about the Post are that it published news articles about ivermectin, *id.* ¶¶ 355–358, and a YouTube ban, *id.* ¶ 470. But such news coverage has nothing to do with the alleged group boycott.

Where, as here, the Complaint "fails to allege particular facts against [multiple] particular defendant[s]," it "must be dismissed." *SD3*, 801 F.3d at 422; *Marucci*, 751 F.3d at 375.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request this Court grant Defendants' motion and dismiss Plaintiffs' Complaint in its entirety.

Dated: July 11, 2023

Respectfully submitted,

*/s/ Leslie E. John*

Leslie E. John (*pro hac vice*, #917698)
Elizabeth P. Weissert (*pro hac vice*, #917700)
Ballard Spahr LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Tel: (215) 665-8500; Fax: (215) 864-8999
johnl@ballardspahr.com
weisserte@ballardspahr.com

Jay Ward Brown (*pro hac vice*, #917699)
Ballard Spahr LLP
1909 K Street N.W., 12th Floor
Washington, D.C. 20006
Tel: (202) 661-2200; Fax: (202) 661-2299
brownjay@ballardspahr.com

Loretta Mince #25796
Fishman Haygood LLP
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170
Tel: (504) 586-5252; Fax: (504) 586-5250
lmince@fishmanhaygood.com

*Attorneys for The Associated Press*

*/s/ Jan P. Christiansen*

Jan P. Christiansen #20142
G. Adam Cossey #31678
Hudson Potts & Bernstein
1800 Hudson Lane, Suite 300
Monroe, Louisiana 71201
Tel: (318) 388-4400; Fax: (318) 388-2758
jpchris@hpblaw.com
acossey@hpblaw.com

Edward B. Schwartz (*pro hac vice forthcoming*)
Reed Smith LLP
1301 K Street, N.W.
Suite 1000, East Tower
Washington, D.C., 20005

*/s/ Jeffrey C. Bank*

Jeffrey C. Bank (*pro hac vice*)
Allison B. Smith (*pro hac vice*)
Wilson Sonsini Goodrich & Rosati
1700 K Street, N.W., 5th Floor
Washington, D.C. 20006
Tel: (202) 973-8800; Fax: (202) 973-8899
jbank@wsgr.com
allison.smith@wsgr.com

Thomas M. McEachin #26412
Andrea V. Timpa #29455
William P. Gibbens #27225
Schonekas, Evans, McGoey
& McEachin, L.L.C.
909 Poydras Street, Suite 1600
New Orleans, Louisiana 70112
Tel: (504) 680-6050; Fax: (504) 680-6051
thomas@semmlaw.com
andrea@semmlaw.com
billy@semmlaw.com

*Attorneys for Reuters News & Media Inc.*

*/s/ John E. Schmidtlein*

John E. Schmidtlein (*pro hac vice*, #917694)
Thomas G. Hentoff (*pro hac vice*, #917696)
Nicholas G. Gamse (*pro hac vice*, #917695)
Kathryn E. Garza (*pro hac vice*, #917697)
Williams & Connolly LLP
680 Maine Avenue, S.W.
Washington, D.C. 20024
Tel: (202) 434-5000; Fax: (202) 434-5029
jschmidtlein@wc.com
thentoff@wc.com
ngamse@wc.com
kgarza@wc.com

Bernard S. Johnson #07280
Cook, Yancey, King & Galloway
333 Texas Street, Suite 1700 (71101)
P.O. Box 22260

Tel: (202) 414-9200
eschwartz@reedsmith.com

Michelle A. Mantine (*pro hac vice forthcoming*)
Reed Smith LLP
Reed Smith Centre, 225
Fifth Avenue
Pittsburgh, PA, 15222
Tel: (412) 288-3131
mmantine@reedsmith.com

Casey J. Olbrantz (*pro hac vice forthcoming*)
Reed Smith LLP
599 Lexington Avenue
New York, NY 10022
Tel: (212) 521-5400
colbrantz@reedsmith.com

*Attorneys for The British
Broadcasting Corporation*

Shreveport, Louisiana 71120-2260
Tel: (318) 221-6277; Fax: (318) 227-7850
bernard.johnson@cookyancey.com

*Attorneys for WP Company LLC
d/b/a The Washington Post*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned Counsel hereby certifies that on the 11th day of July 2023, notice of the foregoing pleading was provided via the CM/ECF system to the counsel of record.

*/s/ John E. Schmidtlein*

John E. Schmidtlein
