# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHILDREN'S HEALTH DEFENSE, TRIALSITE, INC., CREATIVE DESTRUCTION MEDIA, LLC, ERIN ELIZABETH FINN, JIM HOFT, DR. BEN TAPPER, BEN SWANN, DR. JOSEPH MERCOLA, TY BOLLINGER, CHARLENE BOLLINGER & JEFF CROUERE,<br><br>    *Plaintiffs*,<br><br>v.<br><br>WP COMPANY, LLC D/B/A THE WASHINGTON POST, THE BRITISH BROADCASTING CORP., THE ASSOCIATED PRESS & REUTERS NEWS & MEDIA, INC.,<br><br>    *Defendants*. | Civil Action No. 1:23-cv-2735 (TJK) |

## STATEMENT OF INTEREST OF THE UNITED STATES

ABIGAIL A. SLATER
*Assistant Attorney General*

ROGER P. ALFORD
*Principal Deputy Assistant Attorney General*

MARK H. HAMER
DINA KALLAY
WILLIAM RINNER
*Deputy Assistant Attorneys General*

DAVID B. LAWRENCE
DANIEL E. HAAR
*Attorneys, Antitrust Division*

U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530
Telephone: (202) 598-2846
Email: daniel.haar@usdoj.gov

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................. iii

INTEREST OF THE UNITED STATES ............................................................... 1

BACKGROUND ................................................................................................... 2

ARGUMENT ........................................................................................................ 4

I.  THE SHERMAN ACT PROTECTS COMPETITION PROVIDED BY DIVERSE
RIVAL SOURCES IN THE NEWS MARKETPLACE ........................................... 4

II.  SECTION 1'S PROHIBITION ON CONCERTED ACTION THAT UNREASONABLY
RESTRAINS TRADE REACHES RESTRAINTS ON VIEWPOINT COMPETITION .......... 8

    A.  Coordination on the Content Distributed by Competing News Distributors Can
    Constitute Concerted Action ..................................................................... 8

    B.  Elimination of Competition in News Content Can Constitute an Unreasonable Restraint
    of Trade ................................................................................................. 10

        1.  Truncated Analysis for Agreements Fixing Product Features ..................... 11

        2.  Fuller Rule-of-Reason Approach for Agreements on Standards .................. 13

CONCLUSION ................................................................................................... 16

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Abrams v. United States*,
  250 U.S. 616 (1919) ................................................................................................................ 5

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
  486 U.S. 492 (1988) ...................................................................................................... 13, 14

*American Needle, Inc. v. NFL*,
  560 U.S. 183 (2010) ........................................................................................................ 8, 9

*American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.*,
  456 U.S. 556 (1982) ...................................................................................................... 14, 15

*American Tobacco Co. v. United States*,
  328 U.S. 781 (1946) ............................................................................................................ 8

*Arizona v. Maricopa County Medical Society*,
  457 U.S. 332 (1982) .......................................................................................................... 10

*Associated Press v. United States*,
  326 U.S. 1 (1945) ........................................................................................... 5, 6, 9, 12, 13

*Atlantic Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990) ............................................................................................................ 6

*Board of Trade of City of Chicago v. United States*,
  246 U.S. 231 (1918) .......................................................................................................... 11

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................................................ 8, 9

*Biden v. Knight First Amendment Institute at Columbia University*,
  141 S. Ct. 1220 (2021) ........................................................................................................ 1

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977) ............................................................................................................ 6

*California Dental Ass'n v. FTC*,
  526 U.S. 756 (1999) .......................................................................................................... 11

*Citizen Publishing Co. v. United States*,
  394 U.S. 131 (1969) ........................................................................................................ 6, 8

*Copperweld Corp. v. Independence Tube Corp.*,
   467 U.S. 752 (1984) ................................................................................. 9, 10

*Eastman Kodak Co. v. Image Technical Services, Inc.*,
   504 U.S. 451 (1992) ..................................................................................... 9

*FTC v. Indiana Federation of Dentists*,
   476 U.S. 447 (1986) ................................................................................. 9, 12

*Goldfarb v. Virginia State Bar*,
   421 U.S. 773 (1975) ................................................................................... 14

*Johnson v. Commission on Presidential Debates*,
   869 F.3d 976 (D.C. Cir. 2017) ...................................................................... 7

*Kleen Products LLC v. Georgia-Pacific LLC*,
   910 F.3d 927 (7th Cir. 2018) ........................................................................ 9

*National Society of Professional Engineers v. United States*,
   435 U.S. 679 (1978) ................................................................................. 4, 9

*NCAA v. Board of Regents of the University of Oklahoma*,
   468 U.S. 85 (1984) ................................................................................. 9, 11

*North Carolina State Board of Dental Examiners v. FTC*,
   574 U.S. 494 (2015) ..................................................................................... 4

*Northern Pacific Railway Co. v. United States*,
   356 U.S. 1 (1958) ......................................................................................... 4

*Ohio v. American Express Co.*,
   585 U.S. 529 (2018) ..................................................................... 9, 10, 11, 14

*Peden v. Democratic National Committee*,
   2020 WL 6384618 (D. Mass. Oct. 30, 2020) ................................................ 7

*Princo Corp. v. International Trade Commission*,
   616 F.3d 1318 (Fed. Cir. 2010) ................................................................... 15

*Standard Oil Co. v. United States*,
   221 U.S. 1 (1911) ....................................................................................... 10

*Times-Picayune Publishing Co. v. United States*,
   345 U.S. 594 (1953) ..................................................................................... 6

*Todd v. Exxon Corp.*,
   275 F.3d 191 (2d Cir. 2001) ....................................................................... 13

iv

*Tops Markets, Inc. v. Quality Markets, Inc.*,
   142 F.3d 90 (2d Cir. 1998) ........................................................................... 14

*United States v. Associated Press*,
   52 F. Supp. 362 (S.D.N.Y. 1943) .................................................................. 5

*United States v. Container Corp.*,
   393 U.S. 333 (1969) ................................................................................ 9, 15

*United States v. National Ass'n of Real Estate Boards*,
   339 U.S. 485 (1950) ..................................................................................... 14

*United States v. Socony-Vacuum Oil Co.*,
   310 U.S. 150 (1940) ....................................................................................... 9

## Statutes

15 U.S.C. § 1 ...................................................................................................... 8

15 U.S.C. § 4302 .............................................................................................. 15

28 U.S.C. § 517 .................................................................................................. 1

## Other Authorities

Abigail Slater, Assistant Att'y Gen., Antitrust Div., U.S. Dep't of Just., *The Conservative Roots of America First Antitrust Enforcement*, Address at Notre Dame Law School (Apr. 28, 2025), https://www.justice.gov/opa/speech/assistant-attorney-general-gail-slater-delivers-first-antitrust-address-university-notre ............................................................. 1, 7, 8

Abigail Slater (@AAGSlater), X (May 2, 2025),
   https://x.com/AAGSlater/status/1918357746572787757 ............................. 6

F.A. Hayek, *The Use of Knowledge in Society*, Volume 35, American Economic Review, Number 4, 519 (1945), https://www.kysq.org/docs/Hayek_45.pdf ............................................. 5

Khushita Vasant, *US DOJ on lookout for cases of 'product-fixing,' non-price restraints, Kallay says*, MLex (June 25, 2025 20:01 GMT), https://www.mlex.com/mlex/articles/2357617/us-doj-on-lookout-for-cases-of-product-fixing-non-price-restraints-kallay-says ........................... 6

United States House of Representatives Report No. 125, 108th Congress, 1st Session (2003) ... 15

## INTEREST OF THE UNITED STATES

The United States respectfully submits this Statement of Interest pursuant to 28 U.S.C. § 517, which permits the Department of Justice "to attend to the interests of the United States" in any case pending in a federal court.  The Antitrust Division of the U.S. Department of Justice enforces the federal antitrust laws and has a strong interest in their correct application.

The United States has a particular interest in ensuring that free market competition "protect[s] individual liberty from the tyranny of coercive monopoly power."[1]  Yet Defendants in this case suggest that "suppressing competition in the marketplace of ideas . . . is not a cognizable antitrust injury."  Br. in Supp. of Defs.' Mot. to Dismiss 22, ECF No. 41-1 (internal quotation marks omitted) ("MTD"); Suppl. Br. in Supp. of Defs.' Mot. to Dismiss 7, ECF No. 95.  To the contrary, individual liberty—and consumer welfare—benefit greatly from viewpoint competition in news markets and can suffer when that competition is reduced.  News consumers desire and demand diverse perspectives.  Americans therefore vitally depend on viewpoint competition in the marketplace of ideas to limit the abuse of market power and ensure the free flow of information in our democracy.

Justice Thomas recently observed that today's digital platforms exert "unprecedented . . . concentrated control of so much speech in the hands of a few private parties."  *Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220, 1221 (2021) (Thomas, J., concurring).  He also predicted that "we will soon have no choice but to address how our legal doctrines apply to highly concentrated, privately owned information infrastructure such as digital platforms."  *Id.*

---

[1] Gail Slater, Assistant Att'y Gen., Antitrust Div., U.S. Dep't of Just., *The Conservative Roots of America First Antitrust Enforcement*, Address at Notre Dame Law School (Apr. 28, 2025), https://www.justice.gov/opa/speech/assistant-attorney-general-gail-slater-delivers-first-antitrust-address-university-notre.

This is such a case. Defendants' proposed rule of law exempting viewpoint collusion from the antitrust laws would free major news organizations and dominant digital platforms to block competitive threats that offer alternative, competing viewpoints. The United States therefore files this statement to urge the Court to reject Defendants' suggestion that the antitrust laws play no part in protecting viewpoint competition in news markets. Instead, controlling precedent shows that the Sherman Act protects all forms of competition, including competition in information quality. Existing doctrine under Section 1 of the Sherman Act, 15 U.S.C. § 1, thus provides an appropriate legal framework to evaluate Plaintiffs' claims. The United States takes no position on the application of the law to the facts alleged in Plaintiffs' complaint or on the resolution of Defendants' motion.

## BACKGROUND

Plaintiffs are a group of online news publishers whose content often contradicts mainstream media narratives. Compl. ¶ 11, ECF No. 1. Plaintiffs allege that several mainstream news outlets—the Washington Post, the British Broadcasting Corporation, Reuters, and the Associated Press (collectively "Defendants")—entered into an industry partnership called the Trusted News Initiative ("TNI") with internet companies such as Facebook, Google, Microsoft, and Twitter (collectively, the "Platforms").[2] *Id.* ¶¶ 3-5. As part of that partnership, Defendants allegedly "agreed to work together, and have in fact worked together, to exclude from the world's dominant Internet platforms rival news publishers who engage in reporting that challenges and competes with TNI members' reporting on certain issues relating to COVID-19 and U.S. politics." *Id.*

---

[2] Meta (formerly Facebook), Google, X (formerly Twitter), and Microsoft (which owns LinkedIn) are alleged members of the combination, contract, or conspiracy but not named as defendants in this lawsuit. Compl. ¶¶ 203-04.

Plaintiffs allege that TNI restricted the supply of certain viewpoints in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. *Id.* ¶¶ 120, 130. According to the complaint, it targeted claims that, e.g.: COVID-19 was "manmade," "manufactured or bioengineered"; "COVID is no more dangerous to some populations than the seasonal flu"; face masks, mask mandates, and social distancing "do not prevent the spread of COVID"; and "immunity from getting COVID is more effective than vaccination." *Id.* ¶ 314. And as a result, Plaintiffs, who supplied non-mainstream viewpoints on these and other issues, allegedly were "censored, shadow-banned and de-platformed" from posting on websites like Facebook, YouTube, and Twitter. *See, e.g.*, *id.* ¶¶ 49, 60, 64, 74, 85.

Plaintiffs claim that exclusion from digital news markets caused them substantial economic harm as a result of TNI's alleged depriving news consumers of access to Plaintiffs' perspectives. *See, e.g.*, *id.* ¶¶ 363-481. As news providers reach more and more consumers, they gain "revenue from their social media accounts both through monetization opportunities such as advertising or fundraising functions embedded in their social media pages and by driving traffic to their websites," yielding further revenue opportunities. *Id.* ¶ 364. In turn, exclusion from posting in key distribution channels allegedly deprived Plaintiffs of the ability to leverage the diverse sources of monetization that large audiences afford content creators in the media business. *Id.*

Defendants' brief tells a very different story than Plaintiffs' complaint: that TNI was "an industry information-sharing partnership . . . aimed at identifying harmful disinformation." MTD at 1. According to Defendants, the allegations show at most that they "'collectively decided what to count as misinformation' and that some Defendants *flagged* certain unidentified content as such," at which point "the Platforms [took] independent action consistent with their

own individual content moderation policies or business reasons." *Id.* at 1-2. And Defendants believe that even if they injured plaintiffs by colluding to block their content, "suppressing competition in the marketplace of ideas . . . is not a cognizable antitrust injury." *Id.* at 22.

Both parties' narratives implicate competition over viewpoint diversity and information quality. In markets where consumers value quality and diversity in information sources—as they do in most news markets—the antitrust laws protect this competition. This Statement of Interest explains how.

## ARGUMENT

## I.    THE SHERMAN ACT PROTECTS COMPETITION PROVIDED BY DIVERSE RIVAL SOURCES IN THE NEWS MARKETPLACE

The antitrust laws protect all dimensions of competition. They "reflect[] a legislative judgment that ultimately competition will produce not only lower prices, but also better goods and services." *See Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 695 (1978). The competitive process maximizes consumer welfare—not by prescribing what is best for consumers, but by allowing the "unrestrained interaction of competitive forces [to] yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic political and social institutions." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 4 (1958). The antitrust laws therefore safeguard this competition in all its forms, ensuring the functioning of the free market system at the bedrock of our economy. *See, e.g., N.C. State Bd. of Dental Exam'rs v. FTC*, 574 U.S. 494, 502 (2015).

The significance of any particular dimension of competition—e.g., price, quality, choice—depends on how competition plays out in the commercial realities of any given industry. *See* U.S. Dep't of Just. & Fed. Trade Comm'n, *2023 Merger Guidelines* at 2 (2023)

("Competition presents itself in myriad ways" so the analysis begins by asking "how do firms in this industry compete"?).  Here, the complaint alleges antitrust markets in which news organizations compete for audiences not only through prices but also through non-price parameters of competition such as the quality, content, and variety of perspectives they provide.  Compl. ¶¶ 183-221.  It further alleges that trust in a news source is itself a critical dimension of competition.  *Id.* ¶ 195.  This is therefore a case in which economic competition plays out in part through the quality of information and diversity of viewpoints provided to news consumers.

These allegations are consistent with the law's longstanding recognition that content competition is a critical feature—and consumer benefit—of the news media industry.  Justice Holmes explained over a century ago that "the best test of truth is the power of the thought to get itself accepted in the competition of the market . . . ."  *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting).  And "the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public . . . ."  *Associated Press v. United States*, 326 U.S. 1, 20 (1945).  "[R]ight conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection."  *United States v. Associated Press*, 52 F. Supp. 362, 372 (S.D.N.Y. 1943), *aff'd*, 326 U.S. 1; *see also* F.A. Hayek, *The Use of Knowledge in Society*, 35 Am. Econ. Rev. 4, 519, 521-22, 526-27 (1945), https://www.kysq.org/docs/Hayek_45.pdf.

Thus, it is critical that the Sherman Act's prohibitions apply fully when restraints of trade limit non-price features such as the type or quality of information that may compete in the marketplace for ideas.[3]  For nearly a century, the Supreme Court has recognized that the antitrust

---

[3] As AAG Slater recently explained, "consumer welfare . . . is broader than just price"—"it's innovation, it's quality."  Abigail Slater (@AAGSlater), X (May 2, 2025), https://x.com/AAGSlater/status/1918357746572787757.  Relatedly, Deputy Assistant Attorney

laws apply equally to news organizations as to any other type of commerce. "All are alike

covered by the Sherman Act. The fact that the publisher handles news while others handle food

does not . . . afford the publisher a peculiar constitutional sanctuary in which he can with

impunity violate laws regulating his business practices." *Associated Press*, 326 U.S. at 6-7

(rejecting "the argument that newspaper publishers charged with combining cooperatively to

violate the Sherman Act are entitled to have a different and more favorable kind of trial

procedure than all other persons covered by the Act"); *see also Citizen Publ'g Co. v. United

States*, 394 U.S. 131, 139 (1969); *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 614

(1953).

Defendants are therefore wrong to suggest that the harms suffered by Plaintiffs as a result

of their alleged exclusion from key distribution channels cannot be cognizable antitrust injuries.

MTD at 22. Antitrust injury merely requires that a plaintiff suffer injuries of the kind the

"antitrust laws were intended to prevent," *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429

U.S. 477, 489 (1977), that is, "a competition-*reducing* aspect or effect of the defendant's

behavior," *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 343-44 (1990). Plaintiffs

claim that the reduction in content competition has reduced their revenue by depriving them of

the ability to reach consumers who value their distinct viewpoints. Consumers, in turn, were

allegedly deprived of the benefits to content competition of Plaintiffs' participation on several

powerful digital platforms. Since the Complaint alleges that viewpoint competition plays out in

the relevant markets over news content, Compl. ¶¶ 136-68, harm to this competition can

---

General Dina Kallay recently said that the Antitrust Division is "concerned with non-price
restrictions for competition" such as collusive "product-feature fixing." Khushita Vasant, *US
DOJ on lookout for cases of 'product-fixing,' non-price restraints, Kallay says*, MLex (June 25,
2025 20:01 GMT), https://www.mlex.com/mlex/articles/2357617/us-doj-on-lookout-for-cases-
of-product-fixing-non-price-restraints-kallay-says.

establish cognizable antitrust harm that suffice to demonstrate antitrust injury.

In support of a sweeping rule against recognizing antitrust injuries related to the marketplace of ideas, Defendants misread cases rejecting antitrust standing for political candidates.  MTD 22-23; Suppl. Br. in Supp. of Defs.' Mot. to Dismiss 7.  The plaintiffs in *Johnson v. Commission on Presidential Debates* were not market participants, but election participants—failed presidential candidates who had been excluded from a debate.  869 F.3d 976, 982 (D.C. Cir. 2017).  *Johnson* therefore explained that "holding of a political office" does not constitute trade or commerce and that "an antitrust violation must involve injury to commercial competition."  *Id.* at 983.  Likewise, *Peden v. Democratic National Committee*, 2020 WL 6384618 (D. Mass. Oct. 30, 2020), involved a failed Democratic primary candidate whose injuries involved political competition, *not* "market (i.e. economic) competition."  *Id.* at *3.  In contrast, plaintiffs here are market participants who allegedly lost both direct and indirect compensation from losing audiences they grow through content competition in the news markets on digital platforms.  *Cf. id.* ("Peden's attempt to shift his claim from jilted candidate to a purveyor of information in the market place is simply a non-starter").  Accordingly, *Johnson* and *Peden* both support finding antitrust injury where, as here, plaintiffs are market participants harmed by a loss of commercial competition in news markets.

Adopting Defendants' misreading of these cases would cause grave harm in modern digital markets by effectively immunizing anticompetitive conduct that limits consumers' access to diverse viewpoints.  Antitrust Division Assistant Attorney General Gail Slater recently explained that "[t]oday's online platforms . . . control not just the prices of their services, but the flow of our nation's commerce and communication . . . [and] play a critical role in our digital public square."  Slater, *supra* n.1.  The antitrust laws impose a critical check on the abuse of this

immense power, and this court should reject Defendants' novel attempt to immunize speech-related anticompetitive conduct.

## II.    SECTION 1'S PROHIBITION ON CONCERTED ACTION THAT UNREASONABLY RESTRAINS TRADE REACHES RESTRAINTS ON VIEWPOINT COMPETITION

Section 1 of the Sherman Act prohibits every "contract, combination . . . or conspiracy" (i.e., concerted action) that unreasonably restrains trade (i.e., is anticompetitive).  15 U.S.C. § 1.  Courts assess separately whether (i) concerted action exists and (ii) the concerted action is anticompetitive.  *See Am. Needle, Inc. v. NFL*, 560 U.S. 183, 186 (2010).  At each of these steps, coordination among competitors to fix the features of their products—such as competing distributors coordinating on the content they carry—can be reached by the Sherman Act.

### A.    Coordination on the Content Distributed by Competing News Distributors Can Constitute Concerted Action

The Supreme Court has read the statutory phrase "contract, combination . . . , or conspiracy" in Section 1 to require concerted action.  *See Am. Needle* at 189-90.  Concerted action is conduct that joins together "'separate economic actors pursuing separate economic interests,' such that the agreement 'deprives the marketplace of independent centers of decisionmaking,' and therefore of 'diversity of entrepreneurial interests,' and thus of actual or potential competition."  *Id.* at 195 (citations omitted).

Concerted action can take many forms.  It can take the form of express written contracts, *see, e.g.*, *Citizen Publ'g*, 394 U.S. at 135-36, but "[n]o formal agreement is necessary" under Section 1, *Am. Tobacco Co. v. United States*, 328 U.S. 781, 809 (1946).  "[T]acit" agreements qualify, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007) (citation omitted), which can involve merely a "wink and a nod," *Kleen Prods. LLC v. Georgia-Pac. LLC*, 910 F.3d 927, 936 (7th Cir. 2018), or an informal "gentlemen's agreement or understanding," *United States v.*

8

*Socony-Vacuum Oil Co.*, 310 U.S. 150, 179, 252 (1940).  The standard does not rest on "formalistic distinctions" but rather on "a functional consideration of how the parties involved in the alleged anticompetitive conduct actually operate."  *Am. Needle*, 560 U.S. at 191; *see also Ohio v. Am. Express Co.*, 585 U.S. 529, 542-43 (2018) ("*Amex*") (explaining that "[l]egal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law") (*quoting Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 466-67 (1992)).

For more than a century, the U.S. Supreme Court has treated association rules imposing "duties and restrictions in the conduct of [the members'] separate businesses" as agreements subject to Section 1.  *Associated Press*, 326 U.S. at 8.[4]  Moreover, as the Supreme Court explained in *United States v. Container Corp.*, reciprocal information exchange among competitors is "concerted action [that] is *of course sufficient* to establish the combination or conspiracy, the initial ingredient of a violation of § 1 of the Sherman Act."  393 U.S. 333, 335 (1969) (emphasis added).

Although concerted activity can have procompetitive benefits, it "inherently is fraught with anticompetitive risk" because it "deprives the marketplace of the independent centers of decisionmaking that competition assumes and demands."  *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768-69 (1984).  When concerted action is among competitors, it presents heightened risks.  *See Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 348 n.18 (1982) ("horizontal restraints are generally less defensible than vertical restraints").  Courts, therefore,

---

[4] *See also, e.g.*, *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 451-52 (1986) (dental association rule forbidding members from submitting x-rays to insurers); *NCAA v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85, 99 (1984) (NCAA plan restricting members' licensing of television rights); *Nat'l Soc'y of Prof 'l Eng'rs v. United States*, 435 U.S. 679, 681 (1978) (engineering society's ethical canon barring competitive bidding).

should exercise care when analyzing claims of concerted action among competitors to ensure that the Sherman Act's goal of protecting competition throughout the U.S. economy is advanced.

Accordingly, when rival news publishers come together and conduct aspects of their news businesses jointly, that is concerted action subject to Section 1 scrutiny. Indeed, both Plaintiffs and Defendants accept some version of concerted activity. According to Plaintiffs, TNI is a joint effort by Defendants to stop "certain online news reporting" that "competes with, and contradicts, Defendants' own reporting." Pls.' Suppl. Br. Opposing Defs.' Rule 12(b)(6) Mot. to Dismiss at 1-2, ECF No. 96. Defendants, meanwhile, claim that they did no more than flag misinformation for each other, or at most "'collectively decided what to count as misinformation.'" MTD at 1-2. Either way, Defendants have made joint decisions about certain aspects of their news businesses that can be subject to Section 1 scrutiny.

### B. Elimination of Competition in News Content Can Constitute an Unreasonable Restraint of Trade

Once a plaintiff alleges concerted action, the court must then determine whether the challenged conduct unreasonably restrains trade. "Restraints can be unreasonable in one of two ways." *Amex*, 585 U.S. at 540. Some restraints are "unreasonable per se," *id.*, based on their inherently anticompetitive "nature and character," *Standard Oil Co. v. United States*, 221 U.S. 1, 64-65 (1911). Other restraints are unreasonable under the rule of reason, "a fact-specific assessment" of "'the restraint's actual effect' on competition." *Amex*, 585 U.S. at 541 (cleaned up). Under either of these paths, the Sherman Act can reach conduct that restrains competition in news content.[5]

---

[5] Plaintiffs have alleged both per se and rule of reason claims. But because the parties' briefs have covered the per se arguments in detail, this Statement of Interest focuses on the rule-of-reason claim. This focus should not be interpreted as a statement one way or another on the validity of the per se claim.

Defendants are wrong to suggest that, if examined under the rule of reason path, a restraint that "stifled speech" of news providers fails because it "is untethered to any economic effect."  MTD at 21, 23.  As discussed *supra*, the diversity, quality, and availability of perspectives in the relevant news markets are allegedly key dimensions of competition in the relevant markets, valued by news consumers.  If a restraint stifles suppliers' ability to provide consumers what they want, it impacts the economic process of competition by frustrating the ability for supply to meet demand.  *See NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 107 (1984) ("A restraint that has the effect of reducing the importance of consumer preference in setting price and output is not consistent with this fundamental goal of antitrust law.").  The particular dynamics of competition will vary case to case depending on the commercial realities of the industry involved.  *See Amex*, 585 U.S. at 544.

The rule of reason entails a *flexible* inquiry into whether the conduct "merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition."  *Bd. of Trade of City of Chicago v. United States*, 246 U.S. 231, 238 (1918).  "What is required . . . is an enquiry meet for the case, looking to the circumstances, details, and logic of a restraint."  *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 781 (1999).  Some restraints are so obviously anticompetitive that "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect" without a detailed market analysis.  *Id.* at 770.  Other restraints, meanwhile, call for a more intensive market analysis.

### 1.    Truncated Analysis for Agreements Fixing Product Features

Plaintiffs have suggested that Defendants conspired to limit or fix the features included in the products that they sell.  The Sherman Act views such agreements with great skepticism.  *FTC v. Indiana Federation of Dentists* involved "a horizontal agreement among the participating

11

dentists to withhold from their customers a particular service that they desire—the forwarding of x rays to insurance companies." 476 U.S. 447, 459 (1986). As the Supreme Court explained, "no elaborate industry analysis is required to demonstrate [that restraint's] anticompetitive character." *Id.* (citation omitted). Such an agreement among competitors "[not] to compete with respect to the package of services offered to customers . . . cannot be sustained under the Rule of Reason" without "some countervailing procompetitive virtue." *Id.* Indeed, the Court suggested the restraint was tantamount to a naked restriction of a form of output. *Id.* at 460. Accordingly, when such an obviously anticompetitive restraint is shown, that establishes a prima facie case and shifts the burden to defendants to justify the restraint.

The Supreme Court has applied a similar approach in holding restrictive rules of a news organization to be unlawful. Accordingly, in *Associated Press* an organization of newspapers violated Section 1 of the Sherman Act when they "set up a system of By-Laws which prohibited all AP members from selling news to non-members, and which granted each member powers to block its non-member competitors from membership." 326 U.S. at 4. The By-Laws required members to "promptly furnish to the corporation, through its agents or employees, all the news of such member's district," and prohibited them "from selling or furnishing their spontaneous news to any agency or publisher except to AP." *Id.* at 9. Violations could be punished by a fine of $1000 or the suspension of membership, without any right to appeal or obtain review of the decision. *Id.* at 8. The Court explained that, through the adoption of these By-Laws, the publisher defendants "by concerted arrangements, pooled their power to acquire, to purchase, and to dispose of news reports through the channels of commerce" and "entered into agreements . . . plainly designed in the interest of preventing competition." *Id.* at 16 (cleaned up). According to the Court, "the combination [was] in reality an extra-governmental agency,

12

which prescribe[d] rules for the regulation and restraint of interstate commerce, and provide[d] extra-judicial tribunals for determination and punishment of violations, and thus 'trenche[d] upon the power of the national legislature and violate[d] the statute.'" *Id.* at 19 (cleaned up).

### 2.  Fuller Rule-of-Reason Approach for Agreements on Standards

On the other hand, joint efforts to define product-quality standards (or to exchange information on product quality), without mutual agreement on how those standards will be implemented (or on how the information will be used), generally are examined for both anticompetitive and procompetitive effects under the rule of reason.  This is because voluntary product standards promulgated with "meaningful safeguards" can sometimes have "significant procompetitive advantages." *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 501 (1988).  Concerted arrangements to share nonprice information that do not encompass any further understandings on whether or how to act on that information are also typically examined under the flexible rule of reason.  *Cf. Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001).

Thus, at the outset, it is critical to probe plaintiffs' allegations to determine whether they contain plausible allegations of an agreement among competitors about how they will act on information shared and on the pricing or features of the products they will and will not sell.  *See supra* Section II.B.1.  When, by contrast, agreements on standards are purely *voluntary*—that is, when individual participants in the standards-development process are free to produce and sell products not conforming to the standards—they demand an analysis under the rule of reason to assess the potential for anticompetitive and procompetitive effects.[6]  *Cf. Allied Tube*, 486 U.S. at

---

[6] Just because a standard is designated as voluntary does not mean it is in reality.  *See, e.g.*, *Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 559, 563, 570 (1982) ("so-called voluntary standards" were mandatory in practice); *Goldfarb v. Va. State Bar*, 421 U.S. 773, 776-78, 781 (1975) (despite purporting to be "merely advisory," fee schedule in reality established a "fixed, rigid price floor"); *cf. United States v. Nat'l Ass'n of Real Estate Bds.*, 339 U.S. 485, 489

501 n.6 ("Concerted efforts to *enforce* (rather than just agree upon) private product standards face more rigorous antitrust scrutiny").

The competitive effects assessment under the rule of reason accounts for all aspects of competition that impact consumer welfare, including the content, quality, and diversity of news in markets where those are important to consumers.  In applying the rule of reason, courts ask whether the alleged restraint has "ha[d] an anticompetitive effect," which can be "show[n] directly or indirectly."  *Amex*, 585 U.S. at 542.  Under the direct approach, plaintiffs can establish a prima facie case through "proof of actual detrimental effects on competition, . . . such as reduced output, increased prices, or *decreased quality* in the relevant market."  *Id.* (cleaned up) (emphasis added).  Under the indirect approach, plaintiffs can meet their burden by proving "market power, plus some other ground for believing that the challenged behavior could harm competition in the market."  *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 97 (2d Cir. 1998).

Of course, standards-development activities and information exchanges can be anticompetitive and thus violate the rule of reason.  "There is no doubt that the members of such [standards-development] associations often have economic incentives to restrain competition and that the product standards set by such associations have a serious potential for anticompetitive harm."  *Allied Tube*, 486 U.S. at 500.  The Supreme Court has found standards-development activities to violate Section 1 where they involve efforts by some competitors to exclude rivals from the process.  *Id.* at 511; *Am. Soc. of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 570 (1982).  Moreover, information exchanges can corrupt the competitive process or lead to

(1950) ("Subtle influences may be just as effective as the threat or use of formal sanctions to hold people in line.").

anticompetitive effects, even without an agreement to fix prices. *Container Corp.*, 393 U.S. at 336-37.

On the other hand, cooperative standard-setting by trade associations have been found lawful when they have procompetitive purposes and adequate safeguards against abuse. For example, the Federal Circuit explained that "research joint ventures that seek to develop industry-wide standards for new technology can have decidedly procompetitive effects. The absence of standards for new technology can easily result in a 'Tower of Babel' effect that increases costs, reduces utility, and frustrates consumers." *Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d 1318, 1335 (Fed. Cir. 2010). Indeed, "Congress has recognized those procompetitive features and has directed that the activities of a 'standards development organization while engaged in a standards development activity' is subject to the rule of reason." *Id.* (quoting Standards Development Organization Advancement Act of 2004, codified at 15 U.S.C. § 4302).[7]

Accordingly, even if Defendants are correct that that their concerted efforts are directed only at defining standards for identifying misinformation, and applying such standards in flagging misinformation for each other, such joint activities are correctly subject to Section 1 scrutiny for potential anticompetitive effects when such effects are adequately pleaded. This analysis can account for impacts on the content, diversity, and quality of news wherever they are dimensions of competition that impact consumer welfare in the relevant markets.

---

[7] Congress also provided for rule-of-reason analysis for research joint ventures in 15 U.S.C. § 4302, originally passed as the National Cooperative Research Production Act of 1993. In passing these provisions, Congress recognized that the conduct of standards-development organizations (and research joint ventures) "might give rise to legitimate antitrust concerns," H.R. Rep. No. 125, 108th Cong., 1st Sess. 3-7 (2003).

## CONCLUSION

The United States asks the Court to apply the legal framework described in this Statement of Interest as helpful in resolving the motion to dismiss.

Respectfully submitted,

ABIGAIL A. SLATER
*Assistant Attorney General*

ROGER P. ALFORD
*Principal Deputy Assistant Attorney General*

MARK H. HAMER
DINA KALLAY
WILLIAM RINNER
*Deputy Assistant Attorneys General*

DAVID B. LAWRENCE
DANIEL E. HAAR
*Attorneys, Antitrust Division*

Dated: July 11, 2025

/s/ *Daniel E. Haar*
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530
Telephone: (202) 598-2846
Email: daniel.haar@usdoj.gov

*Counsel for the United States of America*

16

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document, which was filed with the Court through the

CM/ECF system, will be sent electronically to all registered participants.


Dated: July 11, 2025                    Respectfully submitted,

                                        /s/ *Daniel E. Haar*
                                        DANIEL E. HAAR