**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**CHILDREN'S HEALTH DEFENSE, TRIALSITE, INC., CREATIVE DESTRUCTION MEDIA, LLC, ERIN ELIZABETH FINN, JIM HOFT, DR. BEN TAPPER, BEN SWANN, DR. JOSEPH MERCOLA, TY BOLLINGER, CHARLENE BOLLINGER & JEFF CROUERE,**

***Plaintiffs*,**

v.

**WP COMPANY, LLC D/B/A THE WASHINGTON POST, THE BRITISH BROADCASTING CORP., THE ASSOCIATED PRESS & REUTERS NEWS & MEDIA, INC.,**

***Defendants.***

---

**CIVIL ACTION NO. 23-cv-2735 (TJK)**

**PLAINTIFFS' RESPONSE TO THE GOVERNMENT'S STATEMENT OF INTEREST AND TO DEFENDANTS' RESPONSE THERETO**

**PLAINTIFFS' RESPONSE TO THE GOVERNMENT'S STATEMENT OF INTEREST AND TO DEFENDANTS' RESPONSE THERETO**

# TABLE OF AUTHORITIES

**Cases**

*Associated Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983) 7
*Associated Press v. United States*, 326 U.S. 1 (1945) 1, 2, 7
*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) 7
*Clark v. Library of Congress*, 750 F.2d 89 (D.C. Cir. 1984) 5
*Coughlin v. Capitol Cement Co.*, 571 F.2d 290 (5th Cir. 1978) 6
*Freedom Watch, Inc. v. Google, Inc.*, 368 F. Supp. 3d 30 (D.D.C. 2019), *aff'd*, 816 F. App'x 497 (D.C. Cir. 2020) 6
*Gelboim v. Bank of Am. Corp.*, 823 F.3d 759 (2d Cir. 2016) 6, 8
*Golden Bridge Tech., Inc. v. Nokia, Inc.*, 416 F. Supp. 2d 525 (E.D. Tex. 2006) 9
*In re Rail Freight Fuel Surcharge Antitrust Litig.*, 587 F. Supp. 2d 27 (D.D.C. 2008) 6
*In re Vitamins Antitrust Litig.*, No. 99-197, 2000 U.S. Dist. LEXIS 7397 (D.D.C. May 9, 2000) 8
*Karnoski v. Trump*, No. 18-51013, 2018 U.S. Dist. LEXIS 160748 (E.D. Mich. Sept. 20, 2018) 10
*Maryland v. United States*, 460 U.S. 1001 (1983) 2
*Mayor & Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129 (2d Cir. 2013) 5
*Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284 (1985) 6
*NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128 (1998) 8
*Ohio v. Am. Express Co.*, 585 U.S. 529 (2018) 8, 9
*Oxbow Carbon & Minerals LLC v. Union Pac. R.R.*, 81 F. Supp. 3d 1 (D.D.C. 2015) 8
*PLS.COM, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824 (9th Cir. 2022) 7
*Smith v. Pro Football, Inc.*, 593 F.2d 1173 (D.C. Cir. 1978) 6
*Taylor v. Gural*, No. 23-4882, 2025 U.S. Dist. LEXIS 35837 (E.D. Pa. Feb. 27, 2025) 7
*United States ex rel. Lynch v. Univ. of Cincinnati Med. Ctr., LLC*, No. 1:18-cv-587, 2020 U.S. Dist. LEXIS 48214 (S.D. Ohio Mar. 20, 2020) 10
*United States v. AT&T Co.*, 552 F. Supp. 131 (D.D.C. 1982) 2
*United States v. Container Corp.*, 393 U.S. 333 (1969) 3
*W. Penn Allegheny Health Sys. v. UPMC*, 627 F.3d 85 (3d Cir. 2010) 5

**Statutes**

28 U.S.C. § 517 10


# TABLE OF CONTENTS

I. Defendants do not and cannot refute the Government's recognition of *Associated Press* as controlling authority…………………………………. 2

II. Plaintiffs have unquestionably alleged an unlawful agreement…………… 3

III. Defendants cannot hide behind the platforms…………………………….. 7

IV. Plaintiffs have pleaded harm to competition………………………………. 8

V. Plaintiffs have stated a valid rule-of-reason claim………………………… 9

VI. Defendants' claim that the Government's Statement is untimely is itself untimely and fails to acknowledge the numerous cases holding that no time limitation applies to such statements…………………………. 9

Conclusion………………………………………………………………… 10

**PLAINTIFFS' RESPONSE TO THE GOVERNMENT'S STATEMENT OF INTEREST AND TO DEFENDANTS' RESPONSE THERETO**

In 2020, the Defendants in this case—the BBC, the Washington Post, the Associated Press, and Reuters—joined together with the world's dominant social media companies, including Facebook, Google, and (as it was then called) Twitter, to form a self-described "groundbreaking" "industry partnership" they named the "Trusted News Initiative" ("TNI"). The TNI was indeed groundbreaking: it was a worldwide news censorship cartel, the likes of which had never been seen before. The TNI's news organization members, including Defendants, would identify certain reporting they did not want published online—reporting that contradicted and competed with their own, especially on the subjects of COVID and U.S. elections—and the TNI's big tech members would then block such reporting from their platforms.

Plaintiffs, who are small online news publishers devastated by TNI censorship, brought this suit in May, 2023 because such an "industry partnership" is a blatant antitrust violation. The case is currently pending before this Court on Defendants' motion to dismiss. On July 11, 2025, the United States filed a Statement of Interest (ECF No. 123) opposing Defendants' argument that "suppressing competition in the marketplace of ideas . . . is not a cognizable antitrust injury." (Def. Br. on Mot. to Dismiss (ECF No. 41-1) at 22.) As the Government correctly and trenchantly says, "Defendants' proposed rule of law exempting viewpoint collusion from the antitrust laws would free major news organizations and dominant digital platforms to block competitive threats that offer alternative, competing viewpoints." (ECF No. 123 at 2.) That is exactly what happened here.

On August 13, Defendants filed a response to the Government's Statement (ECF No. 126 (hereafter "Def. Resp.")) but offered no solution to this demolition of their key argument. Unable

to credibly rebut the Government's Statement, Defendants for the most part rehash erroneous claims they have made in past briefs. Plaintiffs now respectfully submit their response.

## I. Defendants do not and cannot refute the Government's recognition of *Associated Press* as controlling authority.

As the Government recognizes throughout its Statement, *Associated Press v. United States*, 326 U.S. 1 (1945), controls this case. (*See* ECF No. 123 at 5-6, 9, 12-13.) In *Associated Press*, the Supreme Court held that news organizations violate the Sherman Act when they "combine to keep others from publishing" reporting that rival news organizations want to publish. 326 U.S. at 20. Because that is exactly what occurred here, Defendants' effort to distinguish *Associated Press* is understandable but unavailing.

According to Defendants, *Associated Press* is not "relevant here" because it merely "held that the First Amendment did not immunize Sherman Act violations," and "Defendants have not invoked a First Amendment defense." (Def. Resp. at 9-10.) But *Associated Press* did not merely hold that the First Amendment offered no immunity for Sherman Act violations. It specifically held: (1) that the Sherman Act is violated when some newspapers "combine to keep others from publishing"; and (2) that the First Amendment provided "powerful" support for that conclusion. *See* 326 U.S. at 20 ("The First Amendment, far from providing an argument against application of the Sherman Act, here ***provides powerful reasons to the contrary***.") (emphasis added).

This was because, as the Court held, the First Amendment's foundational principle—that "the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public"—is also enshrined in the Sherman Act. *Id*. Thus in antitrust cases involving the news industry, courts "must take into account" the "First Amendment principle of diversity in dissemination of information . . . because, as the Supreme Court has recognized, in promoting diversity in sources of information, the values underlying

the First Amendment coincide with the policy of the antitrust laws." *United States v. AT&T Co.*, 552 F. Supp. 131, 184 (D.D.C. 1982), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983).

And not only did Defendants in this case "combine to keep others from publishing." They did so, in their own words, because they saw and feared "competition" from rival, nontraditional online publishers. As a senior BBC executive admitted at a 2022 TNI gathering:

> ***Of course the members of the Trusted News Initiative are*** . . . ***rivals***. But . . . it's important that trusted news providers ***club together***. Because actually the ***real rivalry*** now is not between for example the BBC and CNN globally, ***it's actually between all trusted news providers and a tidal wave of unchecked [reporting] that's being piped out mainly through digital platforms*** . . . That's the ***real competition*** now in the digital media world . . . the ***existential threat*** . . . . So actually we've got ***a lot more to hold us together than we have to work in competition with one another***.

(Compl. (ECF No. 1) 19 (emphasis added)). This is a stunning, smoking-gun confession of an anti-competitive agreement among horizontal competitors: though admitted "rivals" with one another, Defendants "club[bed] together" to attack the "existential threat" to their businesses posed by small, upstart online news publishers like Plaintiffs, who are their "real competition." There could be no clearer violation of the antitrust laws.

## II. Plaintiffs have unquestionably alleged an unlawful agreement.

Reprising earlier contentions, Defendants assert that Plaintiffs have not alleged that Defendants "reached an agreement with the Platforms" to suppress rival reporting. (Def. Resp. at 3, 4.) As the Government correctly points out, even if this assertion were true—which, as will be shown in a moment, it is not—the Complaint would for two reasons still state a valid claim entitling Plaintiffs to discovery.

First, even if the TNI were only an information-sharing agreement (Defendants' *post hoc* contention), the Government rightly states that "reciprocal information exchange among

competitors is 'concerted action [that] is of course sufficient to establish the combination or conspiracy, the initial ingredient of a violation of § 1 of the Sherman Act.'" (ECF No. 123 at 9 (quoting *United States v. Container Corp.*, 393 U.S. 333, 335 (1969)).) Second, even if the TNI had only been an agreement among Defendants themselves not to publish certain viewpoints or reporting, that would be an agreement among horizontal competitors "to limit or fix the features included in the products that they sell," and "[t]he Sherman Act views such agreements with great skepticism." (ECF No. 123 at 11.)

In any event, Defendants' assertion—that Plaintiffs have not alleged an agreement with the platforms to block TNI-identified "misinformation"—is demonstrably false. The Complaint specifically alleges such an agreement:

> [The TNI's] members have agreed not only to share alerts, but to collaborate in deciding which (frequently accurate) reporting counts as "misinformation" and to take agreed-upon action against such reporting, including (in the case of the TNI's Big Tech Platform Members) by blocking and/or shadow-banning such reporting.

(Compl. 294.) Indeed, the Complaint alleges (and documents) numerous TNI ***admissions*** that the TNI's members, including its "tech organisation" members, agreed not merely to share information but to "take action" and "do everything we can, working together," to "stop the spread" of news the TNI deemed "disinformation":

- On September 7, 2019, the TNI issued a statement through the BBC announcing that it was conducting "'fire drills' before we roll out the ***agreed actions***." (*Id.* 295.)
- On March 27, 2020, the TNI issued another announcement through the BBC, stating the TNI had commenced operations, that the TNI's "***collaboration of major news and tech organisations*** will ***work together*** to rapidly identify ***and stop the spread*** of harmful . . . disinformation," and that the TNI's members—*i.e.*, both its legacy news members and its Big Tech members—were doing "***everything we can, working together, to stop***

***disinformation . . . in its tracks***."[1]

- In September 2021, Jessica Cecil, former head of the TNI, stated that "***all participants [in the TNI] signed up to a clear set of expectations of how to act***," collectively decided what counted as misinformation, and "***decided what to do about it***." The TNI, said Cecil, "tightly defines what ***cooperation and action*** looked like," and "without that core specificity the TNI would never have got off the ground." (*Id*. ¶¶ 273-74, 295.)
- Cecil has also stated that the TNI is an: "***agreed*** statement of what constitutes the most harmful disinformation, and ***we agreed to act***" on such supposed "disinformation." (ECF 41-2 at 7.) In distinguishing the TNI from Facebook's oversight board, which "deals with" censorship decisions on "one platform," Ms. Cecil added, "clearly what I've been talking about is ***cooperation across platforms as well***." (Compl. 295.)
- The TNI's own "mission" statement describes the TNI as bringing together "***major news organisations and tech platforms to work together***, at speed and in a fast-changing digital landscape, to . . . ***take action against the most harmful disinformation***."[2]

A "defendant's admission" is "direct evidence," *Clark v. Library of Congress*, 750 F.2d 89, 101 (D.C. Cir. 1984), and where (as here) there are "non-conclusory allegations of direct evidence of an agreement, a court need go no further on the question of whether an agreement has been adequately pled." *W. Penn Allegheny Health Sys. v. UPMC*, 627 F.3d 85, 99 (3d Cir. 2010); *see, e.g.*, *Mayor & Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013) ("'Allegations of direct evidence of an agreement . . . are independently adequate' under *Twombly*") (citation omitted).

Without even acknowledging the TNI's many public admissions of concerted conduct,

---

[1] BBC, *Trusted News Initiative Announces Plans to Tackle Harmful Coronavirus Disinformation* (Mar. 27, 2020), https://www.bbc.co.uk/mediacentre/latestnews/2020/coronavirus-trusted-news. *See Hernandez v. Wells Fargo & Co.*, No. C 18-07354, 2019 U.S. Dist. LEXIS 114817, at *14-15 (N.D. Cal. July 10, 2019) ("party admissions may be judicially noticed for the truth of the matter if requested by the opposing party"). (*See also* Compl. 263 (similar TNI announcement).)

[2] BBC, Trusted News Initiative, https://www.bbc.co.uk/beyondfakenews/trusted-news-initiative/about-us ("Trusted News Initiative Mission").

Defendants assert that the Complaint does "not ***exclude the possibility*** of parallel conduct as opposed to joint action" on the part of the platforms. Def. Resp. at 3, 4 (emphasis added). But it is hornbook antitrust law that on a motion to dismiss, "the plaintiff need not show that its allegations . . . rule out the possibility of independent action." *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781 (2d Cir. 2016). A "complaint 'need not be dismissed where it does not exclude the possibility of independent business action.'" *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 587 F. Supp. 2d 27, 37 (D.D.C. 2008) (citation omitted).[3]

In any event, the platform companies publicly admitted they were "***working closely together***" to "***jointly***" combat reporting deemed to be "misinformation." (Compl. 264 (emphasis added).) Indeed, the TNI's own self-description—that the TNI is a "***collaboration of major news and tech organisations*** . . . ***work[ing] together*** to rapidly identify ***and stop the spread*** of" TNI-identified "disinformation"[4]—boasts of exactly the agreement Plaintiffs allege: that the TNI's "tech organisations" would block reporting deemed "disinformation" by the news organizations (i.e., Defendants).

Accordingly, Plaintiffs have plainly stated a per se group boycott claim. A "classic" group boycott involves "joint efforts" by horizontal competitors "to disadvantage [other] competitors by … persuading … suppliers" to "cut off access to a supply, facility, or market necessary to enable the boycotted firm to compete." *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 294 (1985). Or as the D.C. Circuit puts it:

> The classic "group boycott" is a concerted attempt by a group of competitors at one level to protect themselves from competition from non-group members who

---

[3] *Freedom Watch, Inc. v. Google, Inc.*, 368 F. Supp. 3d 30 (D.D.C. 2019), *aff'd*, 816 F. App'x 497 (D.C. Cir. 2020), cited by Defendants, is inapposite. Plaintiff there alleged ***only*** parallel conduct. Here, there is direct evidence of agreement. Nor were Plaintiffs required to allege a knowing agreement to act "unlawfully." *See, e.g.*, *Coughlin v. Capitol Cement Co.*, 571 F.2d 290, 302 (5th Cir. 1978) ("the Sherman Act does not require any specific intent to violate the law").

[4] *See supra* note 1.

> seek to compete at that level. Typically, the boycotting group combines to deprive would-be competitors of a trade relationship which they need in order to enter (or survive in) the level wherein the group operates. The group may accomplish its exclusionary purpose by inducing suppliers not to sell to potential competitors. . . .

*Smith v. Pro Football, Inc.*, 593 F.2d 1173, 1178 (D.C. Cir. 1978), *quoted approvingly in, e.g.*, *PLS.COM, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 834 (9th Cir. 2022).

Taking Plaintiffs' allegations as true (as the Court must here), Defendants' conduct exactly tracks these criteria: the TNI is a "concerted attempt by a group of competitors" (i.e., Defendants, who are all rival news publishers) "to protect themselves from competition from non-group members" (such as Plaintiffs) "by inducing suppliers" (the TNI's big tech members) to keep rival reporting off the country's largest social media platforms, thereby "cut[ting] off access to a supply, facility, or market necessary to enable the boycotted firm[s] to compete."[5]

Thus, whether the TNI is viewed as a classic group boycott or (as the Government points out) as an agreement among Defendants to share information and exclude certain viewpoints from their own publications, the notion that Plaintiffs have not pleaded an agreement in violation of the Sherman Act is frivolous. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (to state Sherman Act claim, complaint need only contain "enough factual matter (taken as true) to ***suggest*** that an agreement was made") (emphasis added); *Taylor v. Gural*, No. 23-4882, 2025 U.S. Dist. LEXIS 35837, at *65-68 (E.D. Pa. Feb. 27, 2025) (finding group boycott claim stated on basis of direct evidence—a single ambiguous email—far less substantial than allegations here).

---

[5] When small online news publishers like Plaintiffs are cut off from the TNI big tech members' platforms, they typically lose 90% or more of their audience. (Compl. 234.) Defendants claim that Plaintiffs retain some access to social media platforms. Def. Resp. at 3. This claim not only asserts facts outside the pleadings, but misrepresents both the facts (*see* Compl. 11 & n.1) and the law. *See PLS.COM*, 32 F.4th at 835-36, 840-41 (group boycott claim stated even if boycotters "do not completely cut off the competitor's access to inputs it needs" and even if rivals are not "driven from the market").

## III. Defendants cannot hide behind the platforms.

Although irrelevant to the Government's Statement, Defendants renew their claim that the Complaint fails to plead that Plaintiffs' injuries were "caused by . . . the Defendants, as opposed to the Platforms," and "fails to allege that each individual defendant engaged in any unlawful conduct." Def. Supp. (ECF No. 95) at 7, 15; Def. Resp. at 5-6. These claims contradict settled law:

> [D]efendants' contention that plaintiffs must specifically allege acts committed by each defendant to show its involvement in the conspiracy is baseless. An overt act need not be pleaded against each defendant, because a single overt act by just one of the conspirators is enough to sustain a conspiracy claim even on the merits.

*In re Vitamins Antitrust Litig.*, No. 99-197, 2000 U.S. Dist. LEXIS 7397, at *53 (D.D.C. May 9, 2000). Defendants are all, by their own admission, "core partners" in the TNI (Compl. 305) and hence are jointly and severally liable for all injuries caused by other TNI members. *See, e.g.*, *Oxbow Carbon & Minerals LLC v. Union Pac. R.R.*, 81 F. Supp. 3d 1, 7 (D.D.C. 2015) (antitrust conspirators "are jointly and severally liable under Section 1 for any injury suffered by plaintiffs," and plaintiffs need not plead that each defendant caused injury).

## IV. Plaintiffs have pleaded harm to competition.

Defendants claim, inexplicably, that Plaintiffs fail to allege "harm to competition." (Def. Resp. at 6.) But Plaintiffs' core allegation is that Defendants' group boycott deliberately and successfully "***reduced output***" in the relevant online news markets. (Compl. 552 (emphasis added).) "[R]educed output" is "[d]irect evidence of anticompetitive effects," constituting "'proof of actual detrimental effects [on competition].'" *Ohio v. Am. Express Co.*, 585 U.S. 529, 552 (2018). That's why classic group boycotts are per se illegal—because they always seek to reduce output and thus always harm competition. *See NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 134-35 (1998) (where group boycott alleged, Defendants cannot "claim that only one small

firm, not competition itself, ha[s] suffered injury").[6] Moreover, as the Government points out, the suppression or elimination of "viewpoint competition in news markets" is itself a harm to competition cognizable under the Sherman Act. (ECF. No. 123 at 1-2.)

**V. Plaintiffs have stated a valid rule-of-reason claim.**

Again reprising prior arguments rather than addressing the Government's Statement, Defendants assert that the "Complaint fails to plead a rule of reason violation because it does not plausibly plead concerted activity, adequately define a cognizable relevant market, or otherwise plead facts establishing that Defendants have market power in such a market and thus does not sufficiently allege anticompetitive effects." (Def. Resp. at 9.) This sentence is a tissue of errors.

As shown earlier, Plaintiffs have not only pleaded concerted activity, but have quoted repeated statements by Defendants ***admitting*** their concerted activity. Moreover, the Complaint carefully defines the relevant markets, including "the U.S. online market for COVID news," "the U.S. online market for political news," and zero-price offerings within these online news markets.[7] The Complaint also specifically alleges that the TNI's big tech members possess but near-***monopoly*** power in the search engine and social media markets,[8] allowing the TNI to crush small online news publishers (such as Plaintiffs) who seek to publish TNI-censored reporting. And as stated above, Plaintiffs' plausible allegation of "reduced output" properly pleads harm to competition. *See, e.g.*, *Ohio v. Am. Express Co.*, 585 U.S. at 552.

---

[6] In any event, "allegations pleading harm to competition are not required to withstand a motion to dismiss when the conduct challenged is a *per se* violation." *Gelboim*, 823 F.3d at 775.

[7] *See* Compl. ¶¶ 136-77, 249-57. Plaintiffs' careful market definitions are far more detailed than market definitions deemed sufficient in similar cases. *See, e.g.*, *Golden Bridge Tech., Inc. v. Nokia, Inc.*, 416 F. Supp. 2d 525, 527, 533 (E.D. Tex. 2006) (for purposes of group boycott claim, "worldwide" market in "cellular communication technology" "was a sufficient definition of the relevant market to overcome a 12(b)(6) motion to dismiss for failure to state a claim").

[8] *See* Compl. ¶¶ 220, 230-36 (alleging that Google's YouTube has "a market share of over 75% in the Internet video-hosting market," "Facebook has a market share of close to 100% in the online social networking market," "Google's search engine has a market share of over 90% [in] the online search market," and that Google and Facebook are dominant news aggregators).

**VI. Defendants' claim that the Government's Statement is untimely is itself untimely and fails to acknowledge the numerous cases holding that no time limitation applies to such statements.**

Two weeks before filing, the Government notified all parties of its intention to do so. (ECF No. 122.) If Defendants wished to object that such a Statement was untimely, that was the time to do so. Instead, Defendants waited to see whom the Government would support. Now that Defendants perceive the Government's view of the law to support Plaintiffs' position, Defendants argue untimeliness. That argument should not be heard.

In any event, Defendants fail to mention the many cases holding that the statute authorizing such statements, 28 U.S.C. § 517, "does not contain a time limitation for such a filing, and it does not require the United States to obtain the Court's leave." *United States ex rel. Lynch v. Univ. of Cincinnati Med. Ctr., LLC*, No. 1:18-cv-587, 2020 U.S. Dist. LEXIS 48214, at *9 (S.D. Ohio Mar. 20, 2020); *see, e.g.*, *Karnoski v. Trump*, No. 18-51013, 2018 U.S. Dist. LEXIS 160748, at *4 (E.D. Mich. Sept. 20, 2018) (same) (citing numerous cases). District courts "have interpreted 28 U.S.C. § 517 broadly and typically deny motions to strike" DOJ Statements of Interest. *Id*. Defendants cite a few exceptional cases in which district courts declined to consider Statements of Interest (Def. Resp. at 1-2), but here, where an initial motion on the pleadings has not been decided, where Defendants identify no prejudice whatsoever, and where the Government's filing effects no disruption of any kind, there can be no valid timeliness objection.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court (i) to consider the Government's Statement of Interest, and (ii) either immediately to deny Defendants' motion to dismiss or promptly to schedule oral argument on that motion.

Dated: August 27, 2025

Respectfully submitted,

_/s/__*Kim E. Richman* ___________
KIM E. RICHMAN (DC 1022978)
RICHMAN LAW & POLICY
1 Bridge Street, Suite 83
Irvington, NY 10533
Tel.: (212) 687-8291
krichman@richmanlawpolicy.com

JED RUBENFELD (NY 2214104)
*pro hac vice*
127 Wall St.
New Haven, CT 06511
Tel.: (203) 432-7631
jed.rubenfeld@yale.edu

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

This is to certify that on August 27, 2025, a true and correct copy of the above and foregoing was filed with the Clerk of Court using the CM/ECF system, which automatically sends an electronic notification to all attorneys of record.

Dated: August 27, 2025 By:___*/s/_Kim E. Richman*__________________